## UNITED STATES DISTRICT COURT
## DISTRICT OF THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Open Communities Alliance,<br>    75 Charter Oak Avenue, Suite 1-210,<br>    Hartford, CT 06106,<br><br>Crystal Carter,<br>    47 Gilman Street,<br>    Hartford, CT 06114,<br><br>and<br><br>Tiara Moore,<br>    5841 W. Ohio Street,<br>    Chicago, IL 60644,<br><br>                 Plaintiffs,<br><br>     v.<br><br>Ben Carson, Secretary of Housing and Urban<br>Development, in his official capacity,<br>    451 7th Street SW,<br>    Washington, DC 20410,<br><br>and<br><br>U.S. Department of Housing and Urban<br>Development,<br>    451 7th Street SW,<br>    Washington, DC 20410,<br><br>              Defendants. | Civ. Action No. _____<br><br>**COMPLAINT** |

## INTRODUCTION

1.      This suit challenges the decision of the U.S. Department of Housing and Urban Development (HUD) to abruptly and unlawfully suspend implementation of its own promulgated rule, the Small Area Fair Market Rent Rule (Small Area FMR Rule). The rule provides that, as of January 1, 2018, tens of thousands of low-income families who participate in the Housing

Choice Voucher (HCV) program—families who disproportionally are African-American, Latino, and other racial minorities—can use their housing vouchers to move from poor and racially segregated communities to areas that provide greater opportunity in education, jobs, and more. In doing so, the Small Area FMR Rule aligns the federal government's primary rent subsidy program with HUD's statutory mandates to ensure fair housing and avoid contributing to concentrated poverty.

2.      HUD has announced that it is suspending this important rule, depriving thousands of families of housing choices, without following notice-and-comment requirements or providing adequate reasons. Plaintiffs—two HCV voucher holders who want to move to areas of greater opportunity but are being blocked by HUD's action from doing so, along with an organization whose mission to foster such mobility is being frustrated—bring this action under the Administrative Procedure Act (APA) to require HUD to implement the Small Area FMR Rule on schedule.

3.      The HCV program—formerly known as the Section 8 voucher program—provides a housing subsidy to more than two million households nationwide, enabling them to secure affordable, decent-quality housing in the private market. A participating household generally pays 30 percent of its monthly income towards rent. An HCV voucher covers the remainder of the total rent amount (including utilities), so long as the rent does not exceed an amount based primarily on what HUD determines is the "fair market rent," or FMR, for a comparable dwelling in the area. By subsidizing housing through these vouchers, rather than through public housing projects, the HCV program aims to provide low-income families greater geographic choice in housing. A primary objective of the HCV program is to permit low-income families to settle throughout metropolitan areas, thereby avoiding the high concentrations of

poverty and racial segregation that have been linked to significant adverse health, educational, and economic outcomes for children and adults.

4.       In operation, however, the HCV program has not provided this meaningful choice to participating families, in large part because of how HUD calculates a voucher's worth. HUD historically has calculated FMRs based on the average rent for entire metropolitan regions, without regard for the stark differences in housing costs from neighborhood to neighborhood within such regions. In low-rent (and low-opportunity) neighborhoods, these crudely calculated FMRs exceed what the market would bear, providing some landlords with a substantial windfall at taxpayer expense. Conversely, those same FMRs are too low for HCV households to use their vouchers in higher-rent neighborhoods with better schools, employment options, transportation, and other opportunities.

5.       The Small Area FMR Rule, which HUD adopted in 2016 after years of community input and careful study and analysis, is a major step toward correcting this problem. The rule requires the public housing agencies (PHAs) that administer the HCV program locally to set voucher values in 24 metropolitan areas based on the prevailing private market rents for each distinct zip code within those regions. This revised methodology recognizes the existence of very different local rental markets within each metropolitan area and calibrates vouchers more finely to the amount needed to live in various neighborhoods. It thus enables voucher holders to access a wider range of housing, outside of voucher-concentrated, racially-segregated areas.

6.       The experiences of Plaintiffs Crystal Carter and Tiara Moore illustrate how the Small Area FMR Rule transforms the FMR methodology from one that contributes to racial segregation and concentrated poverty to one that helps combat it. Ms. Carter and Ms. Moore are African-American women who want to use their HCV vouchers to move their families from poor

areas of Hartford and Chicago, respectively, to the higher-rent (and predominantly white) suburbs outside those cities. They have been stymied from doing so by voucher rates too low to secure housing where they want to live. That situation is due to change on January 1, 2018, pursuant to the Small Area FMR Rule.

7.      For example, Ms. Moore's voucher currently allows her to rent a two-bedroom apartment for about $1,200 per month anywhere in the greater Chicago area. That amount proved inadequate when she searched for such an apartment in DuPage County, just outside the City of Chicago. Under the Small Area FMR Rule, her voucher would be worth as much as $1,770 per month for a two-bedroom apartment in DuPage County, allowing her to rent in this more expensive housing market.

8.      On August 11, 2017, HUD abruptly announced that it would not require PHAs to implement the Small Area FMR Rule's requirements in 23 of the 24 metropolitan areas subject to the rule. The only area where the Small Area FMR Rule was not suspended was Dallas, where HUD implemented small area FMRs pursuant to a fair housing settlement. Each of the 23 areas affected by HUD's suspension of the small area FMR requirements encompasses multiple PHAs, with approximately 175 PHAs in all.

9.      HUD announced it would suspend the requirement for two years (until January 1, 2020). It said it would entertain applications from PHAs wanting to use small area FMRs voluntarily in the meantime, but also made clear that it would not be assisting PHAs in implementing small area FMRs and indicated that PHAs would be unwise to do so. Because very few PHAs will implement small area FMRs voluntarily under these circumstances, HUD effectively has suspended the rule altogether. HUD made no attempt to follow notice-and-comment procedure in suspending a rule that will provide housing choice to thousands of low-

income families; instead, it acted by writing letters to the PHAs and posting a notice on its website.

10.     There is no legal basis for HUD's suspension of the rule. The APA does not permit it to suspend a promulgated rule without notice-and-comment procedure. HUD purports to invoke a provision in the rule that authorizes a temporary suspension in a specific area because of area-specific and unforeseen "events," such as a natural disaster. This provision does not authorize a wholesale suspension of the Small Area FMR Rule's start date, and HUD pointed to no unforeseen "event" that would justify its invocation.

11.     Nor are HUD's stated justifications well-reasoned. HUD has pointed to (1) its own supposed failure to take preliminary steps towards implementation, which it contends left PHAs unprepared to implement small area FMRs; (2) a purported need to study the small area FMR issue yet further; and (3) comments filed in a rulemaking not devoted to small area FMRs that made arguments HUD already considered and rejected in promulgating the rule. None of these reasons can support HUD's suspension of a duly promulgated rule.

12.     HUD adopted the Small Area FMR Rule only after studying the issue for years, testing the use of small area FMRs in demonstration projects that spanned several jurisdictions, and conducting a lengthy rulemaking process that included multiple rounds of comments. And even after HUD published the final rule on November 16, 2016, it did not require PHAs in the 23 affected jurisdictions to begin using small area FMRs until January 1, 2018, thus building in sufficient time for PHAs to prepare for implementation. There is no evidence that further delay will accomplish anything but depriving voucher holders like Ms. Carter and Ms. Moore of long-overdue choice in housing.

13.     HUD also has claimed that its decision was based on a recently released study of the PHAs that are implementing small area FMRs as a demonstration project. That study does not, however, contain any information that undermines HUD's conclusions when promulgating the rule or otherwise justifies suspending the rule. Rather, the demonstration project report indicates that small area FMRs, as intended, result in more families using vouchers in high opportunity areas.

14.     HUD's suspension of the Small Area FMR Rule will disproportionately hurt non-white families, who make up the majority of HCV voucher holders in most of the affected areas. In these areas, because of crudely calculated FMRs, the HCV voucher program has perpetuated, rather than ameliorated, racial segregation and concentrations of residential poverty. HCV families have for too long been effectively excluded from richer, whiter areas and consigned to poor, racially segregated neighborhoods, contrary to the Fair Housing Act's mandate.

15.     In taking the actions described herein, HUD is violating the APA in multiple ways, including by:

- suspending a deadline contained in its own promulgated rule without providing proper notice and opportunity to comment;

- purporting to suspend this regulatory requirement based on information that it had previously considered when promulgating the rule (and that, therefore, cannot constitute changed circumstances that support suspending the rule);

- improperly relying upon a narrow provision that authorizes a targeted suspension of the rule's requirements in a discrete area upon extraordinary circumstances as authority for a wholesale suspension of the rule; and

- violating the statutory mandates that underlie the Small Area FMR Rule, including HUD's duty to ensure that federal funds are spent in a way that affirmatively furthers fair housing rather than perpetuating racial segregation and its duty to ensure that the Section 8 program promotes economically mixed housing rather than concentrating poverty.

16.     HUD's unlawful decision to postpone the requirement that affected PHAs begin implementing the Small Area FMR Rule is causing irreparable harm to Plaintiffs and tens of thousands of other voucher families. HUD is failing to take preliminary steps to assist the PHAs in implementing small area FMRs on January 1, 2018. It also is inducing the PHAs themselves to stop preparing for implementation by telling them they will not be required to comply on that date. Each day in which HUD takes no preparatory action itself and discourages the PHAs from taking such action makes it harder to implement the rule on schedule, depriving voucher families of the choice of housing to which they are entitled.

17.     Plaintiffs seek preliminary and permanent injunctive relief requiring HUD to rescind its notice to PHAs that they will not be required to comply with the January 1, 2018 deadline and to take all other necessary steps to ensure that the timeline set forth in the Small Area FMR Rule is followed. The Small Area FMR Rule still can be implemented on time and in an orderly manner, but HUD will not do so without judicial intervention.

## PARTIES

18.     Plaintiff Open Communities Alliance (OCA) is a non-profit corporation headquartered in Hartford, Connecticut, one of the metropolitan areas affected by the Small Area FMR Rule. Its mission is to provide greater opportunities and more choices for people living in low-opportunity areas in Connecticut, including by furthering the ability of HCV voucher

holders and others to move to higher opportunity areas should they wish to do so. As described further below, its mission is being frustrated by HUD's decision to suspend the rule's mandatory implementation, and it is diverting resources to remedy that frustration of its mission as a result.

19.     Plaintiff Crystal Carter resides in Hartford, Connecticut, one of the areas where small area FMRs are scheduled to go into effect on January 1, 2018. She is an African-American woman who has sought to provide better opportunities for her children, including by using a regional school integration program to enroll them in a high-performing school district outside of Hartford. She lives in a four-bedroom apartment that she rents with the assistance of an HCV voucher. As described further below, she would like to use her voucher to secure housing in an area that would provide her family with better opportunities, but she is prevented from doing so by how HUD calculates FMRs.

20.     Plaintiff Tiara Moore resides in Chicago, Illinois, one of the areas where small area FMRs are scheduled to go into effect on January 1, 2018. She is an African-American woman who lives with her 11-month-old daughter. She has been issued a voucher and would like to use it to secure housing outside Chicago, in a place that would provide better opportunities for herself and her daughter. As described further below, she is prevented from doing so by how HUD calculates FMRs.

21.     Defendant U.S. Department of Housing and Urban Development (HUD) is an executive branch agency of the United States government. It is charged with administering a variety of federal housing programs, including the programs at issue in this Complaint.

22.     Defendant Ben Carson is sued in his official capacity as the Secretary of HUD.

## JURISDICTION AND VENUE

23.     This Court has jurisdiction over this matter under 28 U.S.C. § 1331 and 5 U.S.C. § 702.

24.     Venue is proper in this District under 28 U.S.C. § 1391(b) and 5 U.S.C. § 703 because the claims arose in the District, Defendants reside in this District, and a substantial part of the events giving rise to this action occurred in the District.

## FACTS

### Overview of the HCV Program and Fair Market Rents

25.     The Housing Choice Voucher program is the federal government's primary program for assisting very low-income families, the elderly, and people with disabilities in affording decent, safe, and sanitary housing in the private rental market. As the HCV program's name indicates, providing housing choice is its touchstone goal.

26.     The HCV program is part of the regulatory scheme colloquially known as "Section 8," which was established by the Housing and Community Development Act of 1974, Pub. L. No. 93-383, Title II, § 201(a), 88 Stat. 633, now codified at 42 U.S.C. § 1437f. Congress has amended the relevant laws several times, including in the Housing Community Development Act of 1987, Pub. L. No. 100-242, § 143, 101 Stat. 1815, 1850 (1988), codified as amended at 42 U.S.C. § 1437f(o). As required by Congress, HUD has promulgated an extensive regulatory framework governing the HCV program. *See* 24 C.F.R. § 888.111 *et seq.*; 24 C.F.R. § 982.1 *et seq.*

27.     Section 8 consists of the HCV program, a variety of project-based rental assistance programs, and other housing subsidy programs. It has two statutory purposes: (1)

"aiding low-income families in obtaining a decent place to live" and (2) "promoting economically mixed housing." 42 U.S.C. § 1437f(a).

28.     This second aim—of "promoting economically mixed housing"—makes the HCV program different from pre-1974 federal housing programs, which focused on funding the construction and maintenance of large public housing facilities. Under that previous regime, federal funds facilitated the concentration of large numbers of people living in extreme poverty, often in racially segregated conditions. *See Gautreaux v. Romney*, 448 F.2d 731, 739 (7th Cir. 1971) (concluding that, in funding racially segregated housing projects, HUD's "past actions constituted racially discriminatory conduct in their own right").

29.     In 1967, President Johnson commissioned the National Advisory Committee on Civil Disorders (generally known as the "Kerner Commission") to study the causes of recent urban unrest and recommend solutions. The Kerner Commission's report, released in February 1968, recommended, among other things, that "[f]ederal housing programs must be given a new thrust aimed at overcoming the prevailing patterns of racial segregation," and must be "[r]eorient[ed]" to "place more low and moderate income housing outside of ghetto areas." Report of the National Advisory Commission on Civil Disorders: Summary of Report, at 24 (1968), https://www.hsdl.org/?view&did=35837. Otherwise, it found, "those programs will continue to concentrate the most impoverished and dependent segments of the population into the central-city ghettos." *Id.*

30.     Congress first responded to the Kerner Commission's Report by passing the Fair Housing Act of 1968 (FHA), Title VIII of the Civil Rights Act of 1968, 42 U.S.C. § 3601 *et seq*. *See Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project*, 576 U.S. ___, 135 S. Ct. 2507, 2515-16, 2525-26 (2015). The FHA barred discrimination in housing on the basis of race.

It also imposed on HUD the "affirmative[]" obligation to ensure that federal housing programs further racial desegregation and the FHA's other purposes, rather than contributing to racial segregation and concentrations of poverty. 42 U.S.C. § 3608(e)(5). As HUD regulations confirm, this requirement to "affirmatively further fair housing" requires recipients of federal housing funds (including PHAs) to take "meaningful actions" to "overcome the legacy of segregation, unequal treatment, and historic lack of opportunity in housing." 24 C.F.R. § 5.152; *see also* Affirmatively Furthering Fair Housing, 80 Fed. Reg. 42,272 (Jul. 16, 2015).

31.     As HUD Secretary George Romney immediately recognized, this obligation to overcome the legacy of racial segregation requires the coordinated efforts of multiple jurisdictions and PHAs, to ensure that residents of segregated metropolitan areas are not blocked at a city's border by surrounding jurisdictions that want to keep them out. Secretary Romney stated: "[T]he impact of the concentration of the poor and minorities in the central city extends beyond the city boundaries to include the surrounding community. The City and the suburbs together make up what I call the 'real city.' To solve problems of the 'real city,' only metropolitan-wide solutions will do." *Gautreaux v. Chi. Hous. Auth.*, 503 F.2d 930, 937 (7th Cir. 1974) (quoting Statement by Secretary Romney, Appendix Z to HUD's Memorandum to the court).

32.     Then, in 1974, Congress revamped federal spending on low-income housing. It created the Section 8 program, which provides monthly rental subsidies to private owners who rent to people with low incomes, rather than housing those low-income people in government-owned property.

33.     The Section 8 program at first operated primarily through so-called "project based" funding, *i.e.*, contracting with building owners who offer reduced rents to low-income

households in exchange for subsidies. Over the years, it has been transformed such that the

primary form of Section 8 subsidy is a "tenant-based" program that uses vouchers to subsidize

rental payments tenants make to participating landlords. This program, now known as the

Housing Choice Voucher program, gives low-income households more options and, when

properly implemented, empowers them to move to places of greater opportunity. Congress and

HUD over the years have added and expanded features such as "portability"—pursuant to which

a voucher holder can move outside the jurisdiction of the PHA administering her voucher—in a

continuing effort to expand voucher holders' choices. As described below, however, those

choices have been unnecessarily and unreasonably constrained by how HUD has calculated the

amount that vouchers are worth.

<u>**HUD's Calculation of Fair Market Rents**</u>

34.     HUD oversees, implements, and regulates the HCV program. Among other

things, it provides federal funding to and regulates PHAs, which administer the program locally

by issuing vouchers to qualified individuals and families.

35.     Households participating in the HCV program use vouchers to secure housing in

the private rental market. Vouchers can be used for any housing that meets the program's

requirements (including housing quality and rent standards), subject to the PHA's approval.

36.     The voucher's value is based largely on HUD's determination of the "fair market

rent" for the size and type of dwelling in question (*e.g.*, two-bedroom home). The FMR

represents the amount of money that is required "to rent standard quality housing throughout the

geographic area in which rental housing units are in competition," including "the cost of utilities,

except telephone." 24 C.F.R. § 888.113(a). HUD generally sets the FMR for a unit size at what it

calls "the 40th percentile rent," *i.e.*, a dollar amount at which 40 percent of rentals for standard-

quality units of that size (excluding newly built units, public housing units, and sub-standard quality units) are for a lower amount. *Id.*

37.     HUD is required to annually calculate and publish FMRs for different unit sizes in each market area.[1] 42 U.S.C. § 1437f(c)(1)(B); 24 C.F.R. § 982.503(a)(1). These rates become effective on October 1 each year. 42 U.S.C. § 1437f(c)(1)(A). Any changes HUD proposes to make to the FMR calculation procedures must also be published in the Federal Register. 42 U.S.C. § 1437f(c)(1)(B).

38.     PHAs, in turn, must use those FMRs to establish "payment standards" for each unit type, effectively setting a cap on permissible "gross rent" (which includes utilities). A PHA may set its payment standards between 90 and 110 percent of the HUD-calculated fair market rents. 24 C.F.R. § 982.503(b). Absent a "small-area FMR" designation (discussed below), a PHA may vary payment standards within its market area—that is, it may set payment standards at 90 percent of the FMR in one neighborhood and at 110 percent in another—but it must honor the "basic range" established by HUD. 24 C.F.R. §§ 982.503(a)(3), (b)(2). In practice, few PHAs exercise this discretionary authority; most, instead, set a single payment standard for any type of dwelling within their market areas. A PHA may only set payment standards higher than 110 percent of the regional FMR (generally up to 120 percent) with documented need and explicit HUD approval.

39.     So long as a dwelling's actual gross rent is at or below the relevant payment standard, the participating household usually pays the landlord 30 percent of its monthly income

---

[1] In the past, HUD has published the fair market rents in the Federal Register. More recently, it has published a notice in the Federal Register alerting the public that updated FMRs are available on its website. FMRs for FY 2018—as well as previous years—can be found on HUD's website at https://www.huduser.gov/portal/datasets/fmr.html.

toward the rent, while the PHA pays the balance directly to the landlord. If, however, the actual

rent for the apartment exceeds the payment standard, the participating household is usually

responsible for the balance. *See* 24 C.F.R. § 982.1(a)(3). Participation in the HCV program is

limited to low-income households, so this additional payment responsibility makes unaffordable

to them dwellings where the actual rent substantially exceeds the payment standard.

40.     The proper functioning of the HCV program thus depends on HUD setting FMRs

that mirror as closely as possible the actual rents being charged in the relevant private markets.

### Problems with Fair Market Rents Based on Broad Metropolitan Areas

41.     In practice, HUD's FMRs have not accurately reflected the actual rents charged in

many neighborhoods within large metropolitan areas. That is because rents tend to vary widely

within such regions—particularly those that are highly segregated by race, such as Chicago,

Hartford, or Baltimore. Rents in more desirable, lower poverty (and, typically, whiter)

communities far exceed the regional average, while rents in poorer neighborhoods are much

lower. Without FMRs that account for these neighborhood differences, the practical result is that

HCV families are relegated to poor, racially segregated neighborhoods, unable to use their

vouchers to secure housing in higher opportunity areas.

42.     HUD has been aware of this simple truth for decades. Indeed, from the outset of

the Section 8 program, HUD has been criticized for failing to calculate accurate fair market rents

that would permit families receiving Section 8 subsidies to live in all parts of metropolitan areas.

43.     As early as 1977, a Comptroller General report to Congress noted that FMRs were

"too low for program success" and that the calculation of FMRs by metropolitan area "ignores

important distinctions between metropolitan central cities and suburban areas as well as among

suburban areas." Comptroller Gen. of the U.S., CED-77-19, Major Changes Are Needed in the

New Leased-Housing Program, at 16, 21 (1977), http://www.gao.gov/assets/120/113728.pdf.

The same point has been made many times since, yet until adoption of the Small Area FMR

Rule, HUD failed to address it adequately.

44.     HUD's long-time failure to modify the program to address these concerns has had

predictable results: a disproportionate number of HCV voucher holders end up living in areas of

concentrated poverty.

45.     In areas where HCV voucher holders disproportionately are racial minorities, this

concentration of voucher holders in high-poverty neighborhoods also contributes to racial

segregation. HUD's Small Area FMR Rule focuses on precisely those areas: in 21 of the 24

metropolitan areas covered by the rule, at least two-thirds of HCV users are non-white. In such

areas, African-American and Latino voucher holders are particularly likely to live in

neighborhoods that are poor as well as racially segregated.

46.     The greater Hartford area, home to plaintiffs OCA and Crystal Carter, illustrates

this well. In that area, 80 percent of HCV voucher holders are non-white (50 percent Latino, 30

percent African-American), compared with only 31 percent of the overall population. With

FMRs calculated for the entire area, this predominantly non-white population has been

concentrated in poor, racially segregated neighborhoods.

47.     As of 2016, 41 percent of voucher households in the greater Hartford area (the

Hartford-West Hartford-East Hartford, CT HUD Metro FMR Area) live in high-poverty

neighborhoods (census tracts with a poverty rate above 30 percent). By contrast, only 18 percent

of voucher households in the area live in low-poverty neighborhoods (census tracts with a

poverty rate below 10 percent). Sixty-seven percent of HCV households in the region live in

majority-minority neighborhoods.

48.     This concentration of voucher holders in the greater Hartford area in a few very poor areas—with many fewer voucher holders living in surrounding, low-poverty areas—is illustrated by the map below:



## Poverty Concentration Among Voucher Households in the Hartford Small Area FMR Region

1 dot = 50 voucher households

Neighborhood Poverty Rate

Less than 10%    10-19%    20-29%    30-39%    40% or more

Source: 2011-2015 American Community Survey and 2016 HUD administrative data

49.     Similarly, the racial concentration map below illustrates the concentration of

Hartford-area voucher holders—who are themselves almost all non-white—in the small number

of neighborhoods in the region that are predominantly non-white:



## Racial Concentration Among Voucher Households in the Hartford Small Area FMR Region

1 dot = 50 voucher households

Neighborhood Non-White Population

Less than 50%     50% or more

Source: 2011-2015 American Community Survey and 2016 HUD administrative data

50.     The Hartford area is representative of how HCV voucher holders in the areas

affected by the Small Area FMR Rule are concentrated in poor, racially segregated

neighborhoods. To cite one more example, in the greater Atlanta area (Atlanta-Sandy Springs-Roswell, GA HUD Metro FMR Area), 96 percent of HCV voucher holders are non-white (92 percent African-American), compared with only 51 percent of the overall population. Eighty-eight percent of these HCV households in the region live in majority-minority neighborhoods, while 43 percent live in high-poverty neighborhoods. Just 8 percent of HCV households in the greater Atlanta area live in low-poverty areas.

51.    This concentration of predominantly minority voucher holders in low-income neighborhoods has lifelong negative consequences for those voucher holders and their children.[2] Studies have found a link between neighborhood poverty and children's emotional health, cognitive development, and educational achievement.[3] Neighborhood location can also affect adults' access to jobs, transportation, food, and other basic goods and services.[4]

52.    Conversely, providing voucher holders the opportunity to move to high opportunity neighborhoods has demonstrated positive effects on both adults and children. In the 1990s, HUD conducted an experiment entitled "Moving to Opportunity," which offered randomly selected families living in high-poverty housing projects vouchers that allowed them to move to lower-poverty neighborhoods. Several analyses of the experiment demonstrated that moving to lower-poverty areas greatly improved the mental health, physical health, and self-

---

[2] *See*, *e.g.*, Patrick Sharkey, *Stuck in Place: Urban Neighborhoods and the End of Progress Toward Racial Equality* (University of Chicago Press, 2013).

[3] *See*, *e.g.*, Jennifer Darrah & Stefanie DeLuca, "*Living Here Has Changed My Whole Perspective*": *How Escaping Inner-City Poverty Shapes Neighborhood and Housing Choice*, 33(2) J. Pol'y Analysis Mgmt. 350 (2014); Greg J. Duncan & Katherine Magnuson, *The Long Reach of Early Childhood Poverty*, Pathways, Winter 2011, http://whsaonline.org/wp-content/uploads/2013/10/PathwaysWinter11.pdf.

[4] Barbara Sard & Douglas Rice, *Realizing the Housing Voucher Program's Potential to Enable Families to Move to Better Neighborhoods*, Ctr. on Budget Pol'y Priorities (updated Jan. 12, 2016), https://www.cbpp.org/sites/default/files/atoms/files/11-9-15hous.pdf.

reported well-being of adults.[5] Another analysis, cited by HUD in its Regulatory Impact

Analysis of the Small Area FMR Rule, showed that the experiment generated substantial gains

for children who moved to lower-poverty neighborhoods when they were young. Raj Chetty, et

al., *The Effects of Exposure to Better Neighborhoods on Children: New Evidence from the*

*Moving to Opportunity Project*, 106(4) American Economic Review 855 (2016). For example,

children who moved out of public housing to a low-poverty area at a young age were more likely

to attend college and earn higher incomes. *Id.* at 857-59, 899.

53.     In the preamble to the Small Area FMR Rule, HUD explained its determination

that alternatives to the use of small area FMRs are inefficient and inadequate to address the

voucher concentration created by area-wide fair market rent calculations.

54.     For example, in 2000, HUD tried to address the issue of voucher concentration by

raising rents across the board in the most concentrated regions. It did so by setting FMRs and

payment standards based on the 50th percentile market rent, rather than the 40th percentile

market rent, for certain geographic areas where such a change seemed appropriate. *See, e.g.*, 65

Fed. Reg. 58,870 (Oct. 2, 2000); 66 Fed. Reg. 50,024 (Oct. 1, 2001) (implementing new rule and

setting out affected areas). On average, this program resulted in an FMR increase of 7.3 percent.

80 Fed. Reg. 31,332, 31,334-35 (Jun. 2, 2015).

55.     Concurrent with its adoption of the Small Area FMR Rule, HUD is now phasing

out this 50th Percentile FMR program, after concluding that 50th percentile FMRs do not

provide substantially increased opportunities for tenants or measurably reduce concentration of

---

[5] *See, e.g.*, Jens Ludwig, et al., *Long-Term Neighborhood Effects on Low-Income Families: Evidence from Moving to Opportunity*, 103(3) American Economic Review 226 (2013); Lawrence F. Katz, et al., *Moving to Opportunity in Boston: Early Results of a Randomized Mobility Experiment*, 116(2) Quarterly Journal of Economics 607 (2001).

poverty. 80 Fed. Reg. 31,333. Instead, "much of the benefit . . . simply accrues to landlords in lower rent submarket areas." 81 Fed. Reg. 80,567, 80,570 (Nov. 16, 2016). That is because 50th percentile FMRs result in payment standards that are still too low to provide access to higher opportunity neighborhoods, yet at the same time are too high elsewhere and thus "unnecessarily rais[e] subsidies in neighborhoods with lower rents." 80 Fed. Reg. 31,335. In short, the 50th percentile FMR experiment simply reaffirmed the need for HUD to better align its FMRs to the varying rental markets within broad metropolitan areas.

**HUD's Experience with Small Area FMRs Prior to Its Rulemaking**

56.    By the time HUD completed the rulemaking at issue here, it had considerable experience with the results of using small area FMRs and the mechanics of implementing them.

57.    In 2007, the Inclusive Communities Project (ICP) filed a lawsuit against HUD challenging its setting of a single FMR for the 12-county Dallas metropolitan region. ICP alleged that, by fashioning an FMR based on rent data from such a wide area, HUD was effectively steering voucher holders—who, in that area, are predominantly African-American—away from predominantly white areas (where the FMR was inadequate to meet neighborhood market rents) and into predominantly minority areas. ICP alleged that HUD thus violated the Fair Housing Act and the Housing and Community Development Act. Complaint at ¶¶ 25, 36-37, *Inclusive Cmtys. Project, Inc. v. U.S. Dep't of Hous. and Urban Dev.*, No. 3:07-CV-0945 (N.D. Tex. May 29, 2007).

58.    HUD settled ICP's lawsuit in 2010 by agreeing to institute Small Area FMRs calculated at the zip code level in Dallas.

59.    Also in 2010, HUD announced plans for a demonstration project that would test the viability of a broader requirement that PHAs use small area FMRs. Section 8 Housing Choice

Voucher Program, 75 Fed. Reg. 27,808, 27,811 (May 18, 2010). In 2012, five PHAs in five different states began using small area FMRs pursuant to this project. Meanwhile, pursuant to the ICP settlement, PHAs in Dallas also began using small area FMRs.

60.     These pilot projects have proven that small area FMRs are both administratively feasible to implement and effective at accomplishing their goals.

61.     For example, researchers Robert Collinson and Peter Ganong conducted an independent study of the use of small area FMRs in Dallas pursuant to the ICP settlement. They determined that this change resulted in many voucher recipients exiting the lowest-rent neighborhoods in the inner city and moving to higher-rent neighborhoods. Collinson & Ganong, *The Incidence of Housing Voucher Generosity*, at 15-16 (Apr. 2016), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2255799. They found this effect to be "statistically large and economically significant" and determined that the program added no net cost to the government. *Id.*, at 18-19.

62.     The other demonstration project has had comparable results. By 2016, HUD had enough data from the demonstration project to state as part of its regulatory impact statement that, in the areas being studied, the average neighborhood poverty level of voucher holders declined, as did overall subsidy payments. That is, small area FMRs led to voucher holders moving out of impoverished neighborhoods and saved HUD money overall. Regulatory Impact Analysis: Establishing a More Effective Fair Market Rent System; Using Small Area Fair Market Rents in Housing Choice Voucher Program Instead of the Current 50th Percentile FMRs, at 19-21 (Nov. 11, 2016), https://www.regulations.gov/document?D=HUD-2016-0063-0117.

63.     Since 2010, HUD has annually calculated small area FMRs by zip code for every metropolitan area in the U.S. These numbers, which are publicly available on HUD's website,

demonstrate concretely how small area FMRs can provide choice to HCV voucher holders—choice that HUD is denying them by suspending the requirement that PHAs put small area FMRs into effect.

64.     For example, in the Chicago area, payment standards based on HUD's small area FMRs would allow a voucher holder to secure a two-bedroom apartment in high-opportunity DuPage County—where plaintiff Tiara Moore wishes to live—renting for $1,300-$1,770 per month in most zip codes in the county.[6] By contrast, without the use of small area FMRs, a two-bedroom apartment in any of the same zip codes would have an FMR of only $1,180.[7] As Tiara Moore has found, it is considerably harder to rent a two-bedroom apartment in DuPage County for that amount than it is for the higher amount that results from application of small area FMRs.

65.     The situation is similar in the Hartford area, where plaintiff Crystal Carter would like to move from the city of Hartford to Simsbury, CT (zip code 06070), a predominantly white, low-poverty, high-opportunity community outside of the city. Payment standards based on HUD's small area FMRs would allow her to secure a four-bedroom apartment or house renting for up to $1,940.[8] By contrast, an FMR based on average rents across the broad Hartford region is only $1,620 for a four-bedroom apartment or house.[9] Again, that amount is inadequate to

---

[6] *See* U.S. Department of Housing and Urban Development, FY 2018 Hypothetical Small Area FMRs for Chicago-Joliet-Naperville, IL HUD Metro FMR Area. All 2018 Small Area FMRs can be accessed at https://www.huduser.gov/portal/datasets/fmr/fmrs/FY2018_code/select_geography_sa.odn.

[7] *See* FY 2018 Fair Market Rent Documentation System for Chicago-Joliet-Naperville, IL HUD Metro FMR Area. All 2018 FMRs (that is, those not based on small areas) can be accessed at https://www.huduser.gov/portal/datasets/fmr/fmrs/FY2018_code/select_Geography.odn.

[8] *See* FY 2018 Hypothetical Small Area FMRs for Hartford-West Hartford-East Hartford, CT Metro FMR Area.

[9] *See* FY 2018 Fair Market Rent Documentation System for Hartford-West Hartford-East Hartford, CT HUD Metro FMR Area.

permit a voucher holder such as Ms. Carter the housing choice that the HCV voucher program is supposed to provide.

66.     Similar patterns exist in each of the other metropolitan areas subject to the mandatory Small Area FMR rule. Indeed, these areas were selected in part because they are areas where HCVs are exceptionally concentrated, and where implementing small area FMRs would give low-income HCV voucher families the practical ability to move to lower poverty, less racially segregated neighborhoods.

67.     Thus, by the time it completed the rulemaking at issue here in 2016, HUD had years of experience working with various PHAs to implement small area FMRs in different parts of the country. That experience made it clear both that small area FMRs work and that their implementation is quite feasible. It also helped HUD to select those areas where implementation would do the most to bring HUD's administration of the HCV program into alignment with HUD's statutory requirements.

**HUD Rulemaking**

68.     Having laid the groundwork for a larger roll-out of small area FMRs, HUD engaged in an intensive, year-and-a-half-long rulemaking process, with multiple opportunities for public comment, culminating in the Small Area FMR Rule.

69.     On June 2, 2015, HUD announced its intention to promulgate a rule pursuant to which some FMRs would be implemented by zip code rather than broader area. 80 Fed. Reg. 31,332. HUD stated that its "experience with the SAFMR demonstration" suggested that broader use of small area FMRs "could provide HCV tenants greater access to higher opportunity, lower poverty neighborhoods." 80 Fed. Reg. 31,333.

70.    HUD sought comment on a variety of questions, including how broadly the program should be applied and the criteria it should use for selecting areas. In particular, HUD sought comment regarding the experiences of PHAs currently using small area FMRs, in the demonstration areas and in Dallas. 80 Fed. Reg. 31,336. HUD received 78 comments in response, including several that urged it not to take any further action until the demonstration project was completed.

71.    With the benefit of that input, on June 16, 2016, HUD published a proposed rule that would make small area FMRs mandatory only in select jurisdictions meeting certain criteria, including a high level of voucher concentration and market conditions that would make small area FMRs particularly effective in ameliorating that concentration. 81 Fed. Reg. 39,218.

72.    HUD considered and rejected the suggestion that it wait for full results from the demonstration project before promulgating a rule. The agency agreed that implementation of small area FMRs *nationwide* would be premature. It explained, however, that its rule covered only specified areas where use of small area FMRs would be particularly appropriate. 81 Fed. Reg. 39,223. HUD further committed to closely study implementation results and facilitate specific research over the next five years. 81 Fed. Reg. 39,226.

73.    HUD also considered and rejected a proposal to make implementation of small area FMRs voluntary rather than mandatory for PHAs within the affected areas. It observed that the purpose of small area FMRs is to provide voucher holders the effective ability to choose housing throughout the larger area, and allowing some PHAs within that area to opt out of the rule would be inconsistent with that goal. 81 Fed. Reg. 39,224.

74.    In the notice of proposed rulemaking, HUD sought comment on a variety of additional questions about specific implementation issues, including how to reduce the

administrative burden on PHAs and simplify the transition to small area FMRs, and it invited

further comment more generally. It received 113 comments in response.

75.     On November 16, 2016, HUD published the final Small Area FMR Rule. The rule

requires that PHAs in 24 designated metropolitan areas use payment standards based on small

area FMRs beginning on January 1, 2018. *See* Final Rule: Establishing a More Effective Fair

Market Rent System, 81 Fed. Reg. 80,567 (Nov. 16, 2016). It thus extends Small Area FMR

implementation to an additional 230,000 voucher households (about 10 percent of all HCV

voucher holders) spread across 175 PHAs.

76.     HUD explained that the Small Area FMR Rule is intended to reduce "the number

of voucher families that reside in areas of high poverty concentration." 81 Fed. Reg. at 80,567.

HUD found that its former policies had "not proven effective in addressing the problem of

concentrated poverty and economic and racial segregation in neighborhoods." *Id.* The Small

Area FMR Rule, HUD found, was necessary to give voucher holders "a subsidy that is adequate

to cover rents" in "areas of high opportunity." *Id.*

77.     Consistent with its statements in the proposed rulemaking, HUD limited the Small

Area FMR Rule's application to metropolitan areas where it would be particularly effective

based on local housing conditions. It determined that the rule should apply to areas with at least

2,500 vouchers in use that have both (1) "significant voucher concentration challenges" and (2)

rental market conditions, such as a sufficiently high vacancy rate, making it likely that higher

vouchers could actually be used effectively in high opportunity areas. 81 Fed. Reg. 80,568-69;

*see also* 81 Fed. Reg. 80,576 (explaining that markets with low vacancy rates are not as good

candidates for immediate implementation). HUD set objective criteria for determining which

areas qualify, with the coverage determination to be made at the beginning of each federal fiscal

year. 81 Fed. Reg. 80,568.

78.     For areas covered by the Small Area FMR Rule, fair market rents are to be

determined for each zip code. Zip codes, HUD found, "are small enough to reflect neighborhood

differences" and provide for easy and objective administration. 81 Fed. Reg. 80,568.

79.     The Small Area FMR Rule provides that PHAs have three months to update their

payment standards to be based on small area FMRs once the latest FMRs are published and

become effective at the start of the new fiscal year, on October 1, 2017. Thus, PHAs have until

January 1, 2018 to update their payment standards. 81 Fed. Reg. 80,569.

80.     In the final rule, HUD added language empowering it to temporarily suspend a

small area FMR designation in unusual circumstances. That provision, 24 C.F.R.

§ 888.113(c)(4), states:

> HUD will designate Small Area FMR areas at the beginning of a Federal fiscal
> year, such designations will be permanent, and will make new area designations
> every 5 years thereafter as new data becomes available. HUD may suspend a
> Small Area FMR designation from a metropolitan area, or may temporarily
> exempt a PHA in a Small Area FMR metropolitan area from use of the Small
> Area FMRs, when HUD by notice makes a documented determination that such
> action is warranted. Actions that may serve as the basis of a suspension of Small
> Area FMRs are:
> (i)     A Presidentially declared disaster area that results in the loss of a
>         substantial number of housing units;
> (ii)    A sudden influx of displaced households needing permanent housing; or
> (iii)   Other events as determined by the Secretary.

81.     The description of § 888.113(c)(4) in the rule's preamble confirms that HUD may

suspend a designation only for "events," such as a natural disaster, that affect housing conditions

in a specific area:

> Provides HUD may suspend a Small Area FMR designation for a metropolitan
> area, including at the request of a PHA, where HUD determines such action is
> warranted based on a documented finding of adverse rental housing market

26

conditions that will be set out by notice (for example, the metropolitan area experiences a significant loss of housing units as a result of a natural disaster). 81 Fed. Reg. 80,569.

82. In the final rule, HUD made other changes to ameliorate concerns expressed in comments. For example, some comments expressed concern that lowered payment standards in lower-rent neighborhoods could hurt voucher holders in those neighborhoods with existing leases based on the previous, higher standards. In response, HUD authorized PHAs to "hold harmless" for an extended time such households. 81 Fed. Reg. 80,572.

83. HUD also made changes to reduce the administrative burden on PHAs. For example, the Small Area FMR Rule relaxes HUD's preexisting requirement that PHAs conduct a new "rent reasonableness review" for voucher-supported leases when the relevant FMRs decline. Whereas previously PHAs were required to make a new determination of whether the rent charged remains reasonable when FMRs dropped five percent, now they only must do so upon a ten percent drop. 81 Fed. Reg. 80,575.

84. HUD acknowledged the possibility of "administrative expenses associated with implementation on the part of PHAs," but determined that this cost was outweighed by the benefits of the rule. 81 Fed. Reg. 80,569.

85. HUD once again considered and rejected the argument that the rule's promulgation should await final results from the demonstration project. The agency concluded that "it is not premature to implement Small Area FMRs on this limited basis in those areas where it has the potential to address significant voucher concentration concerns." 81 Fed. Reg. 80,579.

86. In announcing the Small Area FMR Rule's promulgation and summarizing the rule's requirements, HUD also stated its intention to take a variety of preliminary steps to

27

facilitate implementation. These steps included providing guidance and support to PHAs

implementing small area FMRs; webinars to share lessons learned and best practices from PHAs

already implementing small Area FMRs; and exploration of a mobile application to enable

tenants to confirm a particular unit's payment standard by entering the address. Key Aspects of

HUD's Final Rule on Small Area Fair Market Rents, http://www.huduser.gov/portal/datasets/fmr

/fmr2016f/SAFMR-Key-Aspects-of-Final-Rule.pdf.

      87.     The Small Area FMR Rule became effective on January 17, 2017.

## Evidence of Small Area FMRs Working

      88.     Since promulgating the Small Area FMR Rule, HUD has received further

evidence regarding the effectiveness of small area FMRs in its demonstration projects. HUD

commissioned an extensive report, termed the Interim Evaluation, and released it publicly on

August 15, 2017. The Interim Evaluation examines changes in the demonstration areas between

2010 and 2015, and thus compares their trends pre- and post-use of small area FMRs. It also

compares findings in the demonstration sites against those for a group of 138 agencies not using

small area FMRs. The Evaluation confirms the viability and importance of small area FMRs.

Small Area Fair Market Rent Demonstration Evaluation, Interim Report (Aug.

2017), http://www.huduser.gov/portal/sites/default/files/pdf/SAFMR-Interim-Report.pdf.

      89.     The Interim Evaluation found that, in demonstration sites where PHAs used small

area FMRs, significantly more voucher holders moved to high-opportunity neighborhoods, even

as overall housing subsidy costs fell. By contrast, the same beneficial effects were not seen for

comparable PHAs not subject to the demonstration project. Interim Evaluation at viii-x; 37-38.

      90.     Although the Interim Evaluation found some adverse impacts for tenants at some

of the PHAs studied, it concluded that the Small Area FMR Rule anticipated these problems and

made changes to prevent them from recurring. For example, the Interim Evaluation found that

some voucher holders paid somewhat more in out-of-pocket rent in the demonstration sites

(Interim Evaluation at vii-viii; 94-96), but the FMR Rule contains several provisions to protect

tenants from such increases. 81 Fed. Reg. 80,572. Similarly, the Interim Evaluation found that,

when some but not all PHAs within the same metropolitan area switch to small area FMRs, the

result within those jurisdictions can be a reduction in the total units that are offered for rent at or

below the revised FMRs (Interim Evaluation at vii-viii; 32-36). The Small Area FMR Rule

addresses this problem by making small area FMRs mandatory for all PHAs within specified

regions, such that even if fewer units are available in some places, such losses will be offset by

gains elsewhere. That is, this finding in the Interim Evaluation supports the Small Area FMR

Rule's mandatory implementation for PHAs, not HUD's suspension of that requirement.

91.     The Interim Evaluation also found modest increases in administrative costs for

PHAs, most of them of a one-time nature. For example, PHAs implementing small area FMRs

for the first time had to adjust computer software systems and amend client briefing materials.

Interim Evaluation at x-xi; 68-84. However, these costs largely were not recurring, and they were

more than offset by cost savings from implementing the small area FMRs. *Id.* They also could be

further ameliorated by HUD issuing guidance and providing technical assistance where needed,

drawing on the lessons of the demonstration project to reduce costs and administrative burden for

later PHAs.

### HUD Suspension of the PHAs' Requirements Under the Small Area FMR Rule

92.     To date, HUD has not taken any of the steps that it publicly stated it would take to

help PHAs implement the rule. For example, it has not provided affected PHAs with any

guidance as to implementation.

93.     Instead, HUD has announced that it is suspending for two years the requirement that PHAs affected by the Small Area FMR Rule must implement payment standards based on small area FMRs on January 1, 2018. HUD has not published a notice of this decision in the Federal Register and has not solicited public comment on it. Nor has it sought to amend the Small Area FMR Rule.

94.     According to HUD, its decision is based in part on comments it received in a proceeding not devoted to the Small Area FMR Rule.

95.     On May 15, 2017, HUD published a notice in the Federal Register soliciting comments on which existing HUD regulations it should consider repealing, replacing, or modifying. *See* Notice and Request for Comment: Reducing Regulatory Burden; Enforcing the Regulatory Reform Agenda Under Executive Order 13777, 82 Fed. Reg. 22,344, 22,344-45 (May 15, 2017). This document did not specifically mention the Small Area FMR Rule; nor did most of the comments HUD received in response.

96.     The National Association of Housing and Redevelopment Officials (NAHRO), a group that characterizes itself as "a leader in the deregulation of programs and the design of programs which provide the maximum flexibility at the local level," used this opportunity to ask HUD to suspend the Small Area FMR Rule's requirements for PHAs. NAHRO.org, History (accessed Oct. 20, 2017), http://www.nahro.org/nahro-history. Prior to the May 15 notice, NAHRO had sent HUD an unsolicited letter making this request, and it incorporated that letter into its comments to the May 15 notice. NAHRO asserted that HUD, by filing a notice in the Federal Register invoking 24 C.F.R. § 888.113(c)(4)(iii), could make compliance with the rule voluntary for all affected PHAs.

97.     On August 11, 2017—before the Interim Evaluation was publicly released—HUD announced the suspension of the requirement that PHAs implement payment standards based on small area FMRs. It did so by sending identical letters to PHAs in 23 of the 24 areas governed by the Rule. Each letter stated that HUD would not require the PHA to begin using small area FMRs on January 1, 2018, and instead would suspend that requirement for two years, until January 1, 2020. *See* Exhibit A. The only PHAs not to receive such a letter were the ones serving Dallas-Plano-Irving, Texas, which had been using small area FMRs pursuant to settlement of the ICP case described above.

98.     HUD has not published a notice of this decision in the Federal Register and has not solicited public comment on it.

99.     In its letter to PHAs, HUD stated that its action should not be treated as "a suspension of the Small Area Final Rule or a regulatory waiver." Exhibit A, at 3. Rather, as NAHRO had suggested, HUD relied solely on its purported authority under 24 C.F.R. § 888.113(c)(4) to suspend the rule's application separately for each affected area. *Id.* HUD did not point to any area-specific event to justify its action with respect to *any* of the affected areas.

100.    HUD stated that its action was based, first, on its internal review of the Interim Evaluation's findings from the small area FMR demonstration project—findings that were not yet available to the public. These interim findings, HUD stated, "suggest the need for further analysis of the benefits and costs of Small Area FMR, particularly with respect to the impact on rent burdens on participating families and the availability of units in the metropolitan area." Exhibit A, at 1. HUD did not explain which data from the Interim Evaluation supported this conclusion or how the Interim Evaluation's findings were inconsistent with information available at the time of the Small Area FMR Rule's promulgation. HUD further stated, without

elaboration, that "a policy change of this magnitude should be fully informed by the final report

on the completed demonstration," expected in July 2018. *Id.* It did not attempt to reconcile this

statement with its express rejection of the same argument in the published Small Area FMR

Rule, at which time the report was well underway.

101.    Second, HUD stated that, in response to its May 15 invitation for comments on

regulatory change, "several PHA industry groups" had expressed "concerns about the Small

Area FMR final rule and the timeline for implementation." Exhibit A, at 2. It stated that its action

would allow it "to be informed by the public comments on reducing regulatory burden for the

HCV program" as well as its own decision as to whether to "implement changes to reduce the

regulatory burden on the HCV program." *Id.*

102.    Finally, HUD pointed to its own failure to take preliminary steps to assist PHAs

in complying with their obligations under the Small Area FMR Rule. It admitted that it had

begun "developing guidance and planning to provide technical assistance to assist PHAs that

must implement the use of the Small Area FMRs as a result of the final rule" but decided not to

continue. Exhibit A, at 2. Instead of meeting its obligations under law, HUD stated, it chose to

"focus[] on soliciting input and feedback from PHAs and other stakeholders on a variety of

regulations and policies, including the Small Area FMR Final Rule." *Id.* As justification for its

deliberate choice not to take preliminary steps to best implement the rule, HUD repeated that (1)

it was waiting for the 2018 final report on the small area demonstration project and (2) it might

decide to alter the rule.

103.    After advising PHAs that it would be unwise to proceed with small area FMRs,

and suspending the requirement that they do so by January 1, 2018, HUD said it would entertain

applications from PHAs that nonetheless wished to use small area FMRs voluntarily.

104.    On August 15, 2017, HUD published its Interim Evaluation. It still did not,

however, explain how that document supported its decision to suspend PHAs' requirements

under the Small Area FMR Rule.

105.    On August 25, 2017, Todd M. Richardson, HUD's Acting General Deputy

Assistant Secretary for Policy Development and Research, made a public statement, posted on

HUD's website.

106.    Mr. Richardson stated that the decision to delay PHAs' obligations was for the

benefit of the affected PHAs, which he contended were not ready to proceed and "needed more

time to integrate this big change into their voucher programs." He further stated that the delay

would allow PHAs to review the findings of the demonstration project and "make sure their

programs are informed by the lessons learned by these early adopters." *See* Exhibit B.

107.    Mr. Richardson cited the Interim Evaluation as influencing these conclusions, but

did not explain what in that report justified them. And he stated that the Interim Evaluation

"confirms that Small Area FMRs do open up previously inaccessible neighborhoods for voucher

tenants" and that "with good planning, it is possible to have a successful program that does not

break the bank."

108.    HUD has provided no further explanation for its actions.

**Irreparable Injury to Plaintiffs and Others Caused by HUD's Actions**

109.    HUD's decision not to require PHAs to implement the Small Area FMR Rule on

schedule is causing, and will continue to cause, irreparable injury to Plaintiffs and others.

110.    As HUD has repeatedly acknowledged, FMRs calculated by averaging private-

market rents across broad metropolitan areas restrict voucher holders' housing options. In the

absence of the Small Area FMR Rule's adjustments to HUD's methodology, voucher holders in

23 of the 24 affected areas (not those in the Dallas area, where small area FMRs continue

pursuant to the ICP settlement) will continue to be artificially concentrated in poorer, low-rent,

and often racially segregated areas, because their vouchers are insufficient for them to rent in

areas of greater opportunity.

111.    HUD has repeatedly found that small area FMRs mitigate those effects and, in

Mr. Richardson's recent words, "open up previously inaccessible neighborhoods for voucher

tenants."

112.    HUD nonetheless has suspended PHAs' obligation to use payment standards

based on small area FMRs beginning on January 1, 2018. This action deprives voucher holders—

who, in most of the affected areas, are predominantly non-white and are concentrated in

predominantly non-white areas—of equal opportunity to rent throughout those geographic areas

beginning on that date. That is to say, it deprives voucher holders like Ms. Moore and Ms. Carter

of precisely the benefit that the Small Area FMR Rule was meant to confer upon them.

113.    Not only has HUD made adoption of small area FMRs voluntary for PHAs, it is

actively discouraging them from exercising their discretion to adopt small area FMRs. HUD is

refusing to provide PHAs with guidance and other support in adopting small area FMRs. It also

has stated that, in the absence of such guidance and support, PHAs are unprepared to use small

area FMRs. And it has stated—contrary to the actual evidence—that PHAs that do wish to use

small area FMRs face formidable administrative and other hurdles in doing so. All of this has the

effect and purpose of not simply making use of small area FMRs "voluntary," but putting a

heavy thumb on the scale with respect to PHA decision-making.

114.    Most of the PHAs that the Small Area FMR Rule requires to use small area FMRs

will not do so under these circumstances. To the extent that some PHAs do, it will be because

organizations like OCA divert their resources to advocating for the use of small area FMRs and helping PHAs with implementing them in the absence of support from HUD.

115.     Ms. Carter is directly harmed by HUD's action and will continue to be harmed unless HUD's action is enjoined.

116.     Ms. Carter is an African-American HCV voucher holder who currently lives in a four-bedroom apartment at 47 Gilman Street in Hartford, Connecticut, with her five dependent children. She currently works as a home health care aide. The rent for Ms. Carter's current apartment is $1,375 per month. She pays that rent with assistance from a voucher administered by the Hartford Housing Authority. The FMR for a four-bedroom dwelling in the greater Harford region is $1,620. Use of small area FMRs would reduce the FMR for Ms. Carter's zip code to $1,540—still easily enough for her to afford her current apartment, should she want to remain there.

117.     Ms. Carter has worked hard to find the best educational opportunities for her children. Taking advantage of an "Open Choice" regional school integration program, she has enrolled her three youngest children in school in Simsbury, Connecticut. Simsbury, a predominantly white town, has high-performing schools and very little poverty—only 3.4 percent.

118.     To maintain her children's enrollment in Simsbury, Ms. Carter can only live in Simsbury or in Hartford. She would like to move to Simsbury, both to be closer to her children's schools and to provide a safer and healthier environment for her children. The zip code in Hartford where Ms. Carter now lives has a 32.2 percent poverty rate. Every zip code in Simsbury has much lower poverty.

119.    Ms. Carter has not been able to find suitable housing in Simsbury, in large part because of the way FMRs are calculated. As described above in paragraph 65, FMRs calculated based on the entire greater Hartford area are inadequate for Simsbury, where Ms. Carter would like to live. Under the small area FMR system, Ms. Carter's voucher could be used for a 4-bedroom dwelling in Simsbury renting for up to $1,940, instead of the $1,620 that applies to the entire greater Harford area under the current system. That increase in the FMR would make it possible for Ms. Carter to rent the housing she wants in Simsbury.

120.    HUD's action thus is directly harming Ms. Carter by preventing her voucher from having the purchasing power necessary to secure housing in Simsbury.

121.    Tiara Moore, too, is directly harmed by HUD's action and will continue to be harmed unless HUD's action is enjoined.

122.    Ms. Moore is a 32-year-old African-American woman. She lives at 5841 W. Ohio Street in Chicago with her 11-month-old daughter and her uncle. Ms. Moore works as a bus aide for the Chicago Public Schools and has a monthly gross income of $1,500.

123.    Ms. Moore currently pays $400 per month in rent, which is all she can afford based on her income. She lives in the Austin neighborhood of Chicago. More than a third (33.8 percent) of households in her zip code are in poverty. Her neighborhood also has very high crime.

124.    On July 28, 2017, Ms. Moore was issued a housing voucher by the Chicago Housing Authority, which she would like to use to find better housing for herself and her daughter. That voucher has a value of $1,207 for a two-bedroom apartment. She must use it to find housing by December 17, 2017, or it will expire.

125. Ms. Moore does not want to use her voucher to find a new place in the City of Chicago. She wants to live instead in nearby DuPage County, where her mother lives. That area has better schools and provides other opportunities not present in Ms. Moore's current location.

126. When Ms. Moore looked for an apartment in DuPage County, however, she could not find suitable housing for the value of her voucher.

127. If the Small Area FMRs go into effect on January 1, 2018, Ms. Moore's voucher will have a substantially higher value in most zip codes in DuPage County, reflecting the fact that (as Ms. Moore herself experienced) $1,207 is insufficient to rent a two-bedroom apartment there. Under the Small Area FMR Rule, the fair market rent for a two-bedroom dwelling in most DuPage County zip codes would be more than $1,300; in some places, it would be as high as $1,770. If Ms. Moore and her landlord had assurance her voucher would soon be worth that much, she would be able to use her voucher to get housing in DuPage County.

128. With an approaching deadline to find housing and the apparent futility of finding appropriate housing in DuPage County for her current voucher amount, Ms. Moore has given up looking in DuPage County. She has refocused her energies on finding an apartment in Chicago for $1,200 or less before her voucher expires in December.

129. If HUD's action were to be enjoined, Ms. Moore would have reason to seek an extension of her December 17 deadline from the Chicago Housing Authority. With small area FMRs going into effect at the beginning at the year, she would have a real chance at finding the housing she desires in DuPage County.

130. HUD's suspension of the small area FMR requirement has harmed and continues to harm the Open Communities Alliance. The OCA, a non-profit organization based in Hartford, Connecticut, seeks to remedy Connecticut's residential racial segregation and the

disproportionate isolation from opportunities—in education, employment, housing, and otherwise—that the state's African-American and Latino families face as a result.

131.    Much of OCA's work pertains to enabling HCV families to move to areas of higher opportunity, including the suburbs of Hartford, and otherwise addressing the concentration of voucher households (which are predominantly non-white in the Hartford area) in high-poverty, segregated areas.

132.    For example, OCA works with the Connecticut Department of Housing and mobility counseling agencies to advise on the design and implementation of programs that help voucher households move to areas of greater opportunity. It also researches the impact of government policies (at the federal, state, and local level) on voucher concentration and the availability of affordable housing where vouchers can be used; develops best practices and policy recommendations; advocates for those policies with agency and legislative staff; engages in education and outreach to build public support for those best practices; and holds related meetings and trainings.

133.    OCA also has projects to expand the supply of rental housing that low-income households can afford outside of racially segregated and resource-poor areas. For example, it is currently partnering with the National Housing Trust, a nonprofit developer, on a project to acquire market-rate rental properties in high-opportunity Hartford suburbs and convert them to properties suitable for rent to, among other people, HCV voucher families. OCA also works with other private developers to encourage and help them to engage in similar conversions. This project is directly imperiled by HUD's decision not to require PHAs to implement small area FMRs.

134.    The financial viability of a rental property that intends to offer many units to HCV voucher families depends on those vouchers paying for rent that is actually commensurate with area fair market rents. Without the use of small area FMRs, voucher rent levels do not reflect the local market rents and so the anticipated income from renting to voucher holder is much lower. This makes it much harder for the OCA-National Housing Trust project and for other private developers to obtain the financing necessary to fund these conversions and create badly needed affordable housing in more expensive parts of the greater Hartford area that provide safer, healthier environments for voucher families.

135.    OCA has devoted considerable resources to advocating for, and then helping prepare for, the rollout of small area FMRs in the Hartford area. In response to HUD's action, OCA already has begun diverting its scarce resources away from previously planned projects to remedying the harm HUD is causing it, and it will have to continue doing so.

136.    For example, in order to assist implementation of the rule and help voucher holders and those who work with them understand newly available options, OCA planned to produce a Small Area Fair Market Rent web portal which would have included (a) an analysis of the difference between small area FMRs and FMRs across the state, (b) an explanation of small area FMRs, (c) data on the current location of voucher holders, and (d) the results of a time consuming rent study that highlighted the additional units that would become available under the new rent calculation formula. Because HUD's action makes it uncertain which (if any) of these additional units actually will be available to voucher holders, OCA is now revising the content of this portal and will instead produce an article, based on the same data, explaining to the public why HUD's program freeze is detrimental and what steps should be taken to counteract the effects of HUD's actions.

137.    OCA also has determined that, as a consequence of HUD's actions, it must spend considerable time and resources on a sustained effort to convince each individual Hartford-area PHA to implement small area FMRs voluntarily. This project, which OCA already is preparing to start, would be entirely unnecessary if not for HUD's unlawful decision to suspend its regulation requiring those PHAs to implement small area FMRs.

138.    This project may prove futile with respect to many or most of the PHAs in the Hartford area. Even to the extent it succeeds, it will do no more than restore OCA to the position it would be in if not for HUD's action, at the cost of considerable expenditure of OCA's time and resources.

139.    OCA already has taken or is about to take many specific actions as part of this project to remedy the effects of HUD's suspension of the rule. Such actions include:

- Writing advocacy pieces, assembling a web portal, and otherwise engaging in sustained public education (including with the state of Connecticut and area PHAs) about why the use of small area FMRs is beneficial;

- Holding conversations, collecting affidavits, and otherwise gathering information about the effect of HUD's action on voucher holders; and

- Notifying other affected parties, including area non-profits that serve many voucher holders, of HUD's action and its likely effect, and convening discussions with them about advocacy efforts and other next steps. OCA's partners expected and relied upon small area FMRs going into effect on January 1, 2018, and OCA now must spend time ensuring that they are aware that their expectations have been unsettled and know how to proceed under these changed circumstances.

140.     OCA will have to take many similar actions in the next two years if HUD's action is not enjoined. It will have to divert much of its time and other resources to projects that, in various ways, counteract the damage that HUD's action is doing to its ability to further its mission. OCA would not have to divert its resources in this way but for HUD's action.

141.     HUD's announcement that it will suspend the January 1, 2018 deadline is already causing irreparable harm that worsens every day for each of these plaintiffs and others. Each day that HUD refuses to take the preliminary steps necessary to implement the rule on time, such as providing guidance and technical assistance to participating PHAs, makes implementation on schedule harder. Moreover, HUD's announcement to PHAs that it will not hold them to their regulatory deadline is causing irreparable harm by inducing the PHAs not to prepare for implementation.

142.     HUD has demonstrated that, absent injunctive relief, it will not conform its conduct to its own regulatory requirements or require PHAs to do so the same.

## CAUSES OF ACTION

### First Cause of Action
### Administrative Procedure Act – Agency Action Without Observance of Procedure Required by Law

143.     The APA empowers this Court to hold unlawful and set aside agency actions taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

144.     HUD has announced that it is suspending for two years the Small Area FMR Rule's requirement that affected PHAs begin using FMRs based on zip codes on January 1, 2018. HUD has informed affected PHAs of this purported change and has posted this action on its website.

145.     HUD's action materially alters the terms of the Small Area FMR Rule.

146.     HUD lacks legal authority to alter the date on which the Small Area FMR Rule requires affected PHAs to begin using FMRs based on zip codes without undertaking notice and comment rulemaking.

147.     Although HUD purports to delay the January 1, 2018 deadline separately for PHAs in each of the 23 affected areas pursuant to 24 C.F.R. § 888.113(c)(4)(iii), it did not properly invoke that provision with respect to any of the affected areas by pointing to an area-specific "event" that results in local housing conditions. Nor is that provision lawfully used to accomplish a wholesale suspension of the Small Area FMR Rule's requirement without notice and comment.

148.     By failing to engage in notice-and-comment rulemaking before suspending the rule, HUD failed to observe procedures required by law, in contravention of the APA.

### Second Cause of Action
### Administrative Procedure Act – Agency Action that Is Arbitrary, Capricious, or an Abuse of Discretion

149.     The APA empowers this Court to "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

150.     Even if HUD had authority, given sufficiently compelling reasons, to excuse PHAs from the requirement that they begin using small area FMRs on January 1, 2018, its stated reasons for the delay are unreasonable, arbitrary, and capricious.

151.     HUD's stated reasons for delaying the requirement's effective date—the purported need for further study of the issue and inability of affected PHAs to adequately prepare—contradict findings that HUD made in promulgating the requirement. No new evidence supports its changing course. HUD has pointed to the Interim Evaluation in conclusory fashion

but has not explained how that document supports its decision. Even if it had, such an explanation would be arbitrary and capricious, since the Interim Evaluation demonstrates that small area FMRs work as intended and do not impose unmanageable administrative burden.

152.    HUD does not claim that it has changed its view of the evidence that was before it when it promulgated the rule. Any such claim would be arbitrary and capricious in any event.

153.    HUD has not provided a reasoned explanation for disregarding the facts and circumstances that underlay the Small Area FMR Rule, including but not limited to its original findings regarding the rule's benefits for voucher holders and the necessity of making small area FMRs mandatory rather than voluntary in affected areas.

154.    HUD does claim that its decision is based in part on comments submitted by industry groups in a proceeding not devoted to this matter. It has not explained how those comments support its decision, and any such explanation would be arbitrary and capricious. Moreover, HUD has not given others the opportunity to weigh in on the decision.

155.    In delaying the requirement that PHAs implement small area FMRs, HUD relies in part on its own failure to adequately prepare PHAs. It is arbitrary and capricious for an agency to bootstrap its own failure to act in accordance with its legal obligations into a reason to continue not to act.

156.    The final rule makes clear that mandatory rather than voluntary compliance by all PHAs in the covered areas is essential to the rule's success. HUD has not explained why it now believes otherwise, and any such explanation would be arbitrary and capricious.

157.    The rationale underlying HUD's delay of the rule is arbitrary, capricious, or an abuse of discretion, in contravention of the APA.

**Third Cause of Action**
**Administrative Procedure Act –Action Contrary to Statute**

158.    The APA empowers this Court set aside an agency action that is "not in accordance with law." 5 U.S.C. § 706(2)(A).

159.    In promulgating the Small Area FMR Rule, HUD brought its practices—and the PHAs'—into closer compliance with its relevant authorizing statutes, the Fair Housing Act of 1968, as amended, and the Housing and Community Development Act of 1974, as amended. Its attempt to suspend PHAs' obligation under the FMR Rule violates both Acts.

160.    In promulgating the Small Area FMR Rule, HUD found that fair market rents calculated across large metropolitan areas limit HCV voucher families—who, in most of the areas affected by the rule, are predominantly non-white—to less wealthy neighborhoods that tend to be predominantly African-American and Latino. HUD found that its previous practices had "not proven effective in addressing the problem of concentrated poverty and economic and racial segregation in neighborhoods." 81 Fed. Reg. 80,567. Instead, the HCV voucher program was improperly distributing federal funds in a way that perpetuated racial segregation and artificially limited the housing choices of families that are disproportionately African-American and Latino. HUD made no contrary finding in suspending the Small Area FMR Rule.

161.    HUD has an affirmative obligation under the FHA to ensure that federal housing programs are administered, and federal housing funds spent, in a manner that furthers racial desegregation and combats the related problem of concentration of poverty where possible. 42 U.S.C. §§ 3608(d), (e)(5). In suspending its requirement that selected PHAs act in accordance with the Small Area FMR rule, HUD is affirmatively choosing to distribute federal housing funds in a manner that it has found perpetuates racial segregation and does not provide the

opportunity to rent standard quality housing throughout the geographic areas in question. As

HUD itself has stated:

> [I]n areas with a history of segregation, if a program participant has the ability to
> create opportunities outside of the segregated, low-income areas but declines to
> do so . . . there could be a legitimate claim that HUD and its program participants
> were acting to preclude a choice of neighborhoods to historically segregated
> groups.

Affirmatively Furthering Fair Housing, 80 Fed. Reg. 42,279 (Jul. 16, 2015). In suspending the

requirements of its already finalized Small Area FMR Rule, HUD is doing exactly that. It also is

acting in a way that has a significant, adverse disparate impact on African Americans and

Latinos without any sufficient justification for doing so.

162.    Similarly, HUD specifically found in promulgating the Small Area FMR Rule that

its former practices failed to result in rental rates that provided opportunities to rent "throughout

the geographic area," contrary to the Housing and Community Development Act's requirement

that the Section 8 program promote "economically mixed housing" rather than concentrated

poverty. 42 U.S.C. § 1437f(a). It made no contrary finding in deciding to suspend PHAs'

regulatory obligations.

163.    HUD's suspension of the Small Area FMR Rule thus violates the Fair Housing

Act of 1968, as amended, and the Housing and Community Development Act of 1974, as

amended, in contravention of the APA.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court:

(a)     enter a declaratory judgment that the decision of the U.S. Department of Housing

and Urban Development to suspend the requirement that PHAs in 23 metropolitan areas begin

using payment standards based on small area FMRs on January 1, 2018 violates the

45

Administrative Procedure Act, 5 U.S.C. § 706, because it is arbitrary, capricious, an abuse of discretion, or contrary to law, and without observance of procedure required by law;

(b)      issue temporary and permanent injunctions requiring the U.S. Department of Housing and Urban Development to timely implement and enforce all the requirements of its Small Area FMR Rule, including but not limited to the requirement that PHAs in the areas subject to that rule begin using payment standards based on small area FMRs on January 1, 2018;

(c)      direct HUD to take all affirmative steps necessary to remedy the effects of the illegal conduct described herein and to prevent similar occurrences in the future;

(d)      award plaintiffs their reasonable attorneys' fees and costs; and

(e)      order such other relief as this Court deems just and equitable.


Dated: October 23, 2017                              Respectfully submitted,


                                              s/Sasha Samberg-Champion
                                              Sasha Samberg-Champion (DC Bar No.
                                              981553)
                                              Sara Pratt (DC bar admission pending)
                                              Michael G. Allen (DC Bar No. 409068)
                                              RELMAN, DANE & COLFAX PLLC
                                              1225 19th Street, NW, Suite 600
                                              Washington, DC 20036
                                              Phone: (202) 728-1888
                                              Fax:    (202) 728-0848
                                              ssamberg-champion@relmanlaw.com

                                              Sherrilyn Ifill (NY Bar No. 2221422)
                                              Janai Nelson (NY Bar No. 2851301)
                                              Samuel Spital (NY Bar No. 4334595)
                                              NAACP LEGAL DEFENSE AND EDUCATIONAL
                                                   FUND, INC.
                                              40 Rector Street, 5th Floor
                                              New York, NY 10006
                                              (212) 965-2200

sspital@naacpldf.org

Coty Montag (DC Bar No. 498357)*
Ajmel Quereshi (DC Bar No. 1012205)*
NAACP LEGAL DEFENSE AND EDUCATIONAL
    FUND, INC.
1444 I Street, NW, 10th Floor
Washington, DC 20005
(202) 682-1300
aquereshi@naacpldf.org

Philip Tegeler (DC Bar No. 1002526)*
POVERTY & RACE RESEARCH ACTION
    COUNCIL
740 15th Street NW, Suite 300
Washington, DC 20005
(202) 360-3906
ptegeler@prrac.org

Jon Greenbaum (DC Bar No. 489887)
Joseph D. Rich (DC Bar No. 463885)*
Thomas Silverstein (DC bar admission
pending)
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
    UNDER LAW
1401 New York Ave., NW
Washington, DC 20005
(202) 662-8331
jrich@lawyerscommittee.org

Allison M. Zieve (DC Bar No. 424786)
PUBLIC CITIZEN LITIGATION GROUP
1600 20th Street, NW
Washington, DC 20009
(202) 588-1000

*Attorneys for Plaintiffs*

* Application for admission to this Court
pending