UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

OPEN COMMUNITIES ALLIANCE,
*et al.*,

        *Plaintiffs*,

    v.

BENJAMIN S. CARSON, SR., M.D.,
Secretary, United States Department of
Housing and Urban Development, *et al.*,

        *Defendants*.

Case 1:17-cv-02192-BAH

# DEFENDANTS' OPPOSITION TO
# PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

JESSIE K. LIU
*United States Attorney*

DANIEL F. VAN HORN
*Chief, Civil Division*

JOHNNY H. WALKER
*Assistant United States Attorney*
555 4th Street, N.W.
Washington, District of Columbia 20530
Telephone: 202 252 2575
Email: johnny.walker@usdoj.gov

Dated: December 1, 2017

**CONTENTS**

*Table of Authorities*.................................................................................................... ii

INTRODUCTION ...........................................................................................................1

BACKGROUND ............................................................................................................2

      A.     HUD's Housing Choice Voucher Program...........................................2

      B.     HUD's Efforts to Achieve Expanded Housing Opportunities.................4

            1.     The 50th Percentile Program ......................................................4

            2.     The Small Area FMR Demonstration Project..............................5

            3.     The Small Area FMR Rule .........................................................7

      C.     Recent Interim Findings Concerning Small Area FMRs......................10

      D.     HUD's Temporary Suspension of the Small Area FMR Rule...............12

      E.     Procedural Posture of This Litigation .................................................15

      F.     HUD's Upcoming Comment Period ...................................................16

STANDARD...................................................................................................................16

ARGUMENT .................................................................................................................17

I.     Plaintiffs Will Not Succeed on the Merits ..........................................................19

      A.     HUD's Temporary Suspension Is Not Reviewable .............................19

      B.     HUD's Temporary Suspension Is Allowed by the Rule ......................21

      C.     HUD's Temporary Suspension Is Not Arbitrary and Capricious.........27

      D.     Plaintiffs' Notice-and-Comment Claim Will Soon Be Moot ...............32

II.    Plaintiffs Will Not Suffer Irreparable Injury ......................................................33

III.   Other Parties and the Public Interest Are Better Served by Denying
an Injunction that Could Deprive Low-Income Families of Housing ..............36

IV.   Plaintiffs' Requested Injunction Is Overbroad ..................................................37

CONCLUSION...............................................................................................................38

# AUTHORITIES

**Cases**

*Air Transport Ass'n of Am. v. Export–Import Bank of the U.S.*,
   878 F. Supp. 2d 42 (D.D.C. 2012) ....................................................................... 35

*Ali v. Fed. Bureau of Prisons*,
   552 U.S. 214 (2008) .......................................................................................... 25

*Assoc. Gen. Contractors of Cal., Inc. v. Coal. for Econ. Equity*,
   950 F.2d 1401 (9th Cir. 1991) ........................................................................... 36

*Auer v. Robbins*,
   519 U.S. 452 (1997) .......................................................................................... 25

*Aviation Consumer Action Project v. Washburn*,
   535 F.2d 101 (D.C. Cir. 1976) ........................................................................... 37

*Banner Health v. Price*,
   867 F.3d 1323 (D.C. Cir. 2017) ......................................................................... 28

*Chaplaincy of Full Gospel Churches v. England*,
   454 F.3d 290 (D.C. Cir. 2006) ............................................................... 16, 33, 36

*Christopher v. SmithKline Beecham Corp.*,
   567 U.S. 142 (2012) .......................................................................................... 26

*Citizens to Preserve Overton Park v. Volpe*,
   401 U.S. 402 (1970) .......................................................................................... 19

*Columbia Hosp. for Women Found. v. Bank of Tokyo–Mitsubishi, Ltd.*,
   15 F. Supp. 2d 1 (D.D.C. 1997) ......................................................................... 17

*Cuomo v. U.S. Nuclear Regulatory Comm'n*,
   772 F.2d 972 (D.C. Cir. 1985) ........................................................................... 17

*Davis v. Pension Ben. Guar. Corp.*,
   571 F.3d 1288 (D.C. Cir. 2009) ......................................................................... 17

*Gooch v. United States*,
   297 U.S. 124 (1936) .................................................................................... 23, 24

*Gov't Procurement v. United States*,
   576 F. Supp. 2d 162 (D.D.C. 2008) .................................................................... 33

*Heckler v. Chaney*,
   470 U.S. 821 (1984) .......................................................................................... 19

ii

*In re Navy Chaplaincy*,
   534 F.3d 756 (D.C. Cir. 2008) ................................................................. 36

*Jones v. Mukasey*,
   565 F. Supp. 2d 68 (D.D.C. 2008) .......................................................... 20

*Judicial Watch, Inc. v. U.S. Dep't of Homeland Sec.*,
   514 F. Supp. 2d 7 (D.D.C. 2007) ............................................................ 33

*League of Women Voters of United States v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016) ............................................... 16, 17, 29, 30

*Madsen v. Women's Health Ctr., Inc.*,
   512 U.S. 753 (1994) ................................................................................ 37

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ............................................................................ 28, 33

*Mylan Pharm., Inc. v. Shalala*,
   81 F. Supp. 2d 30 (D.D.C. 2000) ................................................ 34, 35, 36

*Nat'l Conf. on Ministry to Armed Forces v. James*,
   278 F. Supp. 2d 37 (D.D.C. 2003) .......................................................... 17

*Nat'l Mining Ass'n v. Jackson*,
   768 F. Supp. 2d 34 (D.D.C. 2011) .................................................... 34, 36

*Newdow v. Roberts*,
   603 F.3d 1002 (D.C. Cir. 2010) ............................................................. 32

*Norfolk & Western Ry. Co. v. Am. Train Dispatchers Ass'n*,
   499 U.S. 117 (1991) ............................................................................... 25

*Padula v. Webster*,
   822 F.2d 97 (D.C. Cir. 1987) ................................................................. 19

*Pharm. Research & Mfrs. of Am. v. FTC*,
   790 F.3d 198 (D.C. Cir. 2015) ..................................................... 28, 29, 30

*Pursuing America's Greatness v. FEC*,
   831 F.3d 500 (D.C. Cir. 2016) ............................................................... 16

*Rural Cellular Ass'n v. F.C.C.*,
   588 F.3d 1095 (D.C. Cir. 2009) ............................................................. 28

*Schneider v. Feinberg*,
   345 F.3d 135 (2d Cir. 2003) ................................................................... 19

*Sheildalloy Metallurgical Corp. v. Nuclear Regulatory Comm'n*,
   768 F.3d 1205 (D.C. Cir. 2014) ........................................................................... 26

*Singh v. McConville*,
   187 F. Supp. 3d 152 (D.D.C. 2016) ..................................................................... 17

*Springer v. Gov't of Philippine Islands*,
   277 U.S. 189 (1928)............................................................................................. 24

*State of Neb. Dep't of Health & Human Servs. v. Dep't of Health & Human Servs.*,
   435 F.3d 326 (D.C. Cir. 2006) ............................................................................. 37

*Steenholdt v. Fed. Aviation Admin.*,
   314 F.3d 633 (D.C. Cir. 2003) ............................................................................. 21

*Steffel v. Thompson*,
   415 U.S. 452 (1974)............................................................................................. 32

*U.S. Airwaves, Inc. v. FCC*,
   232 F.3d 227 (D.C. Cir. 2000) ............................................................................. 28

*Weinberger v. Romero–Barcelo*,
   456 U.S. 305 (1982)............................................................................................. 36

*Winter v. Natural Res. Def. Council, Inc.*,
   555 U.S. 7 (2008)........................................................................................... 16, 17

*Wis. Gas Co. v. FERC*,
   758 F.2d 669 (D.C. Cir. 1985) ....................................................................... 33, 36

**Statutes**

5 U.S.C. § 701(a)(2)................................................................................................. 19

5 U.S.C. § 706(2)(A).......................................................................................... 20, 28

42 U.S.C. § 1437f(a) ................................................................................................. 3

42 U.S.C. § 1437f(c)(1)(B) ...................................................................................... 20

42 U.S.C. § 1437f(o)................................................................................................. 3

42 U.S.C. § 1437f(o)(1)(B) ................................................................................. 8, 20

42 U.S.C. § 1437f(o)(6)(B) ...................................................................................... 34

42 U.S.C. § 3608(d) ................................................................................................. 20

42 U.S.C. § 3608(e)(5).............................................................................................. 20

Housing Act of 1937,
    Pub. L. No. 75-412, § 1, 50 Stat. 888, 888 (1937 ................................................. 3

Housing and Community Development Act of 1974,
    Pub. L. No. 93-383, § 8(a), 88 Stat. 633, 662 (1974) ................................... 3

Housing and Urban-Rural Recovery Act of 1983,
    Pub. L. No. 98-181, § 207, 97 Stat. 1153, 1181 (1983) .............................. 3

Housing Opportunity Throught Modernization Act of 2016,
    Pub. L. No. 114-201, § 107, 130 Stat. 782, 801 (2016) ............................. 8

**Regulations**

24 C.F.R. § 888.113(a) ......................................................................................... 4

24 C.F.R. § 888.113(b)(4) ....................................................................... 22, 23, 24

24 C.F.R. § 888.113(c)(4) ................................................................. 9, 12, 20, 21

24 C.F.R. § 982.1(a) ............................................................................................ 3

24 C.F.R. § 982.1(a)(3) ....................................................................................... 4

24 C.F.R. § 982.503 ............................................................................................ 3

*Fair Market Rents: Increased FMRs and Higher Payment Standards for Certain Areas,*
    65 Fed. Reg. 58,870 (Oct. 2, 2000) ............................................................ 4

*Section 8 Hosing Choice Voucher Program—Demonstration Project of Small Area Fair Market
    Rents in Certain Metropolitan Areas for Fiscal Year 2011,*
    75 Fed. Reg. 27,808 (May 18, 2010) .......................................................... 6

*Section 8 Hosing Choice Voucher Program—Demonstration Project of Small Area Fair Market
    Rents in Certain Metropolitan Areas for Fiscal Year 2011,*
    75 Fed. Reg. 27,808 (May 18, 2010) .......................................................... 6

*Proposed Fair Market Rents for the Housing Choice Voucher Program and Moderate
    Rehabilitation Singe Room Occupancy Program; Fiscal Year 2011,*
    75 Fed. Reg. 46,958 (Aug. 4, 2010) ........................................................... 6

*Final Fair Market Rents for the Housing CHoice Voucher Program for Small Artea Fair Market
    Rent Demonstratoipn Program Participants; Fiscal Year 2013,*
    77 Fed. Reg. 69,651 (Nov. 20, 2012) .......................................................... 6

*Establishing a More Effective Fair Market Rent (FMR) System; Using Small Area Fair Market
    Rents (SAFMRs) in the Housing Choice Voucher Program Instead of the Current 50th
    Percentile FMRs; Advance Notice of Porposed Rulemaking,*
    80 Fed. Reg. 31,332 (June 2, 2015) ............................................................ 7

*Establishing a More Effective Fair Market Rent System; Using Small Area Fair Market Rents in the Housing Choice Voucher Program Instead of the Current 50th Percentile FMRs,*
81 Fed. Reg. 80,567 (Nov. 16, 2016)............................................................. 5,6, 8, 9, 10, 26, 34

*Reducing Regulatory Burder; Enforcing the Regulatory Reform Agenda Under Executive Order 13777,*
82 Fed. Reg. 22,344 (May 15, 2017) ....................................................................................... 14

**INTRODUCTION**

In 2012, the United States Department of Housing and Urban Development ("HUD") undertook a demonstration project in five cities to see if setting rental-assistance payments by ZIP code rather than by metropolitan area led to better housing options for Section 8 voucher holders. In November 2016, without awaiting the results of the demonstration project evaluation, HUD finalized a rule to expand the mandatory use of the ZIP-code-level payment methodology to 23 additional metropolitan areas starting in January 2018.

After promulgation of the final rule, in August 2017, researchers retained under a cooperative agreement with HUD published a report with interim findings from the five demonstration cities and two additional cities that were also using the ZIP-code-level payments. The report included findings that the new payment methodology led to more units being made available in high-rent ZIP codes and fewer units being made available in low-rent ZIP codes, as had been expected, and that there was a "slight" increase in voucher holders moving into high-rent areas. Troublingly, however, the decrease in available units in low-rent ZIP codes was disproportionately greater than the growth of available units in high-rent ZIP codes, resulting in an overall decrease in affordable housing and an increase in rent burdens on voucher holders. HUD's Office of Policy Development and Research and Office of Public and Indian Housing therefore recommended that the Secretary delay rollout of the methodology in new cities by two years, so that HUD could further study the cause of the problems in the demonstration cities and craft potential remedies, such as guidance and technical assistance, with the help of a forthcoming final report on the demonstration project. The Secretary concurred with the recommendation and suspended the new payment methodology on August 10, 2017.

Over three months later, Plaintiffs—two individuals and one nonprofit—sued to try to force HUD to implement the new methodology by January 1, 2018, notwithstanding the concerns raised by the interim findings. Those Plaintiffs have now moved for a preliminary injunction.

The injunction should be denied. Plaintiffs will not succeed on the merits because HUD's suspension of the new payment methodology is committed to the agency's unreviewable discretion, is explicitly authorized by regulation, and is rationally and demonstrably based on the interim report's worrisome findings about housing availability and rent burdens. HUD is also currently in the process of undertaking a comment solicitation that will moot Plaintiffs' notice-and-comment claim. Further, Plaintiffs can show no harm other than speculation and nonserious expense, which is insufficient for a preliminary injunction. In fact, plaintiff Tiara Moore can show no redressable harm whatsoever, because she would not stand to benefit from the changed methodology even if it were made mandatory. These claims of harm stand in contrast to the heavy burden that other families may have to bear if HUD is forced to prematurely implement a methodology that could reduce the availability of housing units, increase voucher holders' rent burdens, and render families homeless, without the opportunity to address those concerns. Finally, even if an injunction were warranted, it must be tailored to the harm claimed by the only two plaintiffs in a jurisdiction that would be subject to the rule change, both of whom are in Hartford, Connecticut. Their request for sweeping changes to payments in 22 other metropolitan areas that have nothing to do with them is improper.

## BACKGROUND

### A.   HUD's Housing Choice Voucher Program

Eight decades ago, Congress passed the Housing Act of 1937 to provide financial assistance to state and local governments "to remedy unsafe and insanitary housing conditions and

the acute shortage of decent, safe, and sanitary dwellings for families of low income." Pub. L. No.

75-412, § 1, 50 Stat. 888, 888 (1937). Forty years later, the Housing and Community Development

Act of 1974 added Section 8 to the Housing Act for the dual purposes "of aiding lower-income

families in obtaining a decent place to live and of promoting economically mixed housing." Pub.

L. No. 93-383, § 8(a), 88 Stat. 633, 662 (1974) (codified at 42 U.S.C. § 1437f(a)). Under Section

8, HUD is authorized to enter into contracts with public housing agencies ("PHAs") whereby the

PHAs make rental subsidy payments to landlords on behalf of low-income tenants.

In 1983, Congress added the current Housing Choice Voucher ("HCV") program to Section

8. *See* Housing and Urban-Rural Recovery Act of 1983, Pub. L. No. 98-181, § 207, 97 Stat. 1153,

1181 (1983) (codified as amended at 42 U.S.C. § 1437f(o)). Under the HCV program, families are

able to select units on the private market that meet certain quality standards, and HUD provides a

monthly assistance payment towards those units through local PHAs. 24 C.F.R. § 982.1(a).

The amount of the assistance payment due to a voucher holder is derived from a "payment

standard amount," which is based on the applicable "fair market rent" ("FMR"). 24 C.F.R.

§ 982.503. Each year, HUD publishes FMRs for different geographic areas throughout the United

States. *Id.* § 982.503(a)(1). PHAs then use the FMRs to establish payment standard amounts for

every available unit size (measured by the number of bedrooms and inclusive of utilities) in their

respective jurisdictions. *Id.* A PHA may use the same payment standard amount in all areas within

its jurisdiction, or it "may establish a separate payment standard amount for each designated part

of the FMR area." *Id.* § 982.503(a)(3). The payment standard amount may be "at any level between

90 percent and 110 percent of the published FMR for that unit size" or at some other amount

approved by HUD. *Id.* § 982.503(b).

The assistance payment to a voucher holder is then generally calculated as the difference between the payment standard amount and 30 percent of the voucher holder's income. *See id.* § 982.1(a)(3). In other words, the voucher holder contributes 30 percent of her income towards rent and utilities, and HUD pays the rest. The voucher holder may opt for a unit for which the gross rent is more than the payment standard amount, but she will have to pay the difference in addition to the 30 percent of her income. *Id.*

B.     **HUD's Efforts to Achieve Expanded Housing Opportunities**

1.     **The 50th Percentile Program**

On October 2, 2000, HUD published a rule establishing a new FMR policy. *See Fair Market Rents: Increased Fair Market Rents and Higher Payment Standards for Certain Areas*, 65 Fed. Reg. 58,870 (Oct. 2, 2000). This new policy was "designed to achieve two fundamental program objectives: (1) Ensuring that low-income families are successful in finding and leasing decent and affordable housing; and (2) ensuring that low-income families have access to a broad range of housing opportunities throughout a metropolitan area." *Id.* at 58,870; *see also* Richardson Decl. ¶ 2.

The rule sought to fulfill this policy by allowing PHAs in areas meeting specified criteria to sometimes use payment standard amounts based on higher FMRs. 65 Fed. Reg. at 58,870. HUD generally calculates FMRs to reflect the 40th percentile rent in a given metropolitan area. *Id.*; *see also* 24 C.F.R. § 888.113(a). Under the October 2000 rule, PHAs were authorized to instead use the 50th percentile rent in two circumstances tied to HUD's two stated policy objectives: (1) "where families are having difficulty using housing vouchers to find and lease decent and affordable housing" and (2) "to promote residential choice, help families move closer to areas of job growth, and deconcentrate poverty." 65 Fed. Reg. at 58,870. If, however, a PHA using 50th

percentile FMRs did not experience a decrease in the concentration of voucher holders after three years (or if the concentration declined past a certain threshold), then the FMRs in that area would revert to 40th percentile rents. *Id.* at 58,871.

Based on recent research, HUD has concluded that the 50th percentile FMRs "are not an effective tool" for achieving the second policy objective: "increasing HCV tenant moves from areas of low opportunity to higher opportunity areas." 81 Fed. Reg. 80,567, 80,570 (Nov. 16, 2016). Instead, HUD has found that "the benefit of increased FMRs simply accrues to landlords in lower rent submarket areas in the form of higher rents rather than creating an incentive for tenants to move to units in communities with more and/or better opportunities." *Id.* Further, HUD noticed that a "large number of areas have been disqualified from the 50th percentile program for failure to show measurable reduction in voucher concentration of HCV tenants since 2001 when the program started, which strongly suggests that the deconcentration objective is not being met." *Id.*

### 2.      The Small Area FMR Demonstration Project

Given its lack of success with the 50th percentile program, HUD considered alternative ways of achieving expanding housing opportunities for HCV tenants. *See Establishing a More Effective Fair Market Rent System; Using Small Area Fair Market Rents in the Housing Choice Voucher Program Instead of the Current 50th Percentile FMRs*, 81 Fed. Reg. 80,567, 80,570 (Nov. 16, 2016). In 2010, the United States Census Bureau made available data collected over the first five years of its American Community Survey.[1] *Id.* Using that data, HUD was able to develop "Small Area FMRs," which reflect market rents in individual ZIP codes, rather than in broader

---

[1] The Census Bureau annually contacts over 3.5 million households to participate in the American Community Survey, which collects information about individuals beyond what is collected in the decennial census, including housing information like the number of bedrooms in the respondent's home and the respondent's rent. *See* https://www.census.gov/content/dam/Census/programs-surveys/acs/about/ACS_Information_Guide.pdf.

metropolitan areas. *Id.*; *see also* 75 Fed. Reg. 27,808, 27,809 (May 18, 2010). HUD's goal with this new, more targeted methodology was to "create more means for HCV tenants to move into higher opportunity, lower poverty areas by providing them with subsidy adequate to make such areas accessible and to thereby reduce the number of voucher families that reside in areas of high poverty concentration." 81 Fed. Reg. at 80,570.

To test the effectiveness of Small Area FMRs, HUD announced plans for a five-metropolitan-area demonstration project. *See Section 8 Housing Choice Voucher Program—Demonstration Project of Small Area Fair Market Rents in Certain Metropolitan Areas for Fiscal Year 2011*, 75 Fed. Reg. 27,808, 27,809 (May 18, 2010). The project was commenced in 2012 in five selected PHAs: (1) the Chattanooga (Tenn.) Housing Authority, (2) the Housing Authority of the City of Laredo (Tex.); (3) the Housing Authority of the City of Long Beach (Cal.); (4) the Housing Authority of the County of Cook (Ill.); and (5) the Town of Mamaroneck (N.Y.) Public Housing Authority. *See Final Fair Market Rents for the Housing Choice Voucher Program for Small Area Fair Market Rent Demonstration Program Participants; Fiscal Year 2013*, 77 Fed. Reg. 69,651, 69,652 (Nov. 20, 2012).[2] In instituting the demonstration project, HUD noted that the Small Area FMRs "represent a fundamentally different way of operating the voucher program in metropolitan areas; therefore, HUD is testing [Small Area] FMRs through a demonstration program to better understand the programmatic impacts of changing the way voucher payment standards are set." HUD said that the purpose of the demonstration project was two-fold: "(1) HUD needs to evaluate the demonstration project in terms of effectiveness in meeting the primary goal

---

[2] Even before this broader demonstration, HUD had earlier mandated the use of Small Area FMRs for the Dallas, Texas metropolitan FMRs. *See Proposed Fair Market Rents for the Housing Choice Voucher Program and Moderate Rehabilitation Single Room Occupancy Program Fiscal Year 2011*, 75 Fed. Reg. 46,958, 46,958 (Aug. 4, 2010).

of improving tenants' housing choices in areas of opportunity while also assessing the impact on tenants in areas with [Small Area] FMRs below the metropolitan-wide FMR, and (2) HUD wants to understand and evaluate the administrative and budget impacts of converting and operating the tenant-based voucher program using [Small Area] FMRs." *Id.*

### 3. The Small Area FMR Rule

Prior to the conclusion of the demonstration project, on June 2, 2015, HUD published an advance notice of proposed rulemaking announcing its intention to require several other metropolitan areas meeting certain criteria to switch to Small Area FMRs. *See Establishing a More Effective Fair Market Rent (FMR) System; Using Small Area Fair Market Rents (SAFMRs) in Housing Choice Voucher Program Instead of the Current 50th Percentile FMRs; Advanced Notice of Proposed Rulemaking*, 80 Fed. Reg. 31,332 (June 2, 2015). HUD noted that, based on its research and experience with the demonstration project as of that time, it "believe[d] that amending its current FMR regulation to enable adoption of the [Small Area] FMR methodology could provide HCV tenants greater access to higher opportunity, lower poverty neighborhoods." *Id.* at 31,333. HUD published a proposed rule on June 16, 2016. *Establishing a More Effective Fair Market Rent System; Using Small Area Fair Market Rents in Housing Choice Voucher Program Instead of the Current 50th Percentile FMRs*, 81 Fed. Reg. 39,218 (June 16, 2016). The proposed rule addressed some comments raised in response to the advance notice and sought additional comments on certain specific issues, including what additional policies HUD should adopt to "mitigate the impact of significant and abrupt decreases in the FMRs for certain ZIP code areas on families currently . . . in those impacted areas" and whether there were "specific groups within the general population of voucher holders for whom this policy change would be particularly burdensome." *Id.* at 39,224–25.

HUD published its final rule five months later on November 16, 2016. *Establishing a More Effective Fair Market Rent System; Using Small Area Fair Market Rents in Housing Choice Voucher Program Instead of the Current 50th Percentile FMRs*, 81 Fed. Reg. 80,567 (Nov. 16, 2016). In the preamble, HUD noted that commentators were "divided in their support for the rule." *Id.* at 80,571. In particular, some commenters expressed concern that the rule would result in voucher holders in some ZIP codes "experiencing decreases in their subsidies" as a result of lower FMRs and that "these recipients would be obliged to increase their out-of-pocket share" of rental payments. *Id.* at 80,571. Commenters further stated that the rule would be particularly burdensome on "the elderly, people with disabilities, and families with children," and they "raised the concern that each group could face increased housing cost burdens, displacement, prohibitively expensive moves, and homelessness." *Id.* at 80,575.

HUD agreed that the commenters' concerns "pose serious challenges for the specific populations raised above" and that "it is important to protect tenants" from the adverse effects of the rule change. 81 Fed. Reg. at 80, 872, 80,574–75. HUD therefore added some measures to the final rule intended to do that. *First*, HUD noted that a provision in a recently enacted law, the Housing Opportunity Through Modernization Act of 2016 ("HOTMA"), Pub. L. No. 114-201, § 107, 130 Stat. 782, 801 (July 29, 2016) (amending 42 U.S.C. § 1437f(o)(1)(B)), allowed PHAs the option (but did not require them) to maintain a nonmoving family's payment standard amount in instances where the applicable FMR is reduced. *Id.* at 80,572–73. The final rule also permitted PHAs the option of *increasing* such a family's payment standard amount to a degree less than the reduction in the FMR, so that the PHA "may still achieve some budgetary flexibility." *Id. Second*, the final rule limited the maximum amount by which an FMR could decrease in a given year to 10

percent of the prior year's FMR. *Id. Third*, HUD noted that PHAs could (but were not required to) request an exception to established payment standard amounts, subject to HUD's approval. *Id.*

In addition, HUD added a provision to the final rule (not included in the proposed rule) that allows it broad discretion to "suspend a Small Area FMR designation for a metropolitan area, including at the request of a PHA, where HUD determines such action is warranted based on a documented finding of adverse rental market conditions that will be set out by notice (for example, the metropolitan area experiences a significant loss of housing units as a result of a natural disaster)." 81 Fed. Reg. at 80,569. The provision allowing for such suspensions reads as follows:

> HUD will designate Small Area FMR areas at the beginning of a Federal fiscal year, such designations will be permanent, and will make new area designations every 5 years thereafter as new data becomes available. HUD may suspend a Small Area FMR designation from a metropolitan area, or may temporarily exempt a PHA in a Small Area FMR metropolitan area from use of the Small Area FMRs, when HUD by notice makes a documented determination that such action is warranted. Actions that may serve as the basis of a suspension of Small Area FMRs are:
>
> (i) A Presidentially declared disaster area that results in the loss of a substantial number of housing units;
>
> (ii) A sudden influx of displaced households needing permanent housing; or
>
> (iii) Other events as determined by the Secretary.

24 C.F.R. § 888.113(c)(4).

Notably, some commenters urged HUD not to impose Small Area FMRs on additional metropolitan areas until the conclusion and evaluation of the demonstration project. At least one commenter stated that "given that demonstration of this idea in five locations is well underway, HUD's proposal is premature." 81 Fed. Reg. at 80,579. In response, HUD "acknowledge[d] that more information on the overall effects of the Small Area FMR approach will be forthcoming when the results of the demonstration project are available to inform broad policy." *Id.* It concluded,

however, that "it is not premature to implement Small Area FMRs on this limited basis in those areas where it has the potential to address significant voucher concentration problems." *Id.*

Accordingly, HUD finalized the Small Area FMR rule and required PHAs in the 24 metropolitan areas subject to it, *see* 81 Fed. Reg. 80,678, 80,679 (Nov. 16, 2016) (listing those areas), to implement Small Area FMRs. The new Small Area FMRs went into effect on October 1, 2017, meaning that the PHAs subject to the rule were required to implement them within three months of that date: by January 1, 2018. *See* 81 Fed. Reg. 80,567, 80,569; *see also* 24 C.F.R. § 982.503(b)(1)(i).

### C.      Recent Interim Findings Concerning Small Area FMRs

On April 26, 2017, Abt Associates, an independent group of researchers retained under a cooperative agreement with HUD, presented HUD's Office of Policy Development and Research ("PD&R") with an Interim Report titled, *Small Area Fair Market Rent Demonstration Evaluation*. Ex. 1, Interim Report; Richardson Decl. ¶¶ 4, 7. The Interim Report analyzed the effects of Small Area FMRs in the five demonstration cities, as well as two PHAs in the Dallas, Texas metropolitan area that had been using Small Area FMRs since 2011. Ex. 1, Interim Report at v–vi. The Report considered the effects of Small Area FMRs on potential access to opportunity, actual access to opportunity, and costs and rents. *Id.* at vi.

With respect to the first effect (potential access to opportunity), the Interim Report concluded that Small Area FMRs "increase the pool of units potentially available to HCV voucher holders that rent below the applicable FMR in high-rent ZIP Codes, and they reduce the pool in low-rent ZIP codes." Ex. 1, Interim Report at vii. Adversely, however, "the gain in units with rents below the applicable FMR in high-rent ZIP Codes does not offset the decrease in the number of units in the low-rent and moderate-rent ZIP Codes, resulting in a net loss of units potentially

available to HCV holders overall." *Id.* The net effect across the demonstration areas was "a loss of over 22,000 units (3.4 percent) that might otherwise be affordable to HCV holders." *Id.*

As for the second area (actual access to opportunity), the Interim Report contained "slightly" encouraging news. It noted that "slight changes in rents among the [Small Area] FMR PHAs . . . translate into slight changes in opportunity." Ex. 1, Interim Report at viii. Specifically, "following the implementation of [Small Area] FMRs, 13 percent of HCV holders in the [Small Area] FMR PHAs lived in high-opportunity areas compared with 11 percent prior to implementation." *Id.*

Finally, with respect to the third area (costs and rents), the Interim Report contained more concerning news. It concluded that the overall payment standard amounts in Small Area FMR PHAs declined by about 11 percent in inflation-adjusted real terms—much sharper than the 2 percent decline experienced in comparison PHAs that had not implemented Small Area FMRs. Ex. 1, Interim Report at ix–x. As a result, the average tenant rent contribution in areas with Small Area FMRs increased by 16 percent. *Id.* at x. The increase was particularly sharp for families living in low-rent ZIP codes, who saw average increases in their rent burdens of about 22 percent. *Id.* By contrast, the rent increases in comparison PHAs without Small Area FMRs was only 9 percent. *Id.* The Interim Report noted that the increased rent contributions in Small Area FMR areas "suggests that some HCV holders did not move when payment standards fell, and they faced higher tenant rent contributions as a result." *Id.*

The Interim Report also opined about the impact of Small Area FMRs on PHAs. Ex. 1, Interim Report at x–xi. It noted that the largest expenditure for PHAs were payments to vendors and consultants related to automated systems for handling ZIP code-level payment standards. *Id.* at xi. It also noted that implementation of Small Area FMRs required "intensive staff efforts" in

the areas of setting up the payment standards and training staff on how to explain and apply them. *Id.* Other impacts concerned rent adjustments and communications with landlords and tenants about the changes. *Id.*

Finally, the Interim Report noted that its findings related only to Phase 1 of the demonstration project and that a final report combining and synthesizing data collected in Phase 1 and a still-to-come Phase 2 would be submitted in mid-2018. Ex. 1, Interim Report at xi. During Phase 2, the researchers will use the empirical findings from Phase 1 to form the basis for qualitative interviews of tenants and landlords to determine how the Small Area FMR changes have affected (or could affect) their decisions about housing and housing choice. *Id.* at 97. It will also analyze of Small Area FMRs on racial groups and racial concentration. Richardson Decl. ¶ 10. In addition, Phase 2 will update the Interim Report's empirical analysis with updated housing data. Ex. 1, Interim Report at xi.

### D.      HUD's Temporary Suspension of the Small Area FMR Rule

On July 11, 2017, based on concerns about the adverse findings in the forthcoming Interim Report and additional analysis by HUD, Acting General Deputy Assistant Secretary for PD&R Todd Richardson (a long-time career employee) and Dominique Blom, the General Deputy Assistant Secretary for Public and Indian Housing, concurrently recommended to the Secretary of HUD that he invoke 24 C.F.R. § 888.113(c)(4) to suspend for two years the mandatory use of Small Area FMRs in the 23 metropolitan areas subject to the Small Area FMR rule (excluding Dallas). Richardson Decl. ¶¶ 8–9. Acting General Deputy Assistant Secretary Richardson believed that the two-year suspension would allow HUD sufficient time to address the adverse rental housing market conditions experienced by the cities evaluated in the Interim Report in light of the full and complete findings in the forthcoming final report by Abt Associates. *Id.* ¶¶ 10–11.

On August 10, 2017, the Secretary of HUD issued a signed memorandum temporarily suspending the Small Area FMR designations for the 23 metropolitan areas subject to the Small Area FMR rule (excluding Dallas) and required that those changes go into effect in Fiscal Year 2020 rather than Fiscal Year 2018. Ex. 2, Suspension Memorandum at 1. The Suspension Memorandum relied primarily on the findings of the Interim Report, noting that it "included several findings that are worrisome and where further research is needed to address a number of critical questions with respect to the potential harm to HCV families (both participants and applicants) in areas transitioning to Small Area FMRs." *Id.* The Suspension Memorandum stated that the "findings of the interim report that are of most concern to HUD relate to the availability of units and the impact of Small Area FMRs on voucher success rates and utilization, and to rent burdens among assisted households." *Id.*

With respect to the availability of units and success rates, the Suspension Memorandum noted that "one of the findings of concern from the interim report is that the gain in units with rents below the applicable FMR in high-rent ZIP codes did not offset the decrease in the number of units in the low-rent and moderate-rent ZIP codes." Suspension Memorandum at 5. It acknowledged that the Small Area FMR rule sought to limit this effect by capping any decrease of FMRs to no more than 10 percent per year, but concluded that this protection "may only slow the pace of the loss of units, as opposed to preventing the overall decline in the number of units available to HCV families in the metropolitan area." *Id.* at 5–6. The Suspension Memorandum further observed that landlords were not required to accept housing vouchers; their participation in the HCV program is voluntary. *Id.* at 6. Thus, if landlords in higher-cost areas have enough demand for their units from unassisted families, they may opt not to participate in the HCV program. *Id.* The Suspension Memorandum noted that this decreased availability of rental units had led to a troubling

underutilization of the HCV program in five of the seven demonstration sites. It acknowledged that this underutilization may be temporary or the result of some cause other than Small Area FMRs, but concluded that it is "a potential concern that warrants further exploration during Phase 2 of the Demonstration Evaluation" and that HUD "may need to make adjustments to mitigate the risk that the effort to increase opportunities in higher-rent areas does not unintentionally harm families by significantly reducing the overall number of rental units that are available." *Id.*

As for rent burdens, the Suspension Memorandum recounted that the Interim Report found that Small Area FMRs have the potential to increase an assisted family's rent burden. Ex. 2, Suspension Memorandum at 6. The Memorandum acknowledged that the Small Area FMR rule allowed PHAs to hold nonmoving families harmless from decreases in payment standard amounts resulting from reduced FMRs, but it also noted that "there is no protection for families that must move to a new unit or for applicant families off the waiting list who are trying to lease a unit on the program for the first time." *Id.* at 7. The Memorandum acknowledged that there could be another cause behind the increased rent burdens, but concluded that "further analysis and research is needed on this aspect of the Small Area FMR Demonstration during Phase 2 of the evaluation." *Id.*

In addition to the concerns raised by the Interim Report, the Suspension Memorandum also noted that PHAs had raised concerns about the Small Area FMR rule in response to an invitation for public comment on reducing regulatory burden. Ex. 2, Suspension Memorandum at 7 (citing *Reducing Regulatory Burden; Enforcing the Regulatory Reform Agenda Under Executive Order 13777*, 82 Fed. Reg. 22,344 (May 15, 2017)). It also noted that HUD was in the process of developing guidance and technical assistance to PHAs implementing the Small Area FMRs. *Id.* at 8. But it opined that those efforts had been complicated by HUD's continued efforts to solicit input

and feedback on the Small Area FMR rule from PHAs and other stakeholders, and it expressed concern that "developing and issuing the guidance and technical assistance without fully understanding and incorporating the lessons of the Demonstration will result in a product that does not adequately assist those PHAs that must make the transition." *Id.*

Based on these considerations, the Suspension Memorandum concluded that the Small Area FMR rule should be suspended for two years until Fiscal Year 2020. Ex. 2, Suspension Memorandum at 1. It explicitly noted, however, that the suspension was for the mandatory aspect of the rule only and did not prevent "any PHA operating in the covered metropolitan areas from voluntarily implementing the use of Small Area FMRs prior to October 1, 2019." *Id.* at 3.

A letter dated August 11, 2017, was sent to the more than 200 PHAs subject to the Small Area FMR rule informing them of the suspension. Richardson Decl. ¶ 12; Ex. 3, Letter to PHAs.

### E.      Procedural Posture of this Litigation

On October 23, 2017—nearly three months after the Secretary of HUD issued the Suspension Memorandum—Plaintiffs Open Communities Alliance, Crystal Carter, and Tiara Moore, filed this action in federal court challenging the temporary suspension of Small Area FMRs and insisting that HUD implement Small Area FMRs without delay or modification by January 1, 2018. ECF No. 1. About two weeks later, on November 8, 2017, Plaintiffs moved for a preliminary injunction, arguing that they will be irreparably harmed if Small Area FMRs are delayed by two years and do not go into effect on January 1, 2018. ECF No. 15. Defendants, with Plaintiffs' consent, obtained an extension of time to respond to the motion to December 1, 2017, and (at Plaintiffs' request) an extension of time for Plaintiffs' reply to December 11, 2017. ECF No. 19. In the meantime, on November 13, 2017, the Institute for Policy Integrity sought leave to file an amicus brief in support of Plaintiffs, which this Court granted on November 14, 2017. Defendants

now oppose Plaintiffs' motion for a preliminary injunction. A hearing on the motion is scheduled for the morning of December 19, 2017.

### F.        HUD's Upcoming Comment Period

After this case was filed, HUD determined that it would elect to seek public comment on its decision to suspend Small Area FMRs. To that end, HUD has established a docket for a forthcoming notice requesting public comment. Santa Anna Decl. ¶ 2. HUD expects the notice to be published in the *Federal Register* during the first week of December and will accept comments for a period of 30 days thereafter. *Id.* ¶¶ 3–4. HUD will publish a decision with respect to the Small Area FMR suspension after it has reviewed and considered the comments submitted. Richardson Decl. ¶ 13.

## STANDARD

Plaintiffs seek a preliminary injunction requiring HUD to rescind its August 10, 2017, suspension of Small Area FMRs and to implement them in all metropolitan areas subject to the November 2016 rule by January 1, 2018. A preliminary injunction is "an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To obtain one, a movant must make a "clear showing that four factors, taken together, warrant relief." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (quoting *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 505 (D.C. Cir. 2016)). Those four factors are:

> (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). Further, when a party seeks a mandatory injunction that would alter the status quo rather than preserve it, as

Plaintiffs do here, "the moving party must meet a higher standard than in the ordinary case by showing 'clearly' that he or she is entitled to relief or that 'extreme or very serious damage will result from the denial of the injunction.'" *Nat'l Conf. on Ministry to Armed Forces v. James*, 278 F. Supp. 2d 37, 43 (D.D.C. 2003) (quoting *Columbia Hosp. for Women Found. v. Bank of Tokyo–Mitsubishi, Ltd.*, 15 F. Supp. 2d 1, 4 (D.D.C. 1997), *aff'd* 159 F.3d 636 (D.C. Cir. 1998)).

The D.C. Circuit has in the past applied a "sliding scale" approach to the four factors, holding that "[i]njunctive relief may be granted with either a high likelihood of success and some injury, or vice versa." *Cuomo v. U.S. Nuclear Regulatory Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985). In 2008, however, the Supreme Court decided *Winter*, which rejected the notion that "when a plaintiff demonstrates a strong likelihood of prevailing on the merits," a court could enter an injunction on a showing of the "possibility" of irreparable harm. 555 U.S. at 21. Instead, the Court held, a plaintiff seeking preliminary relief must always "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Id.* at 22 (emphasis in the original). Following *Winter*, courts in this Circuit, including this Court, have held that a movant must show that irreparable injury is "likely," regardless of its showing on the merits. *See Singh v. McConville*, 187 F. Supp. 3d 152, 160 (D.D.C. 2016) (Howell, C.J.). The court of appeals, however, has not yet had the opportunity to reconsider the viability of its sliding-scale approach in light of *Winter*. *See League of Women Voters*, 838 F.3d at 7; *see also Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009) (noting that *Winter* "could be read to create a more demanding burden").

## ARGUMENT

Plaintiffs should be denied a preliminary injunction. Every factor of the four-part test weighs against them. First, Plaintiffs will not succeed on the merits because HUD's suspension is unreviewable, was authorized by regulation, and was a nonarbitrary reaction to an independent

study showing that Small Area FMRs could hurt vulnerable populations and low-income families. Further, Plaintiffs' notice-and-comment challenge will soon become moot when HUD issues a notice seeking public comment on its suspension of Small Area FMRs. That will allow for the process that Plaintiffs demand and will give Plaintiffs and others an opportunity to identify and have HUD consider the issues that they contend (wrongly) that HUD overlooked.

Second, Plaintiffs have not articulated sufficient harm. The individual plaintiffs cite little more than speculation about long-term missed opportunities and a continued need to drive further to daily appointments. Further, one of the individual plaintiffs does not even hold a housing voucher issued by a PHA that would have been subject to the Small Area FMR rule even absent the suspension. She ignores this fact in her declaration, but it negates her claim of irreparable harm. As for the institutional plaintiff, Open Communities Alliance, it argues only that it will now make efforts to oppose the suspension and encourage PHAs to adopt Small Area FMRs voluntarily. That is not sufficient to show irreparable harm.

As for other interested parties and the public interest, the Interim Report indicates that the Small Area FMR rule, if implemented without further study and development, may decrease the availability of affordable housing in the 23 metropolitan areas that are subject to the suspension and may require low-income families to pay an increased and possibly prohibitory amount of their income in rent. It would be inequitable to risk subjecting vulnerable populations and families to homelessness so that the one individual plaintiff that stands to benefit from the rule may (possibly) move to her preferred area two years sooner that she otherwise could.

Finally, even if the Court were inclined to issue an injunction, it should not do so in the form urged by Plaintiffs. The only plaintiffs that are in a jurisdiction subject to the Small Area

FMR rule reside and operate in Hartford, Connecticut. Any injunctive relief must therefore be tailored to that region and that region alone.

## I.     Plaintiffs Will Not Succeed on the Merits.

### A.     HUD's Temporary Suspension Is Not Reviewable.

Plaintiffs urge the Court to enjoin HUD's decision to implement Small Area FMRs in Fiscal Year 2020 rather than Fiscal Year 2018, but they fail to articulate any meaningful statutory or regulatory standard by which HUD's action could be evaluated. Accordingly, HUD's decision concerns an issue committed to its discretion by law and is not subject to judicial review.

The Administrative Procedure Act expressly precludes judicial review of agency action that is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). An action is committed to agency discretion where "the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1984). Notably, the APA's "arbitrary and capricious" standard does not itself supply a means of allowing for judicial review of an otherwise unreviewable statute. *See Schneider v. Feinberg*, 345 F.3d 135, 148 (2d Cir. 2003). Judicially manageable standards "may be found in formal and informal policy statements and regulations as well as in statutes." *Padula v. Webster*, 822 F.2d 97, 100 (D.C. Cir. 1987). In determining whether agency statements create such a standard, a court inquires whether those statements create binding norms by imposing rights or obligations on the respective parties. *Id.* This exception to reviewability is narrow and is applicable only where "statutes are drawn in such broad terms that in a given case there is no law to apply," *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410 (1970) (internal quotations omitted). This is such a case.

As an initial matter, nothing in the statute provides a "meaningful standard" by which the Court may evaluate HUD's decision to implement Small Area FMRs in Fiscal Year 2020 rather than 2018. The only timing requirement imposed by the statute with respect to FMRs is that they must be published annually 30 days in advance of their effective date. *See* 42 U.S.C. § 1437f(c)(1)(B); *see also id.* § 1437f(o)(1)(B) (noting that the voucher program uses the FMRs established under subsection (c)). This requirement provides no standard by which to judge HUD's decision to temporarily delay Small Area FMRs. Indeed, Plaintiffs do not claim that HUD violated this requirement in any way.

Neither do HUD's regulations contain any meaningful standard by which HUD's suspension of Small Area FMRs may be evaluated. As noted in subpart B below, HUD's regulations grant it expansive permission it to suspend Small Areas FMRs "when HUD by notice makes a documented determination that such action is warranted," and it later reiterates that the basis for a suspension may be any event "as determined by the Secretary." 24 C.F.R. § 888.113(c)(4). This language commits the suspension of Small Area FMRs to HUD's discretion, provides no meaningful standard by which the Court can evaluate it, and removes it from judicial review under the Administrative Procedure Act. [3]

---

[3] In their complaint, Plaintiffs include a claim under 5 U.S.C. § 706(2)(A) that HUD's two-year suspension of Small Area FMRs is not in accordance with the Fair Housing Act ("FHA"). *See* Compl. ¶¶ 158–63, ECF No. 1 (citing 42 U.S.C. § 3608(d), (e)(5)). Plaintiffs, however, have opted not to argue that claim in support of their motion for a preliminary injunction. As a result, they cannot obtain an injunction based on a showing of likely success on that claim. *Jones v. Mukasey*, 565 F. Supp. 2d 68, 81 (D.D.C. 2008) ("As the D.C. Circuit has consistently held, the Court should not address arguments raised for the first time in a party's reply."). Nor would they otherwise be able to. The provision in the FHA upon which Plaintiffs rely states broadly that HUD shall "administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of this subchapter." 42 U.S.C. § 3608(e)(5); *see also id.* § 3608(d) (using similar language directed at other executive departments and agencies). That very broad provision provides no meaningful standard by which HUD's decision to temporarily

The D.C. Circuit has recognized analogous language as committing matters to agency discretion. In *Steenholdt v. Federal Aviation Administration.*, the court of appeals held that the FAA's decision not to renew an individual's designation to examine aircraft repairs for compliance with regulations was committed to agency discretion where the statute authorized the Administrator to rescind a designation "at any time for any reason the Administrator considers appropriate" and the regulation similarly allowed rescission "[f]or any reason the Administration considers appropriate." 314 F.3d 633, 638 (D.C. Cir. 2003). Here, the statute is completely silent and the regulations contain language that is just as expansive as that analyzed in *Steenholdt*: HUD may suspend Small Area FMRs "when HUD by notice makes a documented determination that such action is warranted" and for any reason "as determined by the Secretary." 24 C.F.R. § 888.113(c)(4). Accordingly, the suspension is not reviewable under the Administrative Procedure Act.

### B.   HUD's Temporary Suspension Is Allowed by the Rule.

In temporarily suspending the Small Area FMR designations for 23 of the metropolitan areas originally subject to the Small Area FMR rule, HUD acted pursuant to a provision of the Small Area FMR regulation that explicitly authorizes such suspensions for any reason determined by the Secretary to warrant it. Specifically, HUD's regulations provides that that agency "may suspend a Small Area FMR designation from a metropolitan area, or may temporarily exempt a PHA in a Small Area FMR metropolitan area from use of the Small Area FMRs, when HUD by notice makes a documented determination that such action is warranted." The regulation then lists certain "[a]ctions that may serve as the basis for suspending Small Area FMRs," including "(i) A

---

suspend Small Area FMRs may be evaluated and therefore does not nullify the regulation's language committing the matter to the agency's unreviewable discretion.

Presidentially declared disaster area that results in the loss of a substantial number of housing units; (ii) A sudden influx of displaced households needing permanent housing; or (iii) Other events as determined by the Secretary." 24 C.F.R. § 888.113(b)(4). Here, the Secretary of HUD, acting on the recommendation of the Office of Policy Research and Development and the Office of Public and Indian Housing, noted that the Interim Report showed that Small Area FMRs could cause a loss of available housing to voucher families and an increase in their monthly rent burdens, and the Secretary determined that these circumstances (among others) warranted a two-year suspension of Small Area FMRs so that further study could be completed and remedies explored. Richardson Decl. ¶¶ 8–12. That determination was documented and notice was provided, in compliance with the regulation. *See* Ex. 2, Suspension Memorandum; Ex. 3, Letter to PHAs.

Plaintiffs do not argue that the regulation permitting HUD to suspend Small Area FMRs is improper in any way or that HUD failed to provide notice by documented determination. Instead, Plaintiffs contend that the provision does not apply to a suspension based on the Interim Report's findings of negative impacts on voucher families because the cause of those impacts is not "unexpected" and the impacts are not "sudden." Pl.'s Br. at 26, ECF No. 15-1. Thus, Plaintiffs contend, HUD's action was not in compliance with the rule; it was a modification of the rule and had to be accomplished through notice-and-comment rulemaking. But those the conditions on the Secretary's discretion urged by Plaintiffs are nowhere to be found on the face of the regulation. By its plain terms, it allows a suspension whenever HUD determines "that such action is warranted" and explicitly notes that such a suspension may be based on any "events as determined by the Secretary." 24 C.F.R. § 888.113(b)(4). HUD provided notice of the temporary suspension by documented determination and detailed therein the bases for the suspension as determined by the

Secretary. *See* Ex. 2, Suspension Letter; Ex. 3, Letter to PHAs. Consequently, its suspension is proper under the regulation.

Plaintiffs' argument to the contrary employs the doctrine of *ejusdem generis* to try to cabin the broadly permissive language of the regulation in a way that suits their purposes. Skirting past the broad permission that HUD may suspend Small Areas FMRs "where HUD by notice makes a documented determination that such action is warranted" and ignoring the expansive statement that a suspension may be justified by "other events as determined by the Secretary," Plaintiffs instead restrict their attention to the two examples of specific actions that may warrant a suspension: a declared disaster resulting in a loss of housing units or an influx of households needing housing. Plaintiffs contend that the Court should ignore the broad language elsewhere in the regulation and instead read it narrowly to allow a suspension only where justified by events similar in kind to those two enumerated examples, which Plaintiffs characterize as involving "unexpected events resulting in a sudden change in localized rental market conditions." Pls.' Br. at 26.

The doctrine of *ejusdem generis* does not allow such a dramatic rewriting of regulatory language. The Supreme Court has long held that "the rule of ejusdem generis, while firmly established, is only an instrumentality for ascertaining the correct meaning of words when there is uncertainty. Ordinarily, it limits general terms which follow specific ones to matters similar to those specified; but it may not be used to defeat the obvious purpose of legislation." *Gooch v. United States*, 297 U.S. 124, 128 (1936). Here, there is no ambiguity, and the obvious purpose of the regulation is to be expansive. By its terms, the provision allows HUD to temporarily suspend Small Area FMRs at its discretion "where HUD by notice makes a documented determination that such action is warranted." 24 C.F.R. § 888.113(b)(4). There are no conditions on that permission.

In fact, Plaintiffs do not and cannot argue that this particular language (which they ignore) is limited by the doctrine of *ejusdem generis*, because it is not a "general term[] which follow[s] specific ones." *Gooch*, 297 U.S. at 128. It is a self-contained authorization allowing HUD broad discretion in determining when to suspend Small Area FMRs, so long as that determination is noticed and documented.

Rather than address this broad permission, Plaintiffs focus on other language in the regulation providing enumerated examples of things that might serve as a basis for a suspension: "Actions that may serve as the basis of a suspension of Small Area FMRs are: . . . ." 24 C.F.R. § 888.113(b)(4). Plaintiffs construe the items on that list not as examples, but as implied restrictions. Pl.'s Br. at 26. But nothing in the language of the regulation indicates that those enumerations are in fact meant to restrict in any way the bases for which HUD may determine that "such action is warranted." Instead, the regulation indicates that those items are meant to be illustrative. And if there were any doubt about that reading, the enumerated examples themselves dispel it by concluding with an expansive catchall: "other events as determined by the Secretary." The inclusion of that phrase demonstrates that the preceding examples do not restrict the permissible bases for a suspension and that the broad discretion granted earlier that in the provision remains unrestrained.

Plaintiffs seek to avoid the effect of the broad catchall by contending that *ejusdem generis* requires the Court to read into it a condition that the Secretary may determine an event merits a suspension only in the case of "unexpected events resulting in a sudden change in rental market conditions." Pl.'s Br. at 26. But the doctrine of *ejusdem generis* does not apply in this instance because the content and context of the regulation indicate a contrary intent. *See Springer v. Gov't of Philippine Islands*, 277 U.S. 189, 206 (1928) ("Where a statute contains a grant of power

enumerating certain things which may be done and also a general grant of power which, standing, alone, would include these things and more, the general grant may be given full effect if the context shows that the enumeration was not intended to be exclusive."); *see also Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 227 (2008) ("[W]e do not woodenly apply limiting principles every time Congress includes a specific example along with a general phrase."); *Norfolk & Western Ry. Co. v. Am. Train Dispatchers Ass'n*, 499 U.S. 117, 129 (1991) ("The canon [of *ejusdem generis*] does not control, however, when the whole context dictates a different conclusion."). Considering the regulation as a whole, rather than reflexively applying *ejusdem generis*, provides multiple indications of an intent to be expansive. First, the provision features the self-contained, broadly permissive language referenced above, allowing HUD to suspend Small Area FMRs "when HUD by notice makes a documented determination that such action is warranted." Second, the language introducing the enumerated examples contains no indication that those examples are meant to restrict the circumstances under which HUD may find a suspension warranted. And finally, the wording of the catchall provision itself forecloses the notion that the nature of the "events" referenced therein is to be limited by the preceding examples, because it specifically states that the nature of the referenced "events" are those that are "determined by the Secretary," not those that are similar in kind to the preceding examples.

Thus, the regulation unambiguously allows HUD broad discretion in deciding when to suspend Small Area FMRs. But even if the Court were to conclude that there were some ambiguity to the regulation, HUD's interpretation would still be "controlling unless 'plainly erroneous or inconsistent with the regulation.'" *See Auer v. Robbins*, 519 U.S. 452, 461–62 (1997). And nothing in the regulation makes HUD's reading plainly erroneous or inconsistent with the text. Plaintiffs quote (in a parenthetical) the opinion in *Shieldalloy Metallurgical Corp. v. Nuclear Regulatory*

*Commission* for the proposition that an agency's interpretation of its own regulation is not due any deference where it "conflicts with prior interpretations or amounts to 'nothing more than a convenient litigating position.'" Pls.' Br. at 26–27 (citing 768 F.3d 1205, 1209 (D.C. Cir. 2014) (quoting *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012)). But that case is inapposite. In this case, HUD has not adopted any prior conflicting interpretations of its regulation; nor is its interpretation simply a convenient litigating position. It invoked the same interpretation of the regulation that it relies upon here when it issued the Suspension Memorandum, and its reading of that provision has not changed. Accordingly, it is owed the deference required by law.

Finally, even if the Court were to find the regulation to be ambiguous and even were it to apply the doctrine of *ejusdem generis* to limit the expansive catchall in the list of examples, the regulation would nevertheless support HUD's suspension of the Small Area FMR rule. Plaintiffs argue that the listed examples constrain the catchall phrase to "unexpected events resulting in a sudden change in localized rental market conditions." Pl.'s Br. at 26. That characterization, however, is arbitrarily derived simply to suit Plaintiffs' litigation position. There is no rational, policy-based reason for why HUD would limit its ability to suspend Small Area FMRs only to instances where impacts are "sudden" and causes "unexpected," and Plaintiffs do not even attempt to articulate such a reason. Instead, a more relevant and policy-based theme to the two specific examples is that they both relate to market conditions resulting in negative impacts on voucher families. In the case of a disaster, there is a decrease in the supply of units; and in the case of an influx of displaced households, there is an increase in demand. In either case, fewer units are available to voucher families, and that is plainly what would warrant a suspension. Indeed, this reading is consistent with the language of the preamble to the regulation, which noted that the suspension provision would allow HUD to "suspend a Small Area FMR designation for a

metropolitan area, including at the request of a PHA, where HUD determines that such action is warranted based on a documented finding *of adverse rental housing market conditions* that will be set out by notice (for example, the metropolitan area experiences a significant loss of housing units as a result of a natural disaster)." 81 Fed. Reg. at 80,569 (emphasis added). There is nothing in the preamble about "unexpected" events with "sudden" consequences. Construed this way, HUD's action was proper. Its suspension of Small Area FMRs was based on a documented determination that the Small Area FMRs are indicated to cause "a net loss of units that are potentially available to voucher families" by virtue of the fact that the study sites experienced a loss of over 22,000 available units after implementation of Small Area FMRs. Because HUD's basis for the suspension relied upon adverse market conditions, it is of the same relevant kind as the two enumerated examples in the suspension regulation and is proper even if the regulation were read to be ambiguous and limited by the doctrine of *ejusdem generis*.

### C.     HUD's Temporary Suspension Is Not Arbitrary and Capricious.

Next, Plaintiffs argue that HUD's suspension of the Small Area FMRs is arbitrary and capricious because HUD "provided no reasoning, and pointed to no evidence, that adequately supports" its decision. Pls.' Opp. at 28. As noted above, HUD's decision to delay Small Area FMRs to Fiscal Year 2020 instead of Fiscal Year 2018 is committed to its discretion by law and is not subject to judicial review. But even if HUD's suspension were subject to review, it would pass muster under the highly deferential arbitrary-and-capricious standard of the Administrative Procedure Act. Plaintiffs' argument to the contrary relies on a highly selective (even obfuscating) reading of the Suspension Memorandum and is easily dispelled by a considered review of the full document and HUD's reasons for the suspension as detailed therein.

A court may set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). "Normally, an agency [decision] would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The arbitrary and capricious standard is "very deferential." *Rural Cellular Ass'n v. F.C.C.*, 588 F.3d 1095, 1105 (D.C. Cir. 2009). A court "does not substitute its judgment for that of the administrative agency." *U.S. Airwaves, Inc. v. FCC*, 232 F.3d 227, 234 (D.C. Cir. 2000). The agency need only articulate a "'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43. That articulation need not be a "model of clarity." *Banner Health v. Price*, 867 F.3d 1323, 1356 (D.C. Cir. 2017). And the agency is entitled to a "presumption of procedural regularity and substantive rationality." *Pharm. Research & Mfrs. of Am. v. FTC*, 790 F.3d 198, 212 (D.C. Cir. 2015).

Plaintiffs argue that HUD acted arbitrarily and capriciously by failing in several respects to provide a reasoned explanation for its suspension of Small Area FMRs. First, they contend that HUD "failed to acknowledge the benefits of immediate use of small area FMRs." Pls,' Br. at 29. Not true. The Suspension Memorandum acknowledged the Interim Report's positive findings that the Small Area FMRs had achieved some limited fulfillment of their anticipated purposes. It noted that "voucher families in the demonstration sites were slightly more likely to live in high rent ZIP code areas . . . than they were prior to the demonstration project" and that costs had decreased in the demonstration sites more than they had in comparison PHAs. Ex. 2, Suspension Memorandum

at 5. The Suspension Memorandum also noted, however: "But the Interim Report also included several findings that are worrisome and where further research is needed to address a number of critical questions with respect to the potential harm to HCV families (both participants and applicants) in areas transitioning to Small Area FMRs." *Id.* HUD thus balanced the "worrisome" aspects of immediate implementation of Small Area FMRs against their "slight" demonstrated benefits, and it made a reasoned determination that a two-year suspension was warranted to address the concerns.

Next, Plaintiffs contend that "HUD did not explain what in the Interim Evaluation suggested the need for further analysis, let alone how that need in turn justified freezing implementation of a final rule." Pls.' Br. at 30. This is also not accurate. As noted above, the Suspension Memorandum said that the Interim Report included "several findings that are worrisome and where further research is needed to address a number of critical questions with respect to the potential harm to HCV families." Ex. 2, Suspension Memorandum at 5. In particular, the Memorandum noted that the "findings of the interim report that are of the most concern to HUD relate to the availability of units and the impact of Small Area FMRs on voucher success rates and utilization, and to rent burdens among assisted households." *Id.* With respect to success rates and utilization, the Memorandum noted that "[d]epending on the final findings of the [demonstration project] report, HUD and the PHAs operating in the Small Area FMR metropolitan areas may need to make adjustments to mitigate the risk that the effort to increase opportunities in higher-rent areas does not unintentionally harm families by significantly reducing the overall number of rental units that are available for leasing to HCV participants." *Id.* at 6. As for the increased rent burdens on assisted households, the Memorandum noted that there may be other contributing factors causing the increases, but that "further analysis and research is needed on this

aspect of the Small Area FMR Demonstration during Phase 2 of the evaluation." *Id.* at 7. Overall, the Memorandum reasoned that the delay was needed to "allow HUD to develop guidance and technical assistance that is informed by the lessons learned from the demonstration before PHAs are required to revise their payment standards and accomplish all the other administrative changes to their operations necessitated by the mandatory use of Small Area FMRs." *Id.*

Plaintiffs acknowledge that "demonstration project PHAs encountered some issues," but they dismiss those unspecified issues as having been "addressed in the Small Area FMR Rule such that they raise no concern regarding the Small Area FMR Rule's implementation." Pls.' Br. at 32.[4] That is not the case. HUD acknowledged that the final rule included a provision that would cap the year on year decreases in FMRs at 10 percent, but it concluded that this protection "may only slow the pace of the loss of units, as opposed to preventing the overall decline in the number of units available to HCV families in the metropolitan area." Ex. 2, Suspension Memorandum at 6. HUD also acknowledged that the final rule allowed (but did not require) PHAs to hold harmless in-place families from decreases in their payment standard amounts (and concomitant increases in their share of rent) due to decreases in FMRs, but it noted that "there is no protection for families that must move to a new unit or for applicant families off the waiting list who are trying to lease a unit on the program for the first time." *Id.* at 7. Thus, HUD did in fact consider the tenant protections provided in the final rule, but found them inadequate to address the concerns raised by the Interim Report.

---

[4] Similarly, amicus notes that the tenant protections provided by the Small Area FMR rule were not available in the demonstration sites and accuses HUD of failing to acknowledge the effect those protections may have in the metropolitan areas implementing the new rule. Amicus Br. at 31.

Finally, Plaintiffs (and amicus) take issue with HUD's reference to comments received in response to its notice on reducing regulatory burdens and its determination that additional time is warranted for it to develop guidance and technical assistance about Small Area FMRs for PHAs. Pls.' Br. at 32–34; Amicus Br. at 11–13. As for the regulatory-burden comments, Plaintiffs criticize on the comments by an association of PHA officials because they made reference to earlier comments submitted in connection with the November 2016 rulemaking. Pls.' Br. at 32–33. But that is simply a red herring to distract from the fact that the association's June 2017 comment letter raised valid and serious concerns about Small Area FMRs. It stated that the association "strongly believes that the mandatory imposition of Small Area FMRs has the potential to financially burden many future program participants as certain zip codes will see their FMRs decline" and that "a policy that has the potential to have such a large deleterious effect on the lives of hundreds of thousands of people should not be implemented as an experiment." Ex. 4, NAHRO Comment Letter at 5. Plaintiffs ignore those valid concerns, and fail to explain why HUD should have disregarded them.

As for HUD's determination that additional time is required to develop guidance, Plaintiffs (and amicus) attempt to characterize this justification as based on a deliberate lack of diligence by HUD. Pls.' Br. at 33–34; Amicus Br. at 12–13. It is not. HUD's reference to the need to develop additional guidance is tied to the worrisome findings in the Interim Report. As discussed above, the Interim Report indicated that Small Area FMRs had the potential to negatively impact rental markets and harm voucher families, warranting further study of the demonstration. HUD therefore determined that "developing and issuing the guidance and technical assistance without fully understanding and incorporating the lessons learned from the Demonstration will result in a

product that does not adequately assist those PHAs that must make this . . . transition." Ex. 2, Suspension Memorandum at 8. Plaintiffs do not and cannot explain why that is unreasonable.

In any event, HUD's suspension decision is fully and independently justified by the Interim Report's indication that Small Area FMRs could reduce available rental housing and raise rent burdens on voucher families. Those were the problems that HUD officials and the Suspension Memorandum focused upon, *see* Richardson Decl. ¶ 8, and HUD's considered reasoning with respect to those problems is fully explained in the Suspension Memorandum.

### D.    Plaintiffs' Notice-and-Comment Claim Will Soon Be Moot.

Finally, Plaintiffs will not succeed on the merits of their notice-and-comment claim (Count I) because it will soon be moot. "It is a basic constitutional requirement that a dispute before a federal court be 'an actual controversy . . . extant at all stages of review, [and] not merely at the time the complaint is filed.'" *Newdow v. Roberts*, 603 F.3d 1002, 1008 (D.C. Cir. 2010) (quoting *Steffel v. Thompson*, 415 U.S. 452, 459 n. 10 (1974)). Here, Plaintiffs challenge HUD's suspension of Small Area FMRs for not following notice-and-comment procedures and for purportedly ignoring relevant information and providing insufficient reasoning. In the coming days, however, HUD will issue a notice in the *Federal Register* inviting comment by members of the public (including Plaintiffs) concerning HUD's decision to suspend Small Area FMRs in the 23 metropolitan areas listed in the Suspension Memorandum. Santa Anna Decl. ¶¶ 2–3. It will then review the issues raised by those comments and publish the outcome of its consideration of those issues. Richardson Decl. ¶ 13. This will nullify Plaintiffs' claim that no such process was undertaken. Accordingly, it will moot Count I and require its dismissal. Thus, Plaintiffs will not succeed on the merits of that claim.

## II.    Plaintiffs Will Not Suffer Irreparable Injury.

Plaintiffs claim that if the Small Area FMR rule is not implemented on January 1, 2018, they will suffer irreparable injury. They cannot make such a showing. While "[t]he concept of irreparable harm does not readily lend itself to definition," *Judicial Watch, Inc. v. U.S. Dep't of Homeland Sec.*, 514 F. Supp. 2d 7, 10 (D.D.C. 2007), it is established that "[t]he irreparable injury requirement erects a very high bar for a movant," *Coal. for Common Sense in Gov't Procurement v. United States*, 576 F. Supp. 2d 162, 168 (D.D.C. 2008). In this regard, courts consider "several well known and indisputable principles." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). "First, the injury must be both certain and great" and "actual and not theoretical." *Id.* Second, "economic loss does not, in and of itself, constitute irreparable harm." *Id.* Finally, the movant "must show '[t]he injury complained of is of such imminence that there is a 'clear and present' need for equitable relief to prevent irreparable harm,'" and that the injury is "beyond remediation." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (quoting *Wis. Gas*, 758 F.2d at 674).

All three plaintiffs—the two individuals and one institution—claim that they will suffer irreparable injury if the Small Area FMR rule is not fully implemented on January 1, 2018. As for the individuals, Plaintiff Crystal Carter lives in Hartford, Connecticut, but wants to move to nearby Simsbury where her children attend school. Pls.' Br. at 35–36. She claims that she will suffer irreparable harm if she is not able to move soon because Simsbury has a lower crime rate, because a study indicates that children who move to low-poverty areas tend to earn more income by the time they are in their mid-twenties, and because the move will reduce the time and expense for her to commute to her children's school. *Id.* at 38–39. None of these points shows sufficient harm for a preliminary injunction. Though Ms. Carter may find Simsbury to be more desirable for its lower

crime rates, she has not identified any imminent risk that she or her family will actually be subject to criminal activity in Hartford. And the mere possibility, as indicated by a nationwide study, that her school-age children may potentially earn a higher income in their mid-twenties if they move at some point to a lower-poverty area is entirely speculative and in no way imminent. Further, Ms. Carter admits that her children already attend school in the lower-poverty city of Simsbury, so it is not clear why their income later in life would be disadvantaged by residing in Hartford. She also speculates that housing will be available to her in Simsbury, but she has not alleged that she has applied for housing in Simsbury, that if she did apply she would be likely to be selected despite competition from other applicants, or that there are sufficient landlords in Simsbury participating in the HCV program and accepting voucher-holding tenants including, in particular, her. *See* 42 U.S.C. § 1437f(o)(6)(B) (providing that selection of tenants "shall be the function of the owner"). As for any expenses associated with her longer commute (Ms. Carter does not say what those expenses are or how they affect her budget), there is no indication that any such expenses (which she has presumably been incurring for some time) are sufficiently serious to warrant extraordinary injunctive relief. It is true that monetary damages are not recoverable in this Administrative Procedure Act case, but the "fact that economic losses may be unrecoverable does not, in and of itself, compel a finding of irreparable harm," *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 53 (D.D.C. 2011), for the harm must also be "more than simply irretrievable; it must also be serious in terms of its effect on the plaintiff." *Mylan Pharm., Inc. v. Shalala*, 81 F. Supp. 2d 30, 42 (D.D.C. 2000). That is not the case here.

The other individual plaintiff is Tiara Moore. She has a housing choice voucher from the Chicago Housing Authority and wants to use it to move out of Chicago into nearby DuPage County, which she says the Small Area FMR rule will allow her to do. She states that if she does

not move immediately, she will suffer largely the same injuries cited by Ms. Carter. Those injuries are insufficient to show irreparable harm for the reasons explained in the preceding paragraph. More fundamentally, contrary to her representations, Ms. Carter will not benefit from the Small Area FMR rule. The Chicago Housing Authority has been designated as a Moving to Work ("MTW") PHA, which enables it to exercise flexibility in setting payment standard amounts in accordance with its MTW agreement and plan. Nazzaro Decl. ¶ 2; *see also* 81 Fed. Reg. at 80,578 (noting that "MTW PHAs administering the HCV program can exercise flexibility in regards to establishing rent in accordance with the terms of their respective MTW Agreement and approved Annual MTW Plan"). The Chicago Housing Authority currently operates under a HUD-approved MTW plan that would exempt it from the use of Small Area FMRs, even if mandatory Small Area FMRs were implemented in the Chicago metropolitan area. Nazzaro Decl. ¶ 3. Accordingly, "the change from metropolitan-wide FMRs to [Small Area] FMRs would not impact any person who currently holds a housing voucher issued by [the Chicago Housing Authority]," *id.*, including Ms. Moore. Accordingly, she cannot show any remedial irreparable injury.[5]

Finally, the institutional plaintiff, Open Communities Alliance, claims that it will suffer irreparable harm because a temporary suspension of the Small Area FMR rule does not comport with its mission and it now will have to use resources to lobby Hartford-area PHAs to immediately adopt Small Area FMRs voluntarily. Pls.' Br. at 40. Plaintiffs contend that this injury is sufficient to confer standing and rely primarily on standing cases to support their argument. But injury sufficient to show standing and injury sufficient to warrant a preliminary injunction are two different things. *See Air Transport Ass'n of Am. v. Export–Import Bank of the U.S.*, 878 F. Supp.

---

[5] For this same reason, Ms. Moore also lacks standing and should be dismissed from this case. She therefore also fails to show a likelihood of success on the merits.

2d 42, 60–61 (D.D.C. 2012) ("The irreparable-harm standard requires a more significant showing than the injury-in-fact standard."); *In re Navy Chaplaincy*, 534 F.3d 756, 766 (D.C. Cir. 2008) ("[T]o show irreparable harm '[a] plaintiff must do more than merely allege . . . harm sufficient to establish standing.'") (quoting *Assoc. Gen. Contractors of Cal., Inc. v. Coal. for Econ. Equity*, 950 F.2d 1401, 1410 (9th Cir. 1991)). Plaintiffs argue that standing alone is good enough to warrant a preliminary injunction here because Open Communities Alliance cannot obtain damages in this Administrative Procedure Act case. Pls.' Br. at 41. But, as noted, the fact that economic losses may be unrecoverable does not alone show irreparable harm unless it entails a serious effect on the plaintiff. *Nat'l Mining Ass'n*, 768 F. Supp. 2d at 53; *Mylan Pharm., Inc.*, 81 F. Supp. 2d at 42. Along those lines, courts have required plaintiffs claiming irreparable economic injury to show that the claimed monetary loss "threatens the very existence of the movant's business," *Wis. Gas*, 758 F.2d at 674. Open Communities Alliance has shown no such thing and is therefore not entitled to a preliminary injunction.

## III. Other Parties and the Public Interest Are Better Served by Denying an Injunction that Could Deprive Low-Income Families of Housing.

The final two factors for the Court to consider in determining whether to grant a preliminary injunction are "(3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). In this vein, "courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312 (1982). Here, the harm to interested third parties could be disastrous and contrary to the public interest. As the Interim Report concludes, the implementation of Small Area FMRs is indicated to cause a shortage of rental units and increased rent burdens on voucher families, which could potentially deprive low-income

families of affordable housing. In response to these serious issues, HUD has temporarily suspended (not repealed) the Small Area FMRs in an attempt to remedy those problems. While this suspension may result in Plaintiffs having to wait two additional years for a rule that they would prefer go into effect in January 2018, it has the potential of saving low-income families and vulnerable populations from homelessness. Equity therefore weighs against an injunction.

Plaintiffs make the perfunctory assertion that "HCV voucher holders will not be hurt by immediate implementation" of Small Area FMRs because the rule will "protect[] them from any immediate harm." Pls.' Br. at 42. But this ignores HUD's determination in the Suspension Memorandum that the protections in the Small Area FMR rule will not sufficiently protect families who must move or families on the voucher waitlist, nor will they prevent an overall decline in the number of available units. Ex. 2, Suspension Memorandum at 5–7. Equity favors protecting those families.

## IV.   Plaintiffs' Requested Injunction Is Overbroad.

Finally, even if Plaintiffs were entitled to some form of an injunction, they are certainly not entitled to the broadly applicable injunction that they request, which would cover each of the 23 metropolitan areas subject to HUD's Small Area FMR suspension. *See* Pls.' Proposed Order, ECF No. 15-2. "Injunctive relief granted to a party in a lawsuit must be framed to remedy the harm claimed by the party." *Aviation Consumer Action Project v. Washburn*, 535 F.2d 101, 108 (D.C. Cir. 1976). But the injunction should be "no broader than necessary to achieve its desired goals." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994); *see also State of Neb. Dep't of Health & Human Servs. v. Dep't of Health & Human Servs.*, 435 F.3d 326, 330 (D.C. Cir. 2006) ("We have long held that an injunction must be narrowly tailored to remedy the specific harm shown.") (quotations omitted).

This case involves only two plaintiffs that could conceivably benefit from the Small Area FMR rule: Crystal Carter and Open Communities Alliance. (As noted in Part II, the PHA from which plaintiff Tiara Moore received her voucher would be exempt from mandatory use of Small Area FMRs even if the rule were implemented.) Ms. Carter lives in Hartford, Connecticut, Carter Decl. ¶ 1, ECF No. 15-4, and Open Communities Alliance focuses its work in Connecticut and particularly in Hartford, Boggs Decl. ¶ 1, ECF No. 15-5. Consequently, any injunction must be limited to HUD's suspension decision with respect to the Hartford-West Hartford-East Hartford, Connecticut HUD Metropolitan FMR Area. *See* Ex. 2, Suspension Memorandum at 2. Plaintiffs, however, seek an order compelling HUD to rescind its suspension decision with respect to each and every one of the 23 metropolitan areas to which it pertained. Because such a dramatic remedy is far more than what is necessary to adequately remedy the harm claimed by Plaintiffs, such an injunction must be denied.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for a preliminary injunction and proceed with this case in the normal course.

Dated: December 1, 2017

Respectfully Submitted,

JESSIE K. LIU, D.C. Bar No. 472845
United States Attorney

DANIEL F. VAN HORN, D.C. Bar No. 924092
Chief, Civil Division

By:   /s/ Johnny Walker
JOHNNY H. WALKER, D.C. Bar No. 991325
Assistant United States Attorney
555 4th Street, N.W.
Washington, District of Columbia 20530
Telephone: 202 252 2575
Email: johnny.walker@usdoj.gov

*Counsel for Defendants*