**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| OPEN COMMUNITIES ALLIANCE *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> BEN S. CARSON, SR., *Secretary of Housing and Urban Development, in his official capacity*, *et al.*, <br><br> Defendants. | Civil Action No. 17-2192 (BAH) <br><br> Chief Judge Beryl A. Howell |

## MEMORANDUM OPINION

Section 8 of the Fair Housing Act of 1968 serves two statutory purposes: (1) "aiding low-income families in obtaining a decent place to live" and (2) "promoting economically mixed housing." 42 U.S.C. § 1437f(a). This case is not about what is good housing policy, however. This case is about the rule of law—whether an agency effectively may suspend a duly promulgated regulation without observing the procedures or identifying relevant factual criteria that the law requires to effect such a change. The U.S. Department of Housing and Urban Development ("HUD"), without notice and comment or particularized evidentiary findings, has delayed almost entirely by two years implementation of a rule requiring over 200 local Public Housing Authorities ("PHAs") in 24 metropolitan areas, which HUD selected based on fixed, objective criteria, to calculate housing vouchers' values based on local, rather than metropolitan-wide, prevailing market rents. The plaintiffs, two voucher holders and a nonprofit organization devoted to providing housing opportunities for low-income people in Connecticut, move to preliminarily enjoin HUD to implement the rule on January 1, 2018, the rule's effective date.

Pls.' Mot. Preliminary Injunction, ECF No. 15 ("Pls.' Mot."). For reasons this Memorandum Opinion explains in detail, the plaintiffs' motion for a preliminary injunction is granted.

## I.     FACTS

### A.     Overview of the Housing Choice Voucher Program and Fair Market Rents

Congress enacted the Housing Act of 1937 to assist state and local governments "to remedy unsafe and insanitary housing conditions and the acute shortage of decent, safe, and sanitary dwellings for families of low income." Pub. L. No. 75-412, § 1, 50 Stat. 888, 888 (1937) (codified at 42 U.S.C. § 1437(a)). The Housing and Community Development Act of 1974, enacted nearly 40 years later, amended the Housing Act to add Section 8, which authorized HUD to contract with PHAs to pay landlords rental subsidies on low-income tenants' behalf. Pub. L. No. 93-383, § 8(a), 88 Stat. 633, 662 (codified at 42 U.S.C. § 1437f(a)). The Housing and Urban-Rural Recovery Act of 1983, Pub. L. No. 98-181, § 207, 97 Stat. 1153, 1181 (codified as amended at 42 U.S.C. § 1437f(o)), created the Housing Choice Voucher ("HCV") program, which is HUD's "major program for assisting very low-income families, the elderly, and the disabled to afford decent, safe, and sanitary housing in the private market." *Housing Choice Vouchers Fact Sheet*, U.S. DEP'T HOUSING & URB. DEV., https://www.hud.gov/topics/housing_choice_voucher_program_section_8 (last visited Dec. 23, 2017) ("*HCV Fact Sheet*").[1] HUD oversees the HCV program, directing funds to PHAs to administer the program locally by issuing vouchers to qualified individuals and families, who use those vouchers to secure housing in the private rental market. *Id.* A voucher holder may use a voucher toward any housing that meets the HCV program's requirements, subject to a PHA's

---

[1]     Federal Rule of Evidence 201 allows a court to take judicial notice of "a fact that is not subject to reasonable dispute because it . . . is generally known within the trial court's territorial jurisdiction; or . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(b). Both of these conditions apply to a description of the HCV program found on HUD's public website.

approval. 24 C.F.R. § 982.1(a)(2). HCV participation is limited to low-income households, which typically cannot afford to rent dwellings for which the rent substantially exceeds the HCV program payment standard. *See HCV Fact Sheet*, *supra*; *see, e.g.*, Pls.' Mot., Attach. 9, Decl. of Tiara Moore ("Moore Decl.") ¶¶ 3, 7, ECF No. 15-9.

A voucher's value is calculated largely on the basis of HUD's determination of the "fair-market rent" ("FMR") for a dwelling of a particular size and type (*e.g.*, a two-bedroom home). 24 C.F.R. § 982.503(a)(1). An FMR represents the amount required "to rent standard quality housing throughout the geographic area in which rental housing units are in competition," including "the cost of utilities, except telephone." *Id.* § 888.113(a). HUD annually calculates and publishes in the Federal Register FMRs for different types of units in each market area as well as any proposed changes to FMR calculation procedures. 42 U.S.C. § 1437f(c)(1)(B); *see also* 24 C.F.R. § 982.503(a)(1). PHAs, in turn, use FMR calculations to establish "payment standard amounts" for each unit type. 24 C.F.R. § 982.503(a)(1).

A PHA generally sets a payment standard "between 90 percent and 110 percent of the published FMR for that unit size." *Id.* § 982.503(b). A voucher holder typically pays a landlord 30 percent of her or his adjusted monthly income toward rent; the PHA pays the rent's balance directly to the landlord, so long as a dwelling's actual gross rent is at or below the relevant payment standard. *Id.* § 982.1(a)(3). If, however, a dwelling's actual rent exceeds the payment standard, the voucher holder pays the balance. *Id.* A PHA may use the same payment standard amount for all areas within the PHA's jurisdiction, or else "may establish a separate payment standard amount for each designated part of the FMR area." *Id.* § 982.503(a)(3).

### B.    Problems with FMR Calculations in Metropolitan Areas

FMRs often do not, in practice, accurately reflect rents actually charged in neighborhoods within a broad metropolitan area, as "rents can vary widely within a metropolitan area depending upon the size of the metropolitan area and the neighborhood in the metropolitan area within which one resides." *See Establishing a More Effective Fair Market Rent System; Using Small Area Fair Market Rents in the Housing Choice Voucher Program Instead of the Current 50th Percentile FMRs*, 81 Fed. Reg. 80,567, 80,567 (Nov. 16, 2016) ("*Final Rule*"). Consequently, "[t]he result of determining rents on the basis of an entire metropolitan area is that a voucher subsidy . . . may be too low to cover market rent in a given neighborhood." *Id.* FMRs calculated on metropolitan-wide bases may not enable voucher holders to afford rents in high-rent, high-opportunity neighborhoods, consigning them to low-opportunity areas of concentrated poverty. *See id.*; Moore Decl. ¶¶ 5–7; Pls.' Mot., Attach. 4, Decl. of Crystal Carter ("Carter Decl.") ¶¶ 6–7, ECF No. 15-4. Calculating FMRs locally, in contrast, makes rents in high-opportunity areas more affordable.

Prior to 2000, HUD generally calculated FMRs to reflect the 40th percentile rent in a given metropolitan area. *See* 24 C.F.R. § 888.113(a)–(b). In 2000, however, HUD published a new rule authorizing PHAs in areas meeting specified criteria to calculate payment standards based on FMRs reflecting the 50th percentile rent in a given area. *See Fair Market Rents: Increased Fair Market Rents and Higher Payment Standards for Certain Areas*, 65 Fed. Reg. 58,870, 58,870 (Oct. 2, 2000). This new policy was "designed to achieve two fundamental program objectives: (1) Ensuring that low-income families are successful in finding and leasing decent and affordable housing; and (2) ensuring that low-income families have access to a broad range of housing opportunities throughout a metropolitan area." *Id.* Consistent with these goals,

4

the 50th Percentile Rule authorized PHAs to calculate payment standards using a 50th percentile FMR under two circumstances: where "families are having difficulty using housing vouchers to find and lease decent and affordable housing" and "a FMR increase is most needed to promote residential choice, help families move closer to areas of job growth, and deconcentrate poverty." *Id*. FMR calculation would revert to a 40th percentile basis, however, in PHAs that experienced no or an insufficient decrease in concentration of voucher holders after three years. *Id*. at 58,871.

HUD has concluded, based on recent research, that the 50th Percentile Rule is "not an effective tool" for "increasing HCV tenant moves from areas of low opportunity to higher opportunity areas." *Final Rule*, 81 Fed. Reg. at 80,570. Rather, HUD has found that "much of the benefit of increased FMRs simply accrues to landlords in lower rent submarket areas in the form of higher rents rather than creating an incentive for tenants to move to units in communities with more and/or better opportunities." *Id*. HUD also observed that a "large number of areas have been disqualified from the 50th percentile program for failure to show measurable reduction in voucher concentration of HCV tenants since 2001 when the program started, which strongly suggests that the deconcentration objective is not being met." *Id*.

## C.     The Small Area FMR Demonstration Project

In the wake of the 50th Percentile Rule's apparent failure, HUD considered alternative ways to expand housing opportunities for voucher holders. *See id*. Using census data collected through the American Community Survey, HUD developed "Small Area FMRs" ("SAFMRs"), which reflect fair-market rents in individual ZIP codes, rather than in broad metropolitan areas. *Id*. HUD's goal in applying this new, more targeted methodology was to "create more effective means for HCV tenants to move into higher opportunity, lower poverty areas by providing them

with subsidy adequate to make such areas accessible and to thereby reduce the number of voucher families that reside in areas of high poverty concentration." *Id.*[2]

HUD undertook a demonstration project to test SAFMRs' effectiveness. *Section 8 Housing Choice Voucher Program Demonstration Project of Small Area Fair Market Rents in Certain Metropolitan Areas for Fiscal Year 2011*, 75 Fed. Reg. 27,808, 27,809 (May 18, 2010) ("*Proposed Demonstration Project*"). Notably, HUD recognized, in announcing the project, that "[t]he small area FMR demonstration project will not be effective unless the PHAs that operate voucher programs covering the vast majority of voucher tenants in a metropolitan area agree to participate and abide by the small area rents." *Id.* at 27,811. In a subsequent notice describing the project in more detail, HUD explained that SAFMRs "represent a fundamentally different way of operating the voucher program in metropolitan areas," and that the project would help HUD "to better understand the programmatic impacts of changing the way voucher payment standards are set." *Final Fair Market Rents for the Housing Choice Voucher Program for Small Area Fair Market Rent Demonstration Program Participants; Fiscal Year 2013*, 77 Fed. Reg. 69,651, 69,652 (Nov. 20, 2012) ("*Demonstration Project*"). HUD identified two purposes that the demonstration project would serve: to (1) "evaluate [SAFMRs] in terms of effectiveness in meeting the primary goal of improving tenants' housing choices in areas of opportunity while also assessing the impact on tenants in areas with SAFMRs below the metropolitan-wide FMR"

---

[2]     Although SAFMRs are a recent innovation, HUD recognized the shortcomings of FMR schedules based on metropolitan area-wide, rather than more localized, rent levels as early as 1977. *See* COMPTROLLER GEN. OF THE U.S., CED-77-19, MAJOR CHANGES ARE NEEDED IN THE NEW LEASED-HOUSING PROGRAM 21 (1977) ("HUD's decision to prepare single FMR schedules for entire SMSAs [Standard Metropolitan Statistical Areas] or for counties grouped into areas totaling 250,000 population is questionable. This approach ignores important distinctions between metropolitan central cities and suburban areas as well as among suburban areas within SMSAs, and it does not adequately consider the economic and demographic differences among non-SMSA counties. For example, the San Francisco-Oakland, California, SMSA had identical FMRs for the counties of Alameda, Contra Costa, Marin, San Francisco, and San Mateo. HUD field office officials said that each of these counties' actual market rents could vary by 30 to 40 percent.").

and (2) "understand and evaluate the administrative and budget impacts of converting and operating the tenant-based voucher program using SAFMRs." *Id.* In selecting pilot PHAs to participate in the demonstration project, HUD used seven fixed, objective criteria to define an initial pool of eligible PHAs, then "randomly selected" pilot areas "from stratified sets of eligible PHAs." *Id.* HUD ultimately selected five pilot PHAs from this pool: the (1) Chattanooga (Tenn.) Housing Authority, (2) Housing Authority of the City of Laredo (Tex.), (3) Housing Authority of the City of Long Beach (Cal.), (4) Housing Authority of the County of Cook (Ill.), and (5) Town of Mamaroneck (N.Y.) Public Housing Agency. *Id.* HUD also included all Dallas, Texas, metropolitan area PHAs, which since 2010 had implemented SAFMRs pursuant to a settlement agreement, in the demonstration project. *Id.* at 69,652 n.2; *Proposed Fair Market Rents for the Housing Choice Voucher Program and Moderate Rehabilitation Single Room Occupancy Program Fiscal Year 2011*, 75 Fed. Reg. 46,958, 46,962 (Aug. 4, 2010).

### D. The SAFMR Rule

Before the demonstration project's completion, HUD published advance notice of proposed rulemaking announcing the agency's intent to require several other metropolitan areas meeting certain criteria to implement SAFMRs. *See Establishing a More Effective Fair Market Rent (FMR) System; Using Small Area Fair Market Rents (SAFMRs) in Housing Choice Voucher Program Instead of the Current 50th Percentile FMRs; Advanced Notice of Proposed Rulemaking*, 80 Fed. Reg. 31,332 (June 2, 2015). HUD cited in this advance notice "research and experience with the SAFMR demonstration" indicating "that amending its current FMR regulation to enable adoption of the SAFMR methodology could provide HCV tenants greater access to higher opportunity, lower poverty neighborhoods." *Id.* at 31,333. As part of the

advance notice, HUD also announced that the new Rule "would eliminate the use of 50th percentile FMRs as a means to reduce HCV tenant concentration." *Id.*

One year later, on June 16, 2016, HUD published a notice of the proposed new rule. *See Establishing a More Effective Fair Market Rent System; Using Small Area Fair Market Rents in Housing Choice Voucher Program Instead of the Current 50th Percentile FMRs*, 81 Fed. Reg. 39,218 (June 16, 2016) ("*NPRM*"). In doing so, HUD acknowledged that "[i]n order for Small Area FMRs to work in expanding choice for voucher holders within designated metropolitan areas, all PHAs operating in the FMR area would be required to use Small Area FMRs." *Id.* at 39,224. The proposed rule addressed concerns raised in response to the advance notice and sought additional comments on specific issues, including policies HUD should adopt to "mitigate the impact of significant and abrupt decreases in the FMRs for certain ZIP code areas on families . . . in those impacted areas" and whether "this policy change would be particularly burdensome" to any "specific groups within the general population of voucher holders." *Id.* at 39,225.

HUD published a final rule on November 16, 2016. *Final Rule*, 81 Fed. Reg. 80,567. Calculating payment standards based on SAFMRs, HUD said, would "provid[e] . . . a subsidy adequate to make such [high-opportunity, low-poverty] areas accessible and, consequently, help reduce the number of voucher families that reside in areas of high poverty concentration." *Id.* at 80,567. "ZIP codes," HUD reasoned, "are small enough to reflect neighborhood differences and provide an easier method of comparing rents within one ZIP code to another ZIP code area within a metropolitan area." *Id.* at 80,568. The rule contained several provisions to address concerns about SAFMRs' potential adverse impacts on voucher holders in low-rent ZIP codes. *Id.* at 80,572. Particularly relevant here, the rule authorized HUD to "suspend a Small Area FMR designation for a metropolitan area . . . where HUD determines such action is warranted

based on a documented finding of adverse rental housing market conditions that will be set out

by notice," *id*. at 80,569, enumerating three circumstances that could warrant a designation's

suspension or PHA's exemption from the SAFMR mandate, 24 C.F.R. § 888.113(c)(4).   HUD

provided by notice that the new rule would go into effect on October 1, 2017, requiring affected

PHAs to implement the rule by January 1, 2018, *Final Rule*, 81 Fed. Reg. at 81,569; 24 C.F.R. §

982.503(b)(1), and designated 24 metropolitan areas, which covered over 200 PHAs in total,

subject to the Rule based on five fixed, objective criteria, *see Small Area Fair Market Rents in*

*Housing Choice Voucher Program Values for Selection Criteria and Metropolitan Areas Subject*

*to Small Area Fair Market Rents*, 81 Fed. Reg. 80,678, 80,679 (Nov. 16, 2016) ("*SAFMR Area*

*Designations*"); Defs.' Opp'n Pls.' Mot. ("Defs.' Opp'n"), Attach. 1, Decl. of Todd Richardson,

Acting Gen. Deputy Assistant Sec'y for Pol'y Dev. & Research ("HUD Decl.") ¶ 5, ECF No. 24-

1.  In so doing, HUD required all PHAs within affected metropolitan areas to implement

SAFMRs.  These metropolitan areas included the Dallas, Texas area, *SAFMR Area Designations*,

81 Fed. Reg. at 80,679, in which PHAs, pursuant to the earlier-referenced settlement agreement,

already had implemented SAFMRs, *see NPRM*, 81 Fed. Reg. at 39,221.

> **E.   The Interim Report's Preliminary Findings**

After HUD announced the Rule's promulgation, but before the Rule was set to go into

effect, HUD received preliminary findings from the demonstration project in the form of an

Interim Report titled *Small Area Fair Market Rent Demonstration Evaluation*. Defs.' Opp'n, Ex.

1 ("Interim Report"), ECF No. 24-4.  This report contained good news on SAFMRs efficacy to

achieve Section 8's statutory goals, with mixed results for some demonstration project PHAs.

Specifically, the Interim Report found that SAFMRs in the pilot PHAs make "the

availability of units [] much more evenly distributed across different types of neighborhoods,

leading to increased availability in high-rent ZIP Codes and reduced availability in low-rent ZIP Codes." Interim Report at vii; *see also id*. at viii ("Because SAFMRs increase access to high-rent ZIP Codes and reduce access to low-rent ZIP Codes, we found not unexpectedly that the transition to SAFMRs led to an increase in units potentially available to HCV holders in higher-opportunity areas under SAFMRs compared with FMRs and fewer units in lower opportunity areas."). As a result, "[f]ollowing the implementation of SAFMRs, HCV holders in the demonstration sites are slightly more likely to live in high-rent ZIP Codes than they were prior to the demonstration," while no such change was observed in "comparison PHAs." *Id*. at viii. Further, "[t]he slight changes in rents among the SAFMR PHAs also translate into slight changes in opportunity." *Id*.; *see also id*. at ix (finding that "[a]cross all evaluation PHAs . . . changes in rents are also reflected in changes in access to opportunity."). Moreover, Housing Assistance Payment ("HAP") costs, which "are the subsidy costs that PHAs incur on behalf of HCV holders for rent and utilities," "declined in real terms per unit between 2010 and 2015 in SAFMR PHAs," while "[r]ents paid to landlords remained nearly flat in real terms between 2010 and 2015 but varied by rent category." *Id*. at x. The report states, "[i]n summary, it appears that Small Area Fair Market Rents are working as intended—increasing *access* to units in higher-opportunity areas and decreasing access in lower-opportunity areas." *Id*. at 61.

At the same time, the Interim Report troublingly found that "the gain in units with rents below the applicable FMR in high-rent ZIP Codes does not offset the decrease in the number of units in the low-rent and moderate-rent ZIP Codes, resulting in a net loss of units potentially available to HCV holders overall." *Id*. at vii. The net effect of SAFMR implementation across the pilot PHAs, the Interim Report found, was "a loss of over 22,000 units (3.4 percent) that might otherwise be affordable to HCV holders." *Id*. In addition, the Interim Report noted that

average payment standard amounts declined by about 11 percent in inflation-adjusted terms in pilot PHAs, resulting in average rent burden increases for HCV voucher holders of about 16 percent overall and 22 percent in low-income ZIP codes. *Id.* at ix–x. In contrast, payment standard amounts relying on metropolitan area-wide FMRs declined by only about 2 percent, resulting in an average rent burden increase of 9 percent. *Id.*

The Interim Report's findings related only to Phase 1 of the demonstration project. *Id.* at xi. In 2018, HUD will receive a Final Report combining and synthesizing data collected in Phases 1 and 2, the latter of which will (1) update the Interim Report's empirical analyses with new housing data, and (2) use qualitative interviews of tenants and landlords to determine how SAFMRs have affected or could affect housing decisions. *Id.* at xi, 98.

      **F.**     **HUD's Two-Year Delay of the SAFMR Rule**

On August 10, 2017, HUD issued a memorandum delaying SAFMR designations for 23 of the 24 metropolitan areas subject to the Rule (excluding Dallas), requiring PHAs in affected areas to implement the Rule in 2020 rather than in 2018. Defs.' Opp'n, Ex. 2, *Suspension of Small Area Fair Market Rent (FMR) Designations* ("Suspension Mem.") at 2, ECF No. 24-5. The Suspension Memo expressly noted, however, that "any PHA operating in the covered metropolitan areas" could still "voluntarily implement[] the use of Small Area FMRs prior to . . . 2019," and that PHAs in the Dallas metropolitan area would continue to implement SAFMRs pursuant to the settlement agreement. *Id.* at 1, 3. On August 11, 2017, HUD sent over 200 affected PHAs a letter informing those PHAs that their metropolitan areas' mandatory SAFMR designations were suspended until 2020. Defs.' Opp'n, Ex. 3, Letter from Dominique Blom, Gen. Deputy Assistant Sec'y for Public & Indian Housing, HUD, to PHA Exec. Dirs. ("Letter to PHAs") (Aug. 11, 2017), ECF No. 24-6; HUD Decl. ¶ 12.

The Suspension Memo identified "several findings" in the Interim Report "that are worrisome and where further research is needed to address a number of critical questions with respect to the potential harm to HCV families (both participants and applicants) in areas transitioning to Small Area FMRs." *Id.* at 5. "[F]indings of the interim report that are of most concern to HUD," the Suspension Memo stated, "relate to the availability of units and the impact of Small Area FMRs on voucher success rates and utilization, and to rent burdens among assisted households." *Id.* Specifically, the Suspension Memo stated that "[o]ne of the findings of concern from the interim report is that the gain in units with rents below the applicable FMR in high-rent ZIP codes did not offset the decrease in the number of units in the low-rent and moderate-rent ZIP codes." *Id.* The Suspension Memo acknowledged that, by contrast to the operation of SAFMRs in the pilot PHAs, the Rule capped any SAFMR decrease to 10 percent per year, but concluded that this provision "may only slow the pace of the loss of units, as opposed to preventing the overall decline in the number of units available to HCV families in the metropolitan area." *Id.* at 5–6. The Suspension Memo also recounted the Interim Report's findings that SAFMRs have potential to increase voucher holders' rent burdens. *Id.* at 6. The Suspension Memo again acknowledged that, by contrast to the operation of SAFMRs in the pilot PHAs, the Rule allows PHAs to hold nonmoving families harmless from payment standard amount decreases, but noted that "there is no protection for families that must move to a new unit or for applicant families off the waiting list who are trying to lease a unit on the program for the first time." *Id.* at 7.

The Suspension Memo identified two other concerns with respect to implementing the Rule. The first concern was that "several PHA industry groups have [expressed] concerns about the Small Area FMR final rule and the timeline for implementation" in response to a separate

Federal Register notice on reducing regulatory burdens.  *Id.* (citing *Reducing Regulatory Burden;*
*Enforcing the Regulatory Reform Agenda Under Executive Order 13777*, 82 Fed. Reg. 22,344
(May 15, 2017)).  The Suspension Memo recognized that "HUD has not yet completed its
analysis of these public comments," but asserted that "[t]emporarily suspending the Small Area
FMR designation until FY 2020 will allow HUD to be informed by the public comments on
reducing regulatory burden for the HCV program as well as the Final Report . . . before the use
of Small Area FMRs is required."  *Id.*  The second concern was that developing and issuing
"guidance and planning to provide technical assistance to assist PHAs that must implement"
SAFMRs "without fully understanding and incorporating the lessons learned from the
Demonstration will result in a product that does not adequately assist those PHAs that must make
this [] transition."  *Id.* at 8.  Relatedly, HUD noted that "[i]mplementing comprehensive guidance
that may become quickly outdated as the result of related regulatory burden reduction and reform
efforts is likewise problematic."  *Id.*

### G.    The Plaintiffs

The plaintiffs are two African-American women living in metropolitan areas the Rule
would affect, as well as Open Communities Alliance ("OCA"), a nonprofit organization devoted
to providing social and economic opportunities for low-income people.  Compl. ¶¶ 18–20, ECF
No. 1.  Plaintiff Crystal Carter is a voucher holder who would like to move from Hartford,
Connecticut, to nearby Simsbury, Connecticut, to be near her children's schools and to provide
her family a safer home and better opportunities.   Carter Decl. ¶¶ 6–7.  Hartford's voucher
holders, who are disproportionately nonwhite, are concentrated in poor, racially segregated
neighborhoods.  Pls.' Mot., Attach. 6, Decl. of Will Fischer, Sr. Pol'y Analyst, Ctr. on Budget &
Pol'y Priorities ("CBPP Decl.") ¶ 11, ECF No. 15-6.  As of 2016, 41 percent of voucher holders

in the greater Hartford metropolitan area lived in high-poverty neighborhoods, while only 18 percent of voucher holders in the area lived in low-poverty neighborhoods. *Id.* Ms. Carter cannot move her family to Simsbury, however, as the metropolitan area FMR is too low for her to participate in Simsbury's rental market. Carter Decl. ¶ 7. She asserts that she would be able to afford Simsbury rents if the Rule were implemented and claims that HUD's delay of the Rule's implementation thus harms her directly. *Id.*

Plaintiff Tiara Moore, much like Ms. Carter, would like to move from Chicago, Illinois to the high-opportunity area of DuPage County, Illinois, to provide a safer neighborhood and better opportunities for her daughter. Moore Decl. ¶¶ 5–6. Not only does DuPage County have better schools than Chicago, Ms. Moore's mother lives in DuPage County and could provide childcare while Ms. Moore works. *Id.* ¶ 6. The metropolitan area FMR, however, is too low for Ms. Moore to afford DuPage County rents, which would be affordable were the Rule implemented. *Id.* ¶¶ 7, 9. Ms. Moore, like Ms. Carter, asserts that HUD's delay of the Rule's implementation thus harms her directly. *Id.*

### H.   The Instant Litigation

On October 23, 2017, the plaintiffs filed a complaint challenging the Rule's delay, *see* Compl., and, on November 8, 2017, moved for a preliminary injunction that would require HUD to implement the Rule without delay or modification by January 1, 2018, Pls.' Mot. After the parties' briefing on this motion was completed, on December 11, 2017, the Court held a hearing on December 19, 2017. *See* Minute Entry, dated Dec. 19, 2017.[3]

---

[3]      Under Local Rule of Civil Procedure 65.1(d), "[o]n request of the moving party together with a statement of the facts which make expedition essential, a hearing on an application for preliminary injunction shall be set by the Court no later than 21 days after its filing, unless the Court earlier decides the motion on the papers or makes a finding that a later hearing date will not prejudice the parties." LCvR 65.1(d). The plaintiffs did not request an expedited hearing, and in any event, the Court finds that the parties' consent to modification of the original scheduling order, *see* Minute Order, dated Nov. 8, 2017, which moved briefing's conclusion back to December 11, 2017, obviates any concern regarding prejudice to the parties occasioned by the hearing date.

## II.   LEGAL STANDARD

The Administrative Procedure Act ("APA") authorizes any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action" to seek "judicial review thereof." 5 U.S.C. § 702. Actions subject to review include "final agency action for which there is no other adequate remedy in a court." *Id.* § 704. A "reviewing court shall decide all relevant questions of law . . . and determine the meaning or applicability of the terms of an agency action." *Id.* § 706. An agency's "interpretation of its own regulations 'controls unless plainly erroneous or inconsistent with the regulation.'" *Press Commc'ns LLC v. FCC*, 875 F.3d 1117, 1121 (D.C. Cir. 2017) (quoting *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (alterations omitted)); *accord Safari Club Int'l & NRA of Am. v. Zinke*, Nos. 16-5358 & 16-5362, 2017 U.S. App. LEXIS 26317, at *18 (D.C. Cir. Dec. 22, 2017) (same). The "court shall [] compel agency action unlawfully withheld or unreasonably delayed; and [] hold unlawful and set aside agency action, findings, and conclusions found to be," *inter alia*, "arbitrary, capricious, . . . or otherwise not in accordance with law," or "without observance of procedure required by law." *Id.* § 706(1)–(2)(A), (D).

"Agency action is arbitrary and capricious 'if the agency has relied on factors which [law] has not intended it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation for its decision that runs counter to the evidence before the agency.'" *Mayo v. Reynolds*, 875 F.3d 11, 19 (D.C. Cir. 2017) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (alterations omitted)); *see also Safari Club Int'l*, 2017 U.S. App. LEXIS 26317, at *16 (noting that "[a] disputed action also may be set aside as arbitrary and capricious if the agency has acted 'without observance of procedure required by law.'" (citing 5 U.S.C. § 706(2)(D))). A court engaged in arbitrary and

15

capricious review "must not substitute its own judgment for that of the agency," and "ordinarily uphold[s] an agency's decision so long as the agency 'examined the relevant data and articulated a satisfactory explanation for its action, including a rational connection between the facts found and the choice made.'" *Animal Legal Def. Fund, Inc. v. Perdue*, 872 F.3d 602, 611 (D.C. Cir. 2017) (quoting *State Farm*, 463 U.S. at 43 (alterations and internal quotation marks omitted)).

"A party seeking a preliminary injunction must make a 'clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest.'" *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (quoting *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 505 (D.C. Cir. 2016)). Whether a plaintiff must show each of the four factors independently, or else may make a sufficiently "strong showing on one factor [to] make up for a weaker showing on another," remains an open question in the D.C. Circuit. *Id.* at 7 (quoting *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011)).[4]

## III.   DISCUSSION

---

[4]        The Supreme Court, in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008), has suggested that a plaintiff seeking a preliminary injunction must show each factor separately. *Winter* referred to the four factors conjunctively, holding that such a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, *and* that an injunction is in the public interest." 555 U.S. at 20. *Winter* also rejected the contention that "when a plaintiff demonstrates a strong likelihood of prevailing on the merits, a preliminary injunction may be entered based only on a 'possibility' of irreparable harm," holding that "plaintiffs seeking preliminary relief [must] demonstrate that irreparable injury is *likely* in the absence of an injunction." *Id.* at 21–22 (emphasis in original). The D.C. Circuit repeatedly has observed that "the so-called 'sliding-scale' approach to weighing the four preliminary injunction factors" may no longer be viable post-*Winter*, but has never resolved this question one way or the other. *League of Women Voters*, 883 F.3d at 7; *see also Pursuing Am.'s Greatness*, 831 F.3d at 505 n.1 ("We need not resolve here any tension in the case law regarding the showing required on the merits for a preliminary injunction."); *Aamer v. Obama*, 742 F.3d 1023, 1043 (D.C. Cir. 2014) ("[I]t remains an open question whether the 'likelihood of success' factor is 'an independent, free-standing requirement,' or whether, in cases where the other three factors strongly favor issuing an injunction, a plaintiff need only raise a 'serious legal question' on the merits. . . . But we have no need to resolve this question here because the remaining factors do not, in any event, weigh in petitioners' favor."); *Sherley*, 644 F.3d at 392–93 ("[W]e read *Winter* at least to suggest if not to hold that a likelihood of success is an independent, free-standing requirement for a preliminary injunction." (internal quotation marks omitted)).

The plaintiffs seek a preliminary injunction requiring HUD to implement the Rule on its effective date of January 1, 2018. Pls.' Mot. Their motion challenges the lawfulness of HUD's two-year delay of the Rule's implementation in ways relating to claims in the complaint.[5] First, the plaintiffs argue that HUD failed to adhere to the requirements of notice and comment procedure in delaying the Rule's implementation. Pls.' Mem. at 22–27; *see* Compl. ¶ 143–48. The defendants acknowledge HUD delayed the Rule's implementation without notice or comment, but argue that HUD had authority under a promulgated regulation, 24 C.F.R. § 888.113(c)(4), to suspend SAFMR designations and exempt PHAs without resort to notice and comment, Defs.' Opp'n at 21–27. The plaintiffs dispute that this regulation conferred such authority upon HUD. Pls.' Mem. at 24–27. Second, the plaintiffs argue that HUD's delay of the Rule's implementation was arbitrary and capricious because HUD failed to provide an adequate explanation for the delay. *Id*. at 28–34; *see* Compl. ¶¶ 149–57. The plaintiffs contend that the Rule's delayed implementation will irreparably harm them, and that both the balance of equities and consideration of the public interest weigh in favor of issuing a preliminary injunction. Pls.' Mem. at 34–43. Here, for reasons explained in further detail below, the plaintiffs have carried their burdens of demonstrating all four factors, and so merit a preliminary injunction under either the "independent factors" or "sliding scale" approach.

A. **Likelihood of Success on the Merits**

The plaintiffs' (1) notice and comment and (2) arbitrary and capricious claims boil down to a common issue—whether HUD identified adverse rental housing market conditions local to the particular PHAs as to which HUD delayed the Rule's implementation. For reasons explained

---

[5] The complaint also raises a third claim, asserting that HUD acted contrary to statute in delaying the Rule's implementation by distributing housing funds in a manner that perpetuates racial segregation and does not provide opportunity to rent quality housing throughout a metropolitan area. Compl. ¶¶ 158–163. The plaintiffs' motion does not address this argument, and the defendants do not respond to it. *See generally* Pls.' Mot.; Defs.' Opp'n.

17

below, HUD did not.  HUD's failure to connect the Rule's delayed implementation in specific

PHAs by reference to local conditions means 24 C.F.R. § 888.113(c)(4) gave the agency no

authority to act without notice and comment, and also that HUD's decision-making was arbitrary

and capricious.  The plaintiffs thus have shown likely success on their claims' merits.

### 1.      HUD Lacked Authority to Delay the Rule's Implementation.

The plaintiffs argue that they likely will succeed on the merits of their claim that HUD's

delay of the Rule is procedurally defective because HUD did not observe the requirements of

notice and comment.  Pls.' Mem. at 22–27.  HUD, invoking a provision of the Rule, argues

unsuccessfully that the Secretary has broad authority to delay the Rule's implementation

wholesale whenever the Secretary determines he has reason to do so.  Defs.' Opp'n at 21–27;

Hr'g Tr. (Dec. 19, 2017) at 30.[6]  The plaintiffs, relying on the same Rule provision, argue that

the Secretary's authority is more circumscribed, and does not reach HUD's action here.  Hr'g Tr.

at 7.  "To choose between those competing [constructions], we look to the context in which the

words appear." *McDonnell v. United States*, 136 S. Ct. 2355, 2368 (2016).  The Court concludes

that although HUD may suspend an SAFMR designation or exempt a PHA within such a

designated area under circumstances in which SAFMRs may adversely impact the area or PHA's

rental housing unit supply, HUD has made no such area-specific showing with respect to the 23

metropolitan areas as to which the agency delayed the Rule's implementation.  As such, the

plaintiffs have demonstrated likely success on the merits on their notice and comment claim.[7]

---

[6]      All citations to the December 19, 2017 hearing transcript cite to a rough draft of the transcript.  A final draft of the transcript is forthcoming and will be made available on this case's docket.  Discrepancies between the rough and final transcript drafts regarding page numbers may exist.

[7]      The defendants' argument that HUD soon will rescind the Rule through notice and comment and thus moot the plaintiffs' notice and comment claim, *see* Defs.' Opp'n at 31, only underscores that HUD has not yet invoked notice and comment, and thus, that the plaintiffs' claim is not moot.  The issue of whether HUD's planned action would moot the plaintiffs' claim is not yet ripe for review.

The APA generally requires a federal agency engaged in informal rulemaking to engage in notice and comment procedures. *See* 5 U.S.C. § 553(b)–(c). "[A]n agency issuing a legislative rule is itself bound by the rule until that rule is amended or revoked and may not alter such a rule without notice and comment. *Clean Air Council v. Pruitt*, 862 F.3d 1, 9 (D.C. Cir. 2017) (alterations and internal quotation marks omitted). "[A]n order delaying [a] rule's effective date" is "tantamount to amending or revoking a rule." *Id.* at 6; *see also Nat. Res. Def. Council v. Abraham*, 355 F.3d 179, 194 (2d Cir. 2004) ("[A]ltering the effective date of a duly promulgated standard could be, in substance, tantamount to an amendment or rescission of the standard[]."); *Envt'l Def. Fund, Inc. v. EPA*, 716 F.2d 915, 920 (D.C. Cir. 1983) ("[S]uspension or delayed implementation of a final regulation normally constitutes substantive rulemaking under APA § 553."); *Council of S. Mountains, Inc. v. Donovan*, 653 F.2d 573, 580 n.28 (D.C. Cir. 1981) (concluding that an order "deferring the requirement that coal operators supply life-saving equipment to miners, [that] had palpable effects upon the regulated industry and the public in general," is "a substantive rule"); *Nat. Res. Def. Council, Inc. v. U.S. EPA*, 683 F.2d 752, 762 (3d Cir. 1982) ("If the effective date were not part of an agency statement such that material alterations in that date would be subject to the rulemaking provisions of the APA, . . . an agency could guide a future rule through the rulemaking process, promulgate a final rule, and then effectively repeal it, simply by indefinitely postponing its operative date." (internal quotation marks omitted)).

The Rule, which requires PHAs administering the HCV program in select metropolitan areas to use, as of January 1, 2018, SAFMRs, unquestionably is a substantive regulation delay of which ordinarily would require notice and comment. HUD, however, did not delay the Rule's implementation through notice and comment. Thus, HUD's action was lawful only if another

source of authority empowered HUD to delay the Rule's implementation without notice or comment. HUD asserts that 24 C.F.R. § 888.113(c) conferred such authority. HUD is wrong.

a)      *Section 888.113(c)(4)'s Meaning*

HUD's failure to use notice and comment means that the agency's authority to delay the Rule's implementation must flow, if at all, from § 888.113(c)(4). Section 888.113(c)(4) allows HUD to temporarily suspend a region's SAFMR designation or exempt a PHA from use of SAFMRs under specified circumstances. The regulation provides, in relevant part:

> HUD may suspend a Small Area FMR designation from a metropolitan area, or may temporarily exempt a PHA in a Small Area FMR metropolitan area from use of the Small Area FMRs, when HUD by notice makes a documented determination that such action is warranted. Actions that may serve as the basis of a suspension of Small Area FMRs are:
>
> (i)      A Presidentially declared disaster area that results in the loss of a substantial number of housing units;
>
> (ii)     A sudden influx of displaced households needing permanent housing; or
>
> (iii)    Other events as determined by the Secretary.

24 C.F.R. § 888.113(c)(4).

Section 888.133(c)(4)'s plain language makes clear that HUD may suspend an SAFMR designation or exempt a PHA only upon one of three enumerated actions' occurrence. Further, under the canon of *ejusdem generis*, which "limits general terms which follow specific ones to matters similar to those specified," *Wallaesa v. FAA*, 824 F.3d 1071, 1081 (D.C. Cir. 2016) (quoting *Gooch v. United States*, 297 U.S. 124, 128 (1936)), the third action must be construed to reach only events "of the same class as those listed" in the preceding exemplar actions, *DeNaples v. Office of Comptroller of Currency*, 706 F.3d 481, 490 n.5 (D.C. Cir. 2013) (quoting BLACK'S LAW DICTIONARY 594 (9th ed. 2009)). *See also Yates v. United States*, 135 S. Ct. 1074, 1086 (2015) ("[*E*]*jusdem generis* [] counsels: 'Where general words follow specific words in a

statutory enumeration, the general words are usually construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words.'" (quoting *Wash. State Dep't of Soc. & Health Servs.* v. *Guardianship Estate of Keffeler*, 537 U.S. 371, 384 (2003) (alterations omitted))); *Hall St. Assocs., LLC v. Mattel, Inc.*, 552 U.S. 576, 586 (2008) ("Under th[e] rule [of *ejusdem generis*], when a statute sets out a series of specific items ending with a general term, that general term is confined to covering subjects comparable to the specifics it follows."); *Cole v. Burns Int'l Sec. Servs.*, 105 F.3d 1465, 1471 (D.C. Cir. 1997) ("[T]he rule of *ejusdem generis* . . . limits general terms which follow specific ones to matters similar to those specified." (internal quotation marks omitted)).

Section 888.113(c)(4)'s first two enumerated actions each involve changes to local rental housing market conditions that drive rents up, to voucher holders' detriment. The over-arching rationale for HUD's suspension authority that the Rule's preamble sets out confirms the enumerated examples' focus on local rental housing conditions. There, the Rule states that an SAFMR designation's suspension requires "a documented finding of adverse rental housing market conditions." *Final Rule*, 81 Fed. Reg. at 80,569. "[L]anguage in the preamble of a regulation," though "not controlling over the language of the regulation itself . . . is evidence of an agency's contemporaneous understanding of its proposed rules." *Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 53 (D.C. Cir. 1999). Were the third action—"Other events as determined by the Secretary"—intended to allow the Secretary unfettered discretion to suspend an SAFMR designation or exempt a PHA for any reason, the two other enumerated examples would be mere surplusage. As the Supreme Court has stressed in applying the canon of *ejusdem generis*, if the disputed phrase was intended to have such a broad meaning "it is hard to see why" the examples needed to be included at all. *Begay* v. *United States*, 553 U.S. 137, 142 (2008); *see*

*also CSX Transp., Inc.* v. *Ala. Dep't of Revenue*, 562 U.S. 277, 295 (2011) ("We typically use *ejusdem generis* to ensure that a general word will not render specific words meaningless.").

The Supreme Court's reasoning in *Kucana v. Holder*, 558 U.S. 233 (2010), is instructive. The Attorney General claimed broad, unreviewable discretion, under 8 U.S.C. § 1252(a)(2)(B), to act on a motion to reopen alien removal proceedings, but the Court held otherwise. 558 U.S. at 237. The Court examined the provision's two clauses insulating from judicial review, in clause (i), certain discretionary administrative judgments authorized by specific statutes, and, in clause (ii), "any other decision . . . the authority for which is specified under this subchapter." *Id.* at 246. Citing the "lead line" introducing both clauses, the "proximity of clauses (i) and (ii) and the words linking them—'any other decision,'" the Supreme Court reasoned that "[t]he clause (i) enumeration . . . is instructive in determining the meaning of the clause (ii) catchall," ultimately reasoning "that Congress had in mind decisions of the same genre," namely, "that Congress barred court review of discretionary decisions only when Congress itself set out the Attorney General's discretionary authority in the statute." *Id.* at 246‑47. Consequently, the Court held, the judicial review bar encompassed only administrative decisions made discretionary by statute, not by regulation. *Id.* at 253–54. As with *Kucana*, the "lead line" in § 888.113(c)(4) is "Actions that may serve as the basis of a suspension of Small Area FMRs are . . . ," which places all three enumerated actions that follow within the category of actions that justify an SAFMR suspension or PHA exemption. These actions' proximity to the lead line and to one another, as well as the "[o]ther events" term linking the actions, shows that § 888.113(c)(4), "[r]ead harmoniously," lets HUD suspend an SAFMR designation or exempt a PHA only for reasons "of the same genre" as those in the first two enumerated actions. *Kucana*, 558 at 246–47.

*Begay* likewise is clarifying.  The Armed Career Criminal Act imposes a sentencing enhancement on a defendant who violates 18 U.S.C. § 922(g) and has three prior convictions "for a violent felony," defined in part to mean a felony that "is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another." 18 U.S.C. § 922(e)(2)(B)(ii).  "[T]he provision's listed examples," *Begay* reasoned, "illustrate the kinds of crimes that fall within the statute's scope" and "indicates that the statute covers only *similar* crimes, rather than *every* crime that presents a serious potential risk of physical injury to another." 553 U.S. at 142 (internal quotation marks omitted). A Congress intending "the statute to be all encompassing" *Begay* said, likely would not "have needed to include the examples at all," as the statute "would cover *all* crimes that present a serious potential risk of physical injury" absent the examples. *Id.* (internal quotation marks omitted).  "These considerations taken together," *Begay* concluded, "convince us that, to give effect to every clause and word of this statute, we should read the examples as limiting the crimes that [the statute] covers to crimes that are roughly similar, in kind as well as in degree of risk posed, to the examples themselves." *Id.* at 143 (alterations and internal quotation marks omitted).  Here, as in *Begay*, § 888.113(c)(4)'s "listed examples" limit the third action's scope to actions "that are roughly similar" to the first two actions. *Id.* at 142–43.  The third action thus is best construed to encompass only events that involve adverse rental housing market conditions.[8]

Finally, the Rule's localist phrasing and the interrelation of the Rule's provisions, viewed holistically, show that HUD may justify a particular SAFMR designation's suspension or PHA's exemption only through a localized determination that conditions in a particular affected area or

---

[8]     *Johnson v. United States* abrogated *Begay* by voiding the phrase "otherwise involves conduct that presents a serious potential risk of physical injury to another," known as § 922(e)(2)(B)(ii)'s "residual clause," for vagueness. 135 S. Ct. 2551, 2563 (2015).  *Begay* nonetheless persuasively illustrates the *ejusdem generis* canon's application.

PHA warrant such action. Section 888.113(c)(4)'s first sentence requires HUD to designate SAFMR areas each year, which "designations will be permanent." 24 C.F.R. § 888.113(c)(4). Elsewhere, the Rule identifies (1) five fixed, objective "criteria used to determine those metropolitan areas" to receive designations and (2) precise, dynamic "selection values" for each criterion. *Id*. § 888.113(c)(1) (identifying selection criteria); *SAFMR Area Designations*, 81 Fed. Reg. at 80,679 (identifying selection values); *see also infra* Part III.A.2. Section 888.113(c)(4)'s second sentence allows HUD to suspend "*a* Small Area FMR designation from *a* metropolitan area" and to exempt "*a* PHA in *a* Small Area FMR metropolitan area" upon "*a* documented determination that *such action* is warranted." *Id*. (emphasis added). Notably, this sentence does not authorize HUD to suspend, in wholesale fashion, "*all* SAFMR designations" or exempt "*all* affected PHAs" in "*all* metropolitan areas." This language, rather, focuses HUD's inquiry on individualized reasons for suspending a particular designation or exempting a particular PHA.

The third sentence cabins HUD's discretion to suspend an SAFMR designation or exempt a PHA, enumerating three "[a]ctions" that "may serve as the basis of a suspension of Small Area FMRs." *Id*.[9] The first two actions—"A Presidentially declared disaster area that results in the loss of a substantial number of housing units" and "A sudden influx of displaced households needing permanent housing," *id*. § 888.113(c)(4)(i)–(ii)—do not merely address free-floating policy concerns. Each action, by nature, affects discrete, particular geographic areas. Thus, § 888.113(c)(4), read as a whole and in concert with surrounding provisions, requires HUD to justify a particular SAFMR designation's suspension or PHA's exemption by reference to specific rental housing market conditions local to the affected area. HUD may not, in other

---

[9]       Notably, again, this sentence references "*a* suspension of [SA]FMRs." 24 C.F.R. § 888.113(c)(4) (emphasis added).

words, suspend an SAFMR designation or exempt a PHA by citing abstract policy concerns or conclusions extrapolated from data with no or only tenuous relation to the specific affected PHA.

The plaintiffs and defendants read § 888.113(c)(4) differently. The plaintiffs understand HUD's authority to suspend an SAFMR designation or exempt a PHA more narrowly, arguing that the term "events" reaches only "unexpected events resulting in a sudden change in localized rental market conditions." Pls.' Mem. at 26. "Whether market conditions have 'negative impacts on voucher families,'" the plaintiffs argue, "has nothing to do with whether any area meets regulatory criteria for small area designation or whether its FMRs remain reliable." Pls.' Reply Mem. Supp. Mot. ("Pls.' Reply") at 9, ECF No. 25. Section 888.113(c)(4), however, by its plain terms authorizes HUD to suspend an SAFMR designation or exempt a PHA even when the conditions that triggered the SAFMR's application to that metropolitan area or PHA still apply, so long as a qualifying event occurs. HUD could have written § 888.113(c)(4) in terms that would allow SAFMR suspensions or PHA exemptions only when a particular metropolitan area or PHA no longer satisfied the criteria for SAFMR designation in the first place, but HUD did not so limit the suspension/exemption authority that the regulation conferred. *Cf. Wallaesa*, 824 F.3d at 1083 ("If Congress had intended that narrow meaning, it knew how to say so."). Moreover, to construe the term "events" to reach only adverse rental housing market condition changes that are "sudden" and "unexpected" has no basis in the regulatory text, is neither compelled by nor necessary to give effect to the two preceding actions, and would leave HUD powerless to suspend the Rule's impact under circumstances that, though foreseen or gradual, negatively impact voucher holders. Construing "events" to reach any "adverse rental housing market conditions," in contrast, finds support in the preambulatory text, gives effect to the two preceding exemplar actions, and leaves HUD flexibility to suspend an SAFMR designation or

25

exempt a particular PHA under circumstances that, although either foreseen or gradual, nonetheless negatively impact voucher holders.

The defendants, in turn, contend that § 888.113(c)(4) vests HUD with virtually boundless authority to suspend SAFMR designations or exempt PHAs. The defendants specifically argue that (1) the three enumerated actions merely illustrate, rather than exhaust, the sort of actions that trigger HUD's authority to suspend an SAFMR designation or exempt a PHA, and (2) the third action gives HUD unreviewable discretion to suspend an SAFMR designation or exempt a PHA for essentially any reason. Defs.' Opp'n at 21–27. These arguments do not pass muster.

First, the defendants argue that § 888.113(c)(4) does not provide an exclusive list of actions that may justify suspending an SAFMR designation or exempting a PHA, but merely nonexclusive examples of such actions. Defs.' Opp'n at 23–24. This construction is inconsistent with § 888.113(c)(4)'s phrasing, which provides, "Actions that may serve as the basis of a suspension of Small Area FMRs *are*," then lists three specific actions. 24 C.F.R. § 888.113(c)(4) (emphasis added). Section 888.113(c)(4)'s use of the term "are" rather than "include" compels a conclusion that the enumerated examples constitute an exclusive, rather than merely illustrative, list of actions that may justify suspending an SAFMR designation or exempting a PHA. Had HUD wished to reserve to itself authority to suspend an SAFMR designation for reasons other than an enumerated action's occurrence, HUD could have drafted § 888.113(c)(4) to provide that "Actions that may serve as the basis of a suspension of Small Area FMRs *include*" the three enumerated actions. HUD, however, did not do that; by drafting § 888.113(c)(4) to contain the term "are" rather than "include," HUD limited its authority to suspend an SAFMR designation to the occurrence of an enumerated action. *Cf. Wallaesa*, 824 F.3d at 1083.

Second, the defendants argue that even if HUD may suspend an SAFMR designation or exempt a PHA only upon an enumerated action's occurrence, the third action is phrased so broadly as to give HUD essentially unreviewable discretion to suspend an SAFMR designation or exempt a PHA for any reason. Defs.' Opp'n at 22–26. The *ejusdem generis* canon, the defendants say, is inapplicable because § 888.113(c)(4) contains no "general term which follows specific ones." Defs.' Opp'n at 24 (alterations and internal quotation marks omitted). This is incorrect. Section 888.113(c)(4) enumerates two specific actions—"A Presidentially declared disaster area that results in the loss of a substantial number of housing units" and "A sudden influx of displaced needing permanent housing"—followed by a third, more general action— "Other events as determined by the Secretary." 24 C.F.R. § 888.113(c)(4).

The defendants contend that the Rule's overall context shows that *ejusdem generis* does not apply, identifying three aspects of the Rule that the defendants characterize indicating "an intent to be expansive." Defs.' Opp'n at 24–25. Although "the *ejusdem generis* canon does not control when the whole context dictates a different conclusion," *Wallaesa*, 824 F.3d at 1081 (alterations and internal quotation marks omitted), the defendants' argument actually ignores the regulation's pertinent context and precise language. The defendants observe that the regulation uses "self-contained, broadly permissive language." Defs.' Opp'n at 25. The *ejusdem generis* canon applies, however, to language that otherwise reads broadly. *See Wallaesa*, 824 F.3d at 1081. The defendants note that "the language introducing the enumerated examples contains no indication that those examples are meant to restrict the circumstances under which HUD may find a suspension warranted." Defs.' Opp'n at 25. The *ejusdem generis* canon, however, requires no clear statement that specific language limits general language's scope. Indeed, to require such clarity would defeat the canon's purpose of clarifying ambiguous statutes. Finally,

27

the defendants observe that the third action's wording "specifically states that the nature of the referenced 'events' are those that are 'determined by the Secretary,' not those that are similar in kind to the preceding examples," which the defendants argue "forecloses the notion that the nature of the 'events' referenced therein is to be limited by the preceding examples." *Id.* That HUD has some discretion to determine which events justify suspending an SAFMR designation is undisputed, however; the question is whether that discretion is bounded. Here, the sequence of two specifically-phrased actions followed by a generally-phrased third action indicates that the first two actions limit HUD discretion under the third action. To construe the third action as reaching any event the first two actions do not reach would defeat the purpose of enumerating an exclusive list of "[a]ctions that may serve as the basis of a suspension of Small Area FMRs." 24 C.F.R. § 888.113(c)(4).

Nor would applying the *ejusdem generis* canon render the phrase "as determined by the Secretary" superfluous. This language, read in context, can be read to vest HUD with discretion to determine whether a qualifying event warrants an SAFMR designation's suspension or a PHA's exemption, such that HUD need not suspend a designation or exempt a PHA each time a designated area or PHA experiences a disaster. This language does not allow HUD to determine whether something qualifies as an "event" in the first place. In other words, § 888.113(c)(4)(iii) gives HUD discretion, but cabins that discretion by allowing its exercise only upon a qualifying "event['s]" occurrence. The defendants compare the phrase "other events as determined by the Secretary" to the language of 49 U.S.C. § 44702(d)(2), which authorizes the Federal Aviation Administration to "rescind a delegation . . . at any time for any reason the [agency] considers appropriate"—language the D.C. Circuit held "very clearly commits the renewal/nonrenewal designation to agency discretion." *Steenholdt v. FAA*, 314 F.3d 633, 638 (D.C. Cir. 2003). The

phrase at issue here, however, is considerably narrower than § 44702(d)(2)'s language. *Steeholdt*, if anything, cuts against the defendants' position by illustrating how an agency might draft a rule that confers the boundless discretion HUD claims to possess.

Finally, the defendants invoke the *Auer* doctrine to argue that their construction of the regulation is due deference even if the regulation's meaning is not clear. Defs.' Opp'n at 25–26. As explained in detail above, however, the defendants' construction is "inconsistent with the regulation," *Press Commc'ns LLC*, 875 F.3d at 1121, and thus due no deference.[10]

### b)    HUD Failed to Identify Local Adverse Rental Housing Market Conditions

Whether HUD invoked a proper triggering "event" to justify delaying by two years the Rule's implementation thus turns on whether HUD based the Rule's delay on an event involving local "adverse rental housing market conditions." The Suspension Memorandum presents three rationales for delaying the Rule's implementation: (1) the Interim Report's findings showing the Rule's potentially negative impact on voucher holders; (2) comments received in response to the Reducing Regulatory Burden notice; and (3) HUD's failure timely to create SAFMR guidance and technical assistance for affected PHAs. Suspension Mem. at 5–8. The latter two rationales have nothing to do with local rental housing market conditions in the 23 affected PHAs, and so cannot independently sustain HUD's invocation of § 888.113(c)(4)'s third action. As to the Rule's potential adverse impact on voucher holders, the Suspension Memorandum identified evidence from the Interim Report, which evaluated the demonstration project's preliminary findings, that SAFMRs may decrease rental housing unit stock. *Id.* at 5–6. The demonstration

---

[10]    A conclusion that 24 C.F.R. § 888.113(c)(4) does not give HUD essentially boundless discretion to suspend an SAFMR designation or exempt a PHA for any reason, but rather provides meaningful standards by which a court may evaluate the lawfulness of HUD's actions, necessarily also defeats the defendants' contention that HUD's delay of the SAFMR Rule's implementation is not reviewable. Defs.' Opp'n at 19–21; *see Cody v. Cox*, 509 F.3d 606, 610 (D.C. Cir. 2007) ("[Re]but[ting] the presumption that agency action is judicially reviewable" requires a defendant to show that "the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." (internal quotation marks omitted)).

project's 7 pilot PHAs and the 200+ Rule-affected PHAs essentially do not overlap, however, and HUD has identified no basis to conclude that any lessons on SAFMRs' efficacy that can be extrapolated from the demonstration project findings apply to the Rule-affected PHAs, as material differences in the pilot and Rule-affected PHAs' relevant characteristics exist. [11] Indeed, given that HUD selected the pilot and Rule-affected PHAs using entirely different criteria to serve entirely different purposes, any assumption that the pilot PHAs represent the Rule-affected PHAs, or vice versa, in relevant respects seems highly questionable. HUD thus has failed to identify adverse rental housing market conditions local to the 23 Rule-affected areas, and so cannot invoke the authority that § 888.113(c)(4) gives the agency to suspend an SAFMR designation or exempt a PHA without notice and comment.

The Suspension Memorandum primarily relied on the Interim Report's findings that SAFMR use caused a net loss of units available to voucher holders in the pilot PHAs. The Interim Report stated that although the pilot PHAs' use of SAFMRs

> should increase the pool of units potentially available . . . in high-rent FMRs, while reducing the pool of units that are located in lower-rent ZIP codes . . . . the gain in units with rents below the applicable FMR in high-rent ZIP codes did not offset the decrease in the number of units in the low-rent and moderate-rent ZIP codes, resulting in a net loss of units that are potentially available to voucher families.

Suspension Mem. at 5; *see* Interim Report at vii. The Suspension Memorandum concluded that "[t]he net effect across the 7 study PHAs is a loss of over 22,000 units (3.4 percent) that might otherwise have been affordable to voucher families." Suspension Mem. at 5.

---

[11]     The one PHA that the demonstration project and Rule both affected is the Housing Authority of Cook County, Illinois. *Compare Demonstration Project*, 77 Fed. Reg. at 69,652, *with SAFMR Area Designations*, 81 Fed. Reg. at 80,679; *see also* Hr'g Tr. at 8. The Court, pursuant to Federal Rule of Evidence 201, judicially notices that Cook County is in the Chicago-Joliet-Naperville, IL HUD Metro FMR Area. *See Chicago*, ENCYCLOPAEDIA BRITANNICA, https://www.britannica.com/place/Chicago (last visited Dec. 23, 2017) (describing Chicago as the "seat of Cook county"); *Cook County Map Application*, COOK CTY. GOV'T, https://maps.cookcountyil.gov/cookviewer/mapViewer.html (last visited Dec. 23, 2017) (showing Chicago and Cook County's overlap overlap); FED. R. EVID. 201(b).

The problem with HUD's reliance on demonstration project data to justify the Rule's delay is that HUD has failed to show that the pilot and Rule-affected PHAs share similar characteristics, such that any conclusions as to SAFMRs' efficacy that can be extrapolated from the demonstration project's findings apply to the Rule-affected PHAs. For example, in at least one significant way, the Long Beach pilot PHA did not demographically represent the Rule-affected PHAs. Long Beach's high-rent ZIP codes contained only 11 percent of the PHA's rental housing units, a lower figure than for any other pilot PHA. Interim Report at 28 & tbl. 4-1. By contrast, high-rent ZIP codes in each Rule-affected area must, according to the selection criteria, contain at least 20 percent of the area's total rental housing unit supply. *See SAFMR Area Designations*, 81 Fed. Reg. at 80,679; 24 C.F.R. § 888.113(c)(1).[12] This contrast is significant because SAFMRs increase rental unit affordability in high-rent ZIP codes and decrease rental unit affordability in low-rent ZIP codes, and thus reduce overall rental housing unit supply more dramatically in areas like Long Beach, which have relatively few high-rent units, than areas with more high-rent units. Interim Report at 32–34. "[I]f fewer rental units . . . are in high-rent ZIP Codes than in low-rent ZIP Codes . . . then the shift to SAFMRs will mean fewer units" available. *Id.* at 34.

Long Beach, though only one of the seven pilot PHAs, distorted the demonstration project's findings because much of the net decrease in rental housing unit supply that the project attributed to SAFMRs occurred in Long Beach. The Interim Report found that decreases in rental housing unit supply largely were concentrated in Long Beach, which saw a greater than 10

---

[12]     The Interim Report defined a high-rent ZIP code as a zip code with a "rent ratio"—the ratio of a two-bedroom SAFMR over a two-bedroom metropolitan area FMR—of greater than 1.1, and a low-rent ZIP code as a zip code with a rent ratio of below 0.9. Interim Report at 27.

percent net loss of rental housing unit supply. *Id*. at vii.[13]   By contrast, two pilot PHAs—Laredo

and Mamaroneck—saw "virtually no change in the overall number of units" available after

implementing SAFMRs whatsoever. *Id*. at 33 & tbl. 4-5.  Long Beach, an area demographically

unrepresentative of the Rule-affected areas, thus skewed the demonstration project's findings.

   The pilot PHAs also did not represent Rule-affected areas with respect to the SAFMR

mandate's geographic scope within a metropolitan area.  Only two of the seven pilot PHAs—

Laredo and Mamaroneck—mandated SAFMR use throughout the entire metropolitan area. *Id*. at

33.  Laredo and Mamaroneck were "unique among the SAFMR PHAs in that their jurisdictions

are the same as the geographies for which their respective FMRs are calculated." *Id*.  Laredo and

Mamaroneck, in other words, were the only PHAs in their respective metropolitan areas, and, as

such, implementation of SAFMRs applied across those two PHAs' entire metropolitan areas.

Five of the seven pilot PHAs, however, did not make PHA use mandatory across an entire

metropolitan area. *Id*.  In contrast, all PHAs within each metropolitan area that the Rule affects

use SAFMRs.  24 C.F.R. § 888.113(c)(3); *Final Rule*, 81 Fed. Reg. at 80,568.  An SAFMR's

geographic scope within a metropolitan area matters because "[i]f only a few agencies within a

metropolitan area use Small Area FMRs, voucher holders may have difficulty moving to high-

opportunity neighborhoods outside those agencies' jurisdiction."  CBPP Decl. ¶ 7.  "For

example, if an urban agency adopts Small Area FMRs but the surrounding suburbs do not, then

families will face the same cost hurdles that currently prevent them from moving to lower-

poverty, suburban neighborhoods." *Id*.  Indeed, HUD itself acknowledged this conclusion during

both the demonstration project and the rulemaking period.  *See NPRM*, 81 Fed. Reg. at 39,224;

*Proposed Demonstration Project*, 75 Fed. Reg. at 27,811.  When PHAs in low-rent ZIP codes,

---

[13]      The Dallas pilot PHA also saw a large decrease in number of rental housing units lost, but this loss
amounted to only 4% of the Dallas pilot PHA's total rental housing unit supply.  Interim Report at vii.

but not PHAs in high-rent ZIP codes, adopt SAFMRs, voucher holders will face rising rents in low-income areas but no commensurate decrease in rents in high-rent ZIP codes. SAFMRs' success thus requires all PHAs within a metropolitan area to adopt SAFMRs. Laredo and Mamaroneck, the only two pilot PHAs that implemented SAFMRs throughout their entire metropolitan areas, significantly were the only pilot PHAs that saw virtually no decrease in rental housing unit supply. Interim Report at 33. The lack of any metropolitan area-wide SAFMR mandate in five of seven pilot PHAs' respective metropolitan areas raises yet another question about the demonstration project findings' applicability to the Rule-affected areas, which mandate SAFMR use throughout their entire metropolitan areas.

That the pilot PHAs were not representative of Rule-affected PHAs is unsurprising, as HUD used entirely different criteria to select these two groups. HUD used five fixed, objective "selection criteria" to determine which PHAs the Rule would cover: the (1) "number of vouchers under lease in the metropolitan FMR area;" (2) "percentage of the standard quality rental stock, within the metropolitan FMR area is in small areas (ZIP codes) where the Small Area FMR is more than 110 percent of the metropolitan FMR area;" (3) "percentage of voucher families living in concentrated low income areas;" (4) "percentage of voucher families living in concentrated low income areas relative to the percentage of all renters within these areas over the entire metropolitan area;" and (5) "vacancy rate for the metropolitan area." 24 C.F.R. § 888.113(c)(1). HUD also, by notice published in the Federal Register, identified objective "selection values" for each criterion "to determine . . . metropolitan FMR areas subject to Small Area FMRs": (1) "[t]here are at least 2,500 HCV under lease;" (2) "[a]t least 20 percent of the standard quality rental stock, within the metropolitan FMR area is in small areas (ZIP codes) where the Small Area FMR is more than 110 percent of the metropolitan FMR;" (3) "[t]he percentage of voucher

families living in concentrated low income areas relative to all renters within the area must be at least 25 percent;" (4) "[t]he measure of the percentage of voucher holders living in concentrated low income areas relative to all renters within these areas over the entire metropolitan area exceeds 155 percent;" and (5) "[t]he vacancy rate for the metropolitan area is higher than 4 percent." *SAFMR Area Designations*, 81 Fed. Reg. at 80,679.[14]

Entirely different criteria guided the pilot PHAs' selection. HUD first constructed a pool of PHAs that met seven initial criteria, which were entirely different than the criteria HUD used to determine the Rule's coverage. HUD included in the initial pool each PHA that: (1) "[h]ad at least 500 vouchers in use as of September 30, 2011;" (2) "[h]ad at least 10 housing choice voucher (HCV) tenants living in ZIP Codes where the SAFMR exceeded the metropolitan area Fair Market Rent (FMR) by more than 10 percent in fiscal year 2012;" (3) "[h]ad at least 10 HCV tenants living in ZIP Codes where the SAFMR was more than 10 percent less than the metropolitan area FMR;" (4) "[h]ad attained at least 95 percent HCV family reporting in Public and Indian Housing Information Center;" (5) "[w]as not troubled, as determined by the Section 8 Management Assessment Program;" (6) "[h]ad the administrative capacity to carry out the SAFMR program;" and (7) "[h]ad not been involved in litigation that would seriously impede its ability to administer the HCV program." *Demonstration Project*, 77 Fed. Reg. at 69,652. These criteria produced a pool of 247 eligible PHAs, which HUD organized into eight selection clusters based on each PHA's (1) number of vouchers (small or large), (2) metropolitan area two-bedroom FMR (low or high), and (3) number of working-age heads of household (low or high

---

[14]    With respect to the fifth criterion, HUD defined a metropolitan area's vacancy rate as "the number of Vacant For Rent Units divided by the sum of the number of Vacant For Rent Units, the number of Renter Occupied Units, and the number of Rented, not occupied units." *SAFMR Area Designations*, 81 Fed. Reg. at 80,679. HUD calculated the vacancy rate "using data from the 1-year American Community Survey (ACS) tabulations" by averaging values "from the 3 most current ACS 1 year datasets available." *Id.*

percentage). Interim Report at 99 & tbl. A-1. HUD then randomly ordered PHAs within each cluster, and invited the PHA at the top of each cluster to participate in the demonstration project. *Id.* at 100. When a PHA declined to participate, HUD invited a cluster's next ranking PHA. *Id.* After several rounds of invitations, five PHAs had agreed to participate in the demonstration project. *Id.* Finally, HUD included in the project two PHAs from the Dallas metropolitan area, which have used SAFMRs since 2011 pursuant to a settlement agreement. *Id.* at 3.

HUD's decision to use different selection criteria for the pilot PHAs and Rule-affected areas reflects the different purposes HUD intended the demonstration project and Rule to serve. HUD "randomly selected five PHAs for the demonstration that differed across various characteristics" because HUD sought "[t]o test how SAFMRs may potentially affect a range of PHA types." Interim Report at 2. In promulgating the Rule, however, HUD specifically targeted "those metropolitan areas . . . where establishing FMRs by ZIP code areas has the potential to significantly increase opportunities for voucher families." *Final Rule*, 81 Fed. Reg. at 80,568. HUD's different objectives in undertaking the demonstration project and promulgating the Rule further illustrate the inadequacy of HUD's reliance on the demonstration project's preliminary findings to justify the Rule's delay.

Finally, HUD's incorporation into the Rule of various provisions designed to protect against the very concerns that the demonstration project identified further undermines HUD's reliance on demonstration project data to delay the Rule. Most significantly, as discussed above, the Rule requires *all* PHAs within an affected metropolitan area to use SAFMRs, addressing a crucial issue that the demonstration project uncovered. 24 C.F.R. § 888.113(c)(3); *Final Rule*, 81 Fed. Reg. at 80,568. The Rule also contains several other provisions to protect voucher holders against issues the demonstration project revealed, including (1) "limit[ing] the annual decrease in

Small Area FMRs to no more than 10 percent of the area's FMR in the prior fiscal year" and allowing PHAs to (2) "hold harmless those families remaining in place from payment standard reductions," (3) "establish a new payment standard for families under HAP contract between the full 'hold harmless' option . . . and the new payment standard based on the Small Area FMR," (4) "establish different policies regarding how decreases in payment standards will apply [to voucher holders] for designated areas within their jurisdiction," and (5) "request and receive approval to establish an exception payment standard promptly for a ZIP Code area if necessary to react to rapidly changing market conditions or to ensure sufficient rental units are available for voucher families." *Final Rule*, 81 Fed. Reg. at 80,572–74. HUD has discounted the importance of two of these five enumerated voucher holder protections incorporated into the Rule, noting that the 10 percent SAFMR cap "may only slow the pace of the loss of units, as opposed to preventing the overall decline in the number of units available to HCV families," and that the "hold harmless" provision does not "protect[] families that must move to a new unit or [] applicant families off the waiting list who are trying to lease a unit on the program for the first time." Suspension Mem. at 5–7. HUD seemingly has not, however, considered or addressed the Rule's other voucher holder protection provisions.[15]

    In sum, the significant differences between the (1) pilot and Rule-affected PHAs, (2) selection criteria HUD used to identify each group, and (3) purposes HUD sought the demonstration project and Rule to achieve impose on HUD a burden to show that any conclusions the Interim Report extrapolated from the demonstration project's findings apply to

---

[15]     As the Institute for Policy Integrity at New York University School of Law, which filed a brief as *amicus curiae* in support of plaintiffs' motion for a preliminary injunction, observe, various provisions of the Rule are "expressly designed to limit Rule-related increases in tenants' rent burdens . . . . [b]ut HUD makes no mention of these differences between the demonstration project and the Small Area Rule, even as it relies on the Interim Evaluation of the demonstration projects as a justification for suspending implementation of the Rule." Amicus Br. at 8, ECF No. 21.

the specific Rule-affected areas.  Neither the Suspension Memo nor Letter to PHAs, however, even attempt to make such a showing.  Nor, for that matter, does the defendants' briefing.  The plaintiffs thus have established likely success on the merits of their notice and comment claim.

### 2.  HUD's Delay of the Rule's Implementation Was Arbitrary and Capricious

The plaintiffs also argue that HUD's delay of the Rule's implementation was arbitrary and capricious.  Pls.' Mem at 28–34.  According to the plaintiffs, HUD failed adequately to explain its reasons for delaying the Rule's implementation.  *Id.* at 28.  As explained above, § 888.113(c)(4) required HUD to identify adverse rental housing market conditions local to a particular area or PHA to justify suspending an SAFMR designation or exempting a PHA in that area.  HUD, as explained, did no such thing.  Instead, HUD attempted to justify delaying the Rule's implementation by two years by citing data based on a small number of pilot PHAs, which did not represent the Rule-affected areas in terms of demographics or scope and which HUD selected partially randomly (1) on the basis of entirely different criteria than those HUD used to select the Rule-affected areas and (2) for entirely different objectives than HUD sought to achieve through the Rule's promulgation.  HUD, in so doing, "relied on factors"—i.e., the demonstration project data—"which [law] ha[d] not intended it to consider" and "entirely failed to consider an important aspect of the problem"—i.e., local rental housing market conditions in the Rule-affected areas.  *Mayo*, 875 F.3d at 19 (quoting *State Farm*, 463 U.S. at 43 (alterations omitted)).  HUD's two-year delay of the Rule's implementation therefore was arbitrary and capricious.  As such, the plaintiffs have demonstrated a likelihood of success on the merits as to their arbitrary and capricious claim, for essentially the same reasons they have shown likely success on the merits as to their notice and comment claim.

### B.      Risk of Irreparable Harm

The plaintiffs argue that they will suffer irreparable harm if HUD does not implement the Rule by January 1, 2018. "The party seeking a preliminary injunction must make two showings to demonstrate irreparable harm." *League of Women Voters*, 838 F.3d at 7. "First, the harm must be 'certain and great,' 'actual and not theoretical,' and so 'imminent that there is a clear and present need for equitable relief to prevent irreparable harm.'" *Id.* at 7–8 (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (alterations omitted)). "Second, the harm 'must be beyond remediation.'" *Id.* at 8 (quoting *Chaplaincy*, 454 F.3d at 297). Here, plaintiffs Crystal Carter, Tiana Moore, and OCA each have made a requisite showing of irreparable harm from the Rule's delay.

### 1. *Crystal Carter*

Plaintiff Crystal Carter has demonstrated a risk of irreparable injury sufficient to warrant a preliminary injunction. Ms. Carter and her five minor children currently use a Housing Choice Voucher to rent a four-bedroom house in the City of Hartford, Connecticut. Carter Decl. ¶ 1. Three of Ms. Carter's children attend high-performing schools in the Simsbury School District through Hartford's Open Choice school integration program. *Id.* ¶ 4. Ms. Carter wishes to use her voucher to move to the town of Simsbury in Hartford County, Connecticut, to be closer to those schools. *Id.* ¶ 6. Simsbury's poverty rate of 3.4 percent, Decl. of Sasha Samberg-Champion ("Pls.' Decl."), Ex. I, Poverty Data for Simsbury Town, CT, ECF No. 16-9, is much lower than the poverty rate in Ms. Carter's ZIP code, which is 32.2 percent, Pls.' Decl., Ex. G, Poverty Data for 06114 ZIP Code, ECF No 16-7. Simsbury offers higher quality education and a safer living environment for Ms. Carter's entire family than does Hartford. Carter Decl. ¶ 6. As the plaintiffs observe, "[l]iving close to her children's schools has obvious benefits for any parent, including reducing the children's commute times, giving them more opportunity to

engage with their classmates out of school, and allowing the parent to be more involved with her children's schools." Pls.' Mem. at 39.

The Rule's implementation would enable Ms. Carter to move her family from Hartford to Simsbury; the Rule's suspension deprives her of the Rule's benefits. If the Rule goes into effect, the FMR for a four-bedroom unit in much of Simsbury will be $1,940 per month for Fiscal Year 2018. *See* Pls.' Decl., Ex. F, 2018 Hartford SAFMRs at 2, ECF No. 16-6.[16]  Should the Rule's implementation remain delayed, however, the FMR for a four-bedroom dwelling in Simsbury will be $1,620 per month, *see* Pls.' Decl., Ex. E, 2018 Hartford FMRs at 5, ECF No. 16-5—an amount that Ms. Carter's experience shows to be insufficient to find an appropriate in Simsbury. Carter Decl. ¶ 7. The fact that Ms. Carter's PHA may implement SAFMRs voluntarily, *see* Suspension Mem. at 3; Letter to PHAs at 3, does not prevent Ms. Carter from showing irreparable harm. For the reasons explained above, SAFMRs fail to assist voucher holders to relocate to high-opportunity areas unless all or substantially all PHAs within a metropolitan area implement SAFMRs, meaning that a single PHA, such as Ms. Carter's, likely will not implement SAFMRs voluntarily. Further, HUD's counsel conceded at oral argument that no Rule-affected PHA has come forward to opt into the Rule voluntarily, Hr'g Tr. at 18–19, which likewise illustrates the unlikeliness that Ms. Carter's PHA will implement SAFMRs voluntarily.

The defendants correctly observe that Ms. Carter's children already attend school in Simsbury, Defs.' Opp'n at 34, but do not dispute that Ms. Carter would enjoy the obvious benefits of "be[ing] closer to [her] children's schools" and "liv[ing] in a safer and healthier neighborhood environment for [her] children" if she lived in Simsbury. Carter Decl. ¶ 6. The

---

[16]     The Court, relying on the United States Postal Service's "Look Up A ZIP Code" tool, *see Look Up A Zip Code*[TM], U.S. POSTAL SERV., https://tools.usps.com/go/ZipLookupAction!input.action?mode=2&refresh=true (last visited Dec. 23, 2017), takes judicial notice that the ZIP Code for much of Simsbury is 06070. FED. R. EVID. 201.

defendants argue that "the mere possibility . . . that [Ms. Carter's] school-age children may potentially earn a higher income in their mid-twenties if they move at some point to a lower-poverty area is entirely speculative and in no way imminent."  Defs.' Opp'n at 34.  The plaintiffs, however, identify "robust evidence that children who moved to lower-poverty areas when they were young (below age 13) are more likely to attend college," to "have substantially higher incomes as adults," and to "live in better neighborhoods themselves as adults," and are "less likely to become single parents."  Raj Chetty et al., *The Effects of Exposure to Better Neighborhoods on Children: New Evidence from the Moving to Opportunity Experiment*, 106 AM. ECON. REV. 855, 899 (2016); *see also* LORA ENGDAHL, POVERTY & RACE RES. ACTION COUNCIL, NEW NEIGHBORHOODS, NEW SCHOOLS: A PROGRESS REPORT ON THE BALTIMORE HOUSING MOBILITY PROGRAM 27–28 (2009) (finding that relocation to low-poverty areas produces significant mental health benefits to Housing Choice Voucher holders); MARGERY AUSTIN TURNER & LYNETTE RAWLINGS, URBAN INST., PROMOTING NEIGHBORHOOD DIVERSITY: BENEFITS, BARRIERS, AND STRATEGIES 2 (2009) (describing the myriad ways "[n]eighborhoods matter to the well-being of children and families.").  The weight of this research certainly indicates that Ms. Carter's family may enjoy some additional benefits from living in Simsbury.

The defendants also argue that Ms. Carter has not "identified any imminent risk that she or her family will actually be subject to criminal activity in Hartford." Defs.' Opp'n at 34. This arguments set the bar too high. "[A]s a preliminary injunction requires only a likelihood of irreparable injury, . . . Damocles's sword does not have to actually fall . . . before the court will issue an injunction." *League of Women Voters*, 838 F.3d at 8–9.  Irreparable harm can flow not only from actual criminal victimization, but also from "continued exposure to [a] high crime rate . . . and unsafe conditions of [one's] present community."  *Bronson v. Crestwood Lake Section 1*

40

*Holding Corp.*, 724 F. Supp. 148, 153 (S.D.N.Y. 1989); *see also* ENGDAHL, *supra*, at 27 ("Families in disadvantaged neighborhoods are at higher risk for disease and earlier death likely due" in part to "the cumulative stress arising from living in unsafe neighborhoods with limited resources."); TURNER & RAWLINGS, *supra*, at 3 ("Young people who live in high-crime areas are more likely to commit crimes themselves.").

The defendants observe that Ms. Carter has not "alleged that she has applied for housing in Simsbury, that if she did apply she would be likely to be selected despite competition from other applicants, or that there are sufficient landlords in Simsbury participating in the HCV program and accepting voucher-holding tenants including, in particular, her." Defs.' Opp'n at 34. To apply for housing in Simsbury prior to the Rule's implementation, however, would be futile—the Rule's premise is that voucher holders such as Ms. Carter cannot obtain housing in high-income areas like Simsbury because current payment standards do not suffice to make such housing affordable. Ms. Carter has established that she intends to apply for and obtain such housing as soon as she possibly can. Carter Decl. ¶¶ 6–7. A landlord's discrimination against voucher holders, moreover, would violate Connecticut law. *See* Con. Gen. Stat. § 46a-64c; *Comm'n on Human Rights & Opportunities v. Sullivan Assocs.*, 739 A.2d 238, 241 (Conn. 1999). Furthermore, HUD's own calculation, based on detailed housing market data, that an FMR of $1,940 will suffice to allow a voucher holder to rent a four-bedroom unit in Simsbury belies HUD's speculative assertion that such units may be unavailable to Ms. Carter even under the Rule, *see* Defs.' Opp'n at 34.

Finally, the defendants dispute that any expenses associated with Ms. Carter's longer commute would be sufficiently burdensome to warrant injunctive relief. *Id.* This argument mischaracterizes the nature of the harm that Ms. Carter's family would suffer from her commute.

41

The relevant harm is not primarily an economic injury, but "the opportunity cost of spending hours on a bus instead of participating in after school activities, studying, and engaging in active play." Pls.' Reply at 21.

### 2. *Tiara Moore*

Plaintiff Tiara Moore likewise has demonstrated a risk of irreparable injury sufficient to warrant a preliminary injunction. Ms. Moore and her minor child live in an apartment in the City of Chicago, Illinois. Moore Decl. ¶ 1. The Chicago Housing Authority has issued Ms. Moore a Housing Choice Voucher for $1,207 per month for a two-bedroom unit. *Id.* ¶¶ 4, 7. Ms. Moore wishes to move to DuPage County, Illinois, to live in a neighborhood that will afford her family greater employment opportunities, higher quality education, and a safer living environment, as well as to be nearer to Ms. Moore's mother, who provides child care so that Ms. Moore can work. *Id.* ¶¶ 5–6. DuPage County's poverty rate of 7.4 percent, Pls.' Decl., Ex. J, Poverty Data for DuPage County, Ill., ECF No. 16-10, is also much lower than the poverty rate in Ms. Moore's ZIP code, which is 33.8 percent, Pls.' Decl., Ex. H, Poverty Data for 60644 ZIP Code, ECF No 16-8. Ms. Moore has not, however, been able to locate any two-bedroom rental units in DuPage County for $1,207 per month. *Id.* ¶ 7. The Rule would enable Ms. Moore to move her family from the City of Chicago to DuPage County. For fiscal year 2018, the FMR for a two-bedroom unit in the broad Chicago metropolitan area, which includes DuPage County, would be $1,180 per month. Pls.' Decl., Ex. C, Chicago FMRs at 1, ECF No. 16-3. In contrast, under the Rule, 41 of DuPage County's ZIP codes would have SAFMRs exceeding $1,180 per month, with SAFMRs in the highest-cost ZIP codes reaching $1,770 per month. Pls.' Decl., Ex. D, 2018 Chicago SAFMRs, ECF No. 16-4. This difference in voucher purchasing power throughout much of DuPage County would dramatically improve Ms. Moore's ability to find suitable

housing there.  In addition,  Ms. Moore will,  absent the Rule's implementation,  continue to incur

opportunity  and transportation costs arising from her daily trips to bring her child  to and from her

mother's house for child care.  Moore Decl.  ¶ 6.

     The defendants argue that Ms. Moore will  suffer no injury  from the Rule's delay,  as the

Rule would not benefit her in the first place.  Defs.' Opp'n at 35.  The defendants observe that

the Chicago Housing  Authority  is a Moving  to Work PHA and so would  be exempt from use of

SAFMRs even if the Rule were implemented.  *See id.*, Attach. 3, Decl. of Marianne Nazzaro ¶¶

2–3, ECF No. 24-3;  *Final Rule*, 81 Fed. Reg. at 80,578.   Ms. Moore, however, seeks to move to

DuPage County, not to Chicago.  Moore Decl. ¶¶ 5–6, 9.  The DuPage County PHA, not the

Chicago Housing  Authority,  sets payment standards for DuPage County,  *see* 24 C.F.R. §

982.503(a)(1)  (providing  that PHAs set payment standards for their own jurisdictions),  and,

unlike  the Chicago Housing  Authority,  is not a Moving  to Work PHA, *see Moving  to Work*

*(MTW) - Participating Sites*, U.S. DEP'T HOUSING & URBAN DEV.,

https://www.hud.gov/program_offices/public_indian_housing/programs/ph/mtw/mtwsites  (last

visited  Dec. 23, 2017).  The Rule's  implementation  thus would benefit Ms. Moore. [17]

### 3.  OCA

     Finally,  Plaintiff OCA has demonstrated a risk of irreparable injury  sufficient to warrant a

preliminary  injunction.  An organization,  to show irreparable harm, must show first that "the

'actions taken by the defendant have perceptibly impaired the organization's  programs." *League*

*of Women Voters*, 838 F.3d at 8 (quoting  *Fair Emp't Council of Greater Wash., Inc. v. BMC*

*Mktg. Corp.*, 28 F.3d 1268,  1276 (D.C. Cir. 1994)).  "If so, the organization  must then also show

---

[17]    The defendants also assert that their arguments as to why Ms. Carter has not shown irreparable harm apply equally to Ms. Moore.  Defs.' Opp'n at 34–35.  The defendants' arguments fail as to Ms. Moore for the same reason they fail as to Ms. Carter.

that the defendant's actions 'directly conflict with the organization's mission.'" *Id.* (quoting *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996)). "[O]bstacles [that] unquestionably make it more difficult for [an organization] to accomplish [its] primary mission . . . provide injury for purposes [of] . . . irreparable harm." *Id.* at 9. OCA works "to promote access to opportunity," including educational, employment, and housing opportunity, "for all people, and specifically to address the disproportionate isolation from opportunity experienced by Blacks and Latinos in Connecticut due to residential segregation." Pls.' Mot., Attach. 5, Decl. of Erin Boggs, Exec. Dir., OCA ("OCA Decl.") ¶ 2, ECF No. 15-5. "OCA's central focus in this work is leveraging affordable and subsidized housing programs to enable low-income families to access housing outside of areas with concentrated poverty and segregation." *Id.* Much of this work involves enabling families who receive housing vouchers to move to higher-opportunity areas and addressing the concentration of voucher holders (who, in the Hartford area, primarily are nonwhite) in high-poverty, segregated areas. *Id.* ¶¶ 4–9. For example, OCA works to improve housing mobility programs for voucher users and to increase the supply of rental housing suitable for voucher holders in high-opportunity neighborhoods. *Id.*

OCA has shown that the Rule's delay will "perceptibly impair[]" OCA's programs and "directly conflict with the organization's mission." *League of Women Voters*, 838 F.3d at 8. The Rule's delay frustrates OCA's ability to assist voucher holders gain access to greater opportunity in several ways. First, the delay frustrates OCA's "engage[ment] with . . . developers to encourage the acquisition and construction of housing that is affordable to voucher holders in non-concentrated, high-opportunity areas in the Hartford metropolitan area," because "[t]he anticipated income from voucher holders will not support financing of such development while [voucher] rents are being calculated on a metropolitan-wide basis, rather than with a small-area

calculation." OCA Decl. ¶ 8. OCA also has diverted scarce resources away from previously planned projects to address HUD's delay of the Rule. *Id.* ¶¶ 10–12. "With the suspension in effect," OCA explains, "OCA will need to spend significant resources on research, outreach, public education, and advocacy to implement small area market rents 'voluntarily' on a PHA-by-PHA basis across the Hartford metropolitan area, a multi-year effort that may ultimately prove futile." *Id.* ¶ 10. OCA has already changed its activities as a result of the Rule's delay. For example, OCA "planned to produce a Small Area Fair Market Rent web portal which would have included (a) an analysis of the difference between SAFMRs and FMRs across the state, (b) an explanation of SAFMRs, (c) data on the current location of voucher holders, and (d) the results of a time consuming rent study that highlighted the additional units that would become available under the new rent calculation formula." *Id.* ¶ 11. In light of the Rule's delay, OCA is "now taking steps to revise the content of this portal and to instead produce an advocacy piece, based on this data, explaining why the program freeze is detrimental." *Id.* Finally, the Rule's delay has required OCA "to engage in further meetings and other communications with stakeholders to ensure that the impact of this policy suspension is fully understood" and to "spen[d] time conducting outreach to [OCA's] coalition members to explain the freeze and its consequences for voucher holders." *Id.* ¶ 12.

The defendants assert that plaintiffs must show that OCA's claimed monetary loss "threatens the very existence of the movant's business" to support OCA's claims of irreparable economic injury. Defs.' Opp'n at 36 (quoting *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). The defendants misread the authority on which they rely. *Wisconsin Gas Co.* held that "[r]*ecoverable* monetary loss may constitute irreparable harm only where the loss threatens the very existence of the movant's business." 758 F.2d at 674. OCA's monetary losses,

however, are not recoverable, as the APA provides no damages remedy. *See* 5 U.S.C. § 702 (authorizing actions "seeking relief other than money damages"). *Wisconsin Gas Go.* thus is inapposite; to show irreparable harm, OCA need only show that HUD's delay of the Rule will "perceptibly impair[]" OCA's programs and "directly conflict with the organization's mission." *League of Women Voters*, 838 F.3d at 8.  For the reasons given, OCA has made such a showing.

### C.    Balance of Equities and Public Interest

The third and fourth factors that courts consider in determining whether a preliminary injunction is warranted are "a balance of the equities in [the plaintiffs'] favor, and accord with the public interest." *Id.* at 6 (quoting *Pursuing Am.'s Greatness v. FEC*, 831 F.3d at 505).  The harm the plaintiffs would suffer from the Rule's delay is clear, for the reasons explained above. As HUD's counsel acknowledged at oral argument, moreover, the Rule's delay would leave in place the 50th Percentile Rule, which the defendants recognize has failed to serve Section 8's goals.  Hr'g Tr. at 17.  The harms the defendants assert that voucher holders would suffer should HUD implement the Rule on schedule, in contrast, are wholly speculative because they presume the Interim Report's findings apply to Rule-affected areas, which, also for reasons explained earlier, the defendants have failed to show.  The defendants, moreover, "cannot suffer harm from an injunction that merely ends an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013); *accord R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (same). The balance of equities thus weighs in the plaintiffs' favor.  A preliminary injunction's issuance also would serve the public interest.  "There is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters*, 838 F.3d at 12.  "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws"—such as the APA, as well as regulations such as § 888.113(c)(4)—"that govern their existence and

operations." *Id.* (internal quotation marks omitted); *accord Gulf Coast Mar. Supply, Inc. v. United States*, 218 F. Supp. 3d 92, 101 (D.D.C. 2016), *aff'd*, 867 F.3d 123 (D.C. Cir. 2017) ("The public interest is served both by ensuring that government agencies conform to the requirements of the APA."). As such, the plaintiffs have met their burdens to show that the balance of equities and consideration of the public interest support the injunctive relief they seek.

## IV.   CONCLUSION

For the foregoing reasons, the plaintiffs' motion for preliminary injunction is granted. An appropriate Order accompanies this Memorandum Opinion.

**Date:** December 23, 2017

_____
BERYL A. HOWELL
Chief Judge